UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| THE ASSOCIATED PRESS, STATES NEWSROOM d/b/a Indiana Capital Chronicle, GANNETT CO., INC., CIRCLE CITY BROADCASTING I, LLC, and TEGNA INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> RON NEAL, *in his official capacity as the Superintendent of Indiana State Prison*, and LLOYD ARNOLD, *in his official capacity as the Commissioner of the Indiana Department of Correction*, <br><br> *Defendants*. | Case No. 1:25-cv-872 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980) (plurality opinion).

2. This complaint challenges the constitutionality of a provision within the Indiana Code that prohibits Plaintiffs—news organizations that serve as "surrogates for the public," *Richmond Newspapers*, 448 U.S. at 573—from observing executions carried out at Indiana State Prison.

3. Indiana Code § 35-38-6-6(a) and the Defendants' implementation of that provision prohibit Plaintiffs and other, similarly situated members of the press from attending and observing a governmental proceeding that has been historically open to the public or its surrogates in the press, and about which trustworthy first-hand accounts are of immense importance.

4. Indiana's total prohibition on access for the press to attend and witness executions is an outlier among death penalty states and the federal government and severely limits the ability of reporters and news organizations, including Plaintiffs, to exercise their First Amendment rights.

5. Indiana Code § 35-38-6-6(a) thus violates the First Amendment. Plaintiffs, through undersigned counsel, allege and state as follows:

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over Plaintiffs' section 1983 claims pursuant to 28 U.S.C. §§ 1331 and 1343.

7. Venue is proper in the Southern District of Indiana under 28 U.S.C. § 1391(b) because all Defendants are residents of Indiana and Defendant Lloyd Arnold resides in this District in his official capacity as the Commissioner of the Indiana Department of Correction.

## PARTIES

8. Plaintiff The Associated Press is an independent not-for-profit global news organization. The AP is one of the world's most trusted news sources, reaching four billion people per day, including with its coverage of executions carried out across the United States. The AP is incorporated under the laws of New York with its headquarters and principal place of business in New York.

9. Plaintiff States Newsroom d/b/a Indiana Capital Chronicle (the "Capital Chronicle") is a nonprofit news outlet focusing on state policy. Its Creative Commons license allows all media in Indiana and nationwide to republish its content for free. Newspapers, television and radio outlets run Capital Chronicle content hundreds of times per month. Capital Chronicle employs one editor and three reporters full-time, including reporters who gather news about executions taking place in Indiana.

10. Plaintiff Gannett Co., Inc. ("Gannett") is the largest local newspaper company in the United States. It has more than 200 local daily brands in 43 states. In Indiana, Gannett owns and operates through its subsidiaries, including, among others, The Indianapolis Star, the Lafayette Journal & Courier, The Herald-Times in Bloomington, and the South Bend Tribune. These publications employ full-time reporters who gather news on matters of public concern, including news about executions taking place in Indiana.

11. Plaintiff Circle Broadcasting I, LLC ("WISH-TV") is Indiana's only locally owned and operated broadcast and digital news media network. WISH-TV is a statewide television news network offering 80 hours per week of local news and programming and provides around-the-clock information on digital platforms. Circle City Broadcasting I, LLC is a certified Minority Business Enterprise and Black owned business. It employs full-time reporters who gather news on matters of public concern, including news about executions taking place in Indiana

12. Plaintiff TEGNA Inc. ("TEGNA") owns or services (through shared service agreements or other similar agreements) 64 television stations in 52 markets. In Indiana, TEGNA owns and operates WTHR-13, a television station in Indianapolis, Indiana. TEGNA employs full-time reporters who gather news on matters of public concern, including news about executions taking place in Indiana.

13. Defendant Ron Neal is the Superintendent of Indiana State Prison. As Superintendent, Defendant Neal is required under Indiana law to execute death warrants for condemned prisoners, Ind. Code § 35-38-6-2, and to administer Ind. Code § 35-38-6-6. Defendant Neal is sued in his official capacity.

14. Defendant Lloyd Arnold is the Commissioner of the Indiana Department of Correction ("IDOC"). Under his direction and control, IDOC is authorized to adopt rules and

regulations governing execution protocols, Ind. Code § 35-38-6-1(d), and for witness access, Ind. Code § 35-38-6-6(b)–(c). Defendant Arnold is sued in his official capacity.

## FACTUAL ALLEGATIONS

15. Plaintiffs are organizations that gather and publish the news and represent the interests of journalists and news organizations working in Indiana.

16. Plaintiffs' journalists routinely document the manner in which law enforcement officers, the criminal justice system, and correctional institutions perform official duties, including by directly observing the operations of those institutions and reporting on their proceedings.

17. Plaintiffs are in the business of regularly publishing newsworthy information and all employ journalists assigned to cover activities of Indiana's law enforcement, criminal justice system, and correctional institutions on a regular basis. *See, e.g.*, Casey Smith, *New Document Shows Indiana Paid $900,000 for Execution Drug, but Other Details Still Sparse*, Ind. Cap. Chron. (Mar. 26, 2025), https://indianacapitalchronicle.com/2025/03/26/new-document-shows-indiana-paid-900000-for-execution-drug-but-other-details-still-sparse/; Kristine Phillips, *Lawless: Legacy of Racist, Brutal Police Culture Still Plagues City of Elkhart*, The Indianapolis Star (Apr. 29, 2025), https://www.indystar.com/story/news/investigations/2025/04/29/lawless-racist-brutal-cops-wolverines-elkhart-indiana/81925291007/; *see generally* Crime, WTHR-13, https://www.wthr.com/crime (last visited May 2, 2025); Crime Watch 8, WISH-TV, https://www.wishtv.com/crime-watch-8/ (last visited May 2, 2025).

18. For instance, Gannett, through its subsidiary The Indianapolis Star, and TEGNA, through its subsidiary WTHR-13, covered the crime, prosecution, and sentencing of Benjamin Ritchie, whose execution, discussed below, has been scheduled for May 20, 2025. *See, e.g.*, Joe Fahy & Terry Horne, *Beech Grove Policeman Slain*, The Indianapolis Star, Sept. 30, 2000, at 01A; Vic Ryckaert, *Suspect May Face Death Penalty; Prosecutor Puts Process in Motion to Seek Lethal*

*Injection for Man Accused of Killing Police Officer*, The Indianapolis Star, Nov. 2, 2002, at 01B; Steve Jefferson, *Convicted Cop Killer Tells His Story*, WTHR-13 (Aug. 15, 2002) https://www.wthr.com/article/news/convicted-cop-killer-tells-his-story/531-db2acea2-9bc8-4d19-8df9-08c867808ac2; Vic Ryckaert, *Ritchie Gets Death for Murder of Officer; Killer, 22, Laughed as Verdict Was Read; Jury Deliberated for About 3 ½ Hours*, The Indianapolis Star, Aug. 15, 2002, at 01A; Steve Jefferson, *Convicted Cop Killer Gets Death Row*, WTHR-13 (Oct. 15, 2002), https://www.wthr.com/article/news/convicted-cop-killer-gets-death-row/531-8edb2075-3c56-4cd8-8855-b64147db12f8.

19. Similarly, WISH-TV, the Capital Chronicle, and the AP have covered the recent processes leading up to Ritchie's scheduled execution. *See* Jay Adkins, *Indiana Attorney General Seeking Second Execution Date for Convicted Murderer*, WISH-TV (Sept. 27, 2024), https://www.wishtv.com/ news/politics/indiana-attorney-general-seeking-second-execution-date-for-convicted-murderer/; Brady Gibson, *Killer of Beech Grove Police Officer Cites Fetal Alcohol Syndrome to Avoid Execution*, WISH-TV (Dec. 3, 2024), https://www.wishtv.com/news/crime-watch-8/killer-of-beech-grove-police-officer-cites-fetal-alcohol-syndrome-to-avoid-execution/; Todd Richmond, *Indiana Supreme Court Sets May Execution for Man Convicted of Killing Police Officer*, AP News (Apr. 15, 2025), https://apnews.com/article/indiana-execution-date-benjamin-ritchie-murder-c743857b0111b0cece3cfdfc07be8136; Casey Smith, *Clemency Hearings Scheduled for Indiana Death Row Inmate Benjamin Ritchie*, Ind. Cap. Chron. (Apr. 28, 2025), https://indianacapitalchronicle.com/2025/04/28/clemency-hearings-scheduled-for-indiana-death-row-inmate-benjamin-ritchie/.

20. Plaintiff The AP regularly covers executions throughout the United States by sending reporters to observe the proceedings in person. On February 28, 2024, The AP published

a report on the attempted execution of Thomas Creech in Idaho, which was halted "after medical team members repeatedly failed to find a vein where they could establish an intravenous line to carry out the lethal injection." Rebecca Boone, *Idaho Halts Execution by Lethal Injection After 8 Failed Attempts to Insert IV Line*, AP News (Feb. 28, 2024), https://apnews.com/article/idaho-execution-creech-murders-serial-killer-91a12d78e9301adde77e6076dbd01dbb. The AP's reporter Rebecca Boone, who attended the proceeding, reported that "[e]ach attempt took several minutes, with medical team members palpating the skin and trying to position the needles." Creech, age 73, "frequently looked toward his family members and representatives, who were sitting in a separate witness room. His arms were strapped to the table, but he often extended his fingers toward them." *Id.*

21. On January 27, 2024, The AP published a report on the execution of Kenneth Smith in Alabama, which was "the nation's first execution using nitrogen gas." Kim Chandler, *What Happened at the Nitrogen Gas Execution: an AP Eyewitness Account* (Jan. 27, 2024) https://apnews.com/article/death-penalty-nitrogen-gas-alabama-kenneth-smith-54848cb06ce32d4b462a77b1bb25e656. Chandler reported that "Smith began to shake and writhe violently, in thrashing spasms and seizure-like movements, at about 7:58 p.m. The force of his movements caused the gurney to visibly move at least once. Smith's arms pulled against the straps holding him to the gurney. He lifted his head off the gurney and then fell back." *Id.*

22. This coverage required reporter access to witness execution proceedings first-hand. A lack of press access leaves the public with an incomplete understanding of the proceedings.

23. Indiana is one of 27 states with the death penalty, but one of only two states that prohibits media witnesses to its executions. Rebecca Boone, *Indiana Law Shrouds Executions in Secrecy, Prompting New Pushes for Public Oversight*, AP News (Dec. 18, 2024),

https://apnews.com/article/indiana-execution-corcoran-lethal-injection-secret-witness-media-5faa4280831f3e122c13b73595a7c7f4.

24. Indiana Code § 35-38-6-6(a) and Defendants' implementing policy, "ISP 06-26," deny Plaintiffs' reporters access to witness execution proceedings occurring in the state.

25. Defendants' enforcement and implementation of Indiana Code § 35-38-6-6(a) and ISP 06-26 directly burden the exercise of Plaintiffs' First Amendment rights.

26. Indiana Code § 35-38-6-6(a), reproduced in relevant part herein, provides that only certain, limited categories of witnesses may attend executions in the state:

> Only the following persons may be present at the execution:
>
> (1) The warden of the state prison.
>
> (2) The person designated by the warden of the state prison and any assistants who are necessary to assist in the execution.
>
> (3) The prison physician.
>
> (4) One (1) other physician.
>
> (5) The spiritual advisor of the convicted person.
>
> (6) The prison chaplain.
>
> (7) Not more than five (5) friends or relatives of the convicted person who are invited by the convicted person to attend.
>
> (8) Except as provided in subsection (b), not more than eight (8) of the following members of the victim's immediate family who are at least eighteen (18) years of age:
>
>> (A) The victim's spouse.
>>
>> (B) One (1) or more of the victim's children.
>>
>> (C) One (1) or more of the victim's parents.

7

    (D) One (1) or more of the victim's grandparents.

    (E) One (1) or more of the victim's siblings.

Ind. Code § 35-38-6-6(a).

  27. Defendants' implementing policy, ISP 06-26, reproduced in relevant part herein and attached as **Exhibit A**, states that the press "shall not be permitted to witness the execution or to be in the Execution Chamber":

> C. NEWS MEDIA:
>
> 1. The Commissioner or their designee shall designate a Central Office staff person to assist the State Prison in the coordination of media communications. The designated Central Office staff person shall be present at the State Prison to assist with the media during the period preceding the execution. Additionally, the Warden shall designate a staff person to assist with coordinating media activities.
>
> 2. Authorized and properly identified representatives of the news media shall be permitted access to a designated area. Media personnel must remain in the designated area until the execution has been completed. The Warden or designee shall assign a staff person to remain with the media personnel at all times.
>
> 3. Media personnel shall not be permitted to witness the execution or to be in the Execution Chamber. The only exception to this rule is if the offender requests, in writing, that a member or members of the media be present. The name of the individual(s) must then be included on the list of five (5) persons who are invited by the offender to witness the execution.
>
> 4. Under no circumstances will cameras or recorders not under the control of the Department of Correction be permitted in the execution area.

Ind. Dep't of Corr., Indiana State Prison Facility Directive, ISP 06-26: Execution of Death Sentence, Sec. C (June 17, 2024).

  28. Indiana's statutory prohibition on providing access to news reporters at its executions has limited the public's understanding of these proceedings. For example, in 1985, Indiana executed William Vandiver by electrocution. Contemporaneous news reporting relied on

8

the account of a prison doctor, who stated that after an initial administration of 2,300 volts, "[t]he current was applied three more times before [Vandiver] was pronounced dead 17 minutes later." *Man Who Murdered His Father-in-Law Executed in Indiana*, N.Y. Times (Oct. 17, 1985), https://www.nytimes.com/1985/10/17/us/man-who-murdered-his-father-in-law-executed-in-indiana.html. Vandiver's attorney, who witnessed the execution, called the proceeding "outrageous," and a spokesperson for the Department of Correction said the execution "did not go according to plan," but few other details were made available to the public. *Id.*

29. Similarly, in 1996, Indiana executed Tommy Smith by lethal injection. Contemporaneous reporting relied on the account of an Indiana State Prison spokesperson who conveyed that "the primary procedure of putting a catheter in two of the prisoner's extremities could not be completed, so a catheter had to be put in Smith's foot. [The spokesperson] said the procedure caused a 35-minute delay." *Indiana Executes Cop Killer*, United Press Int'l (July 18, 1996), https://www.upi.com/Archives/1996/07/18/Indiana-executes-cop-killer/1496837662400/. Again, few other details were publicly reported.

30. In 2024, Indiana scheduled the execution of Joseph Corcoran, which was to be the state's first execution in 15 years.

31. Upon learning of Corcoran's scheduled execution, The AP contacted the Indiana Department of Correction ("IDOC") and requested information about how to attend the execution. The AP intended to send a reporter to witness the execution so that it could publish reporting on the proceeding. The Chief Communications Officer for IDOC stated that The AP could not attend, citing Indiana Code § 35-38-6-6(a).

32. Similarly, upon learning of Corcoran's scheduled execution, Gannett began covering the story in earnest using court filings, written statements from the Indiana state

government, and interviews with Corcoran's attorneys. Due to Indiana Code § 35-38-6-6(a), Gannett Co. did not formally request to attend Corcoran's execution, but they did send reporter Joseph Dits to cover the proceeding from the parking lot of the Indiana State Prison in Michigan City.

33. Similarly, upon learning of Corcoran's scheduled execution, WISH-TV enlisted a team of journalists, led by Tim Spears, to cover all aspects of the appeals and pre-execution process, including the State's acquisition of the drug pentobarbital. In the days before the execution, Mr. Spears interviewed then-Governor Eric Holcomb and Corcoran attorney Joanna Green regarding Corcoran's execution. Mr. Spears made multiple requests to interview Corcoran before his execution, but Mr. Spears was not granted an interview. Mr. Spears covered the execution from the parking lot outside of Indiana State Prison in Michigan City with two other WISH-TV journalists, but they were not permitted to enter the facility.

34. Similarly, TEGNA, through WTHR-13, was unable to enter the facility to observe the execution of Corcoran, despite its coverage in the days and weeks prior. *See, e.g.*, Rich Nye, *Indiana's First Execution in 15 Years Now 1 Week Away*, WTHR-13 (Dec. 11, 2024), https://www.wthr.com/article/news/crime/indiana-first-execution-in-15-years-now-1-week-away-joseph-corcoran/531-1708882d-b7ac-4ef7-a27f-33cfd6eb9d13.

35. On December 18, 2024, Indiana executed Corcoran.

36. A journalist working for the Capital Chronicle, Casey Smith, was permitted to attend Corcoran's execution because Corcoran designated Smith as one of his "five (5) friends or relatives of the convicted person who are invited by the convicted person to attend." Ind. Code § 35-38-6-6(a)(7); *see also* Ex. A, ISP 06-26(C)(3).

37. In an article published by the Capital Chronicle, Smith reported that "Department of Correction officials said in a statement that 'the execution process started shortly after' 12 a.m. Central Time," and that witnesses were not allowed into the execution room until 12:32 a.m. Casey Smith, *Death Row Inmate Joseph Corcoran Executed for Quadruple Murder*, Ind. Cap. Chron. (Dec. 18, 2024), https://indianacapitalchronicle.com/2024/12/18/death-row-inmate-jospeh-corcoran-executed-for-quadruple-murder/ (attached hereto as **Exhibit B**).

38. Further, Smith reported that "[t]he execution was the first in which Indiana used" only pentobarbital, and that it was "not clear when exactly the execution drug . . . was administered into Corcoran's left arm, via an IV line that protruded from the execution chamber's wall." *Id.*

39. Further, Smith reported that "[b]linds for a one-way window with limited visibility into the execution chamber were raised at 12:34 a.m. Corcoran appeared awake with his eyes blinking, but otherwise still and silent, at that time. After a brief movement of his left hand and fingers at about 12:37 a.m., Corcoran did not move again. Blinds to the witness room were closed by the prison warden at 12:40 a.m." *Id.*

40. Further, Smith reported that "[w]itnesses were unable to hear voices inside the execution chamber; DOC officials said Corcoran's last words were, 'Not really. Let's get this over with.'" *Id.*

41. Further, Smith reported that although IDOC had originally denied a request from Corcoran to permit his spiritual advisor inside the execution chamber, after a lawsuit by Corcoran, "Rev. David Leitzel, Corcoran's Wesleyan minister, was allowed within the execution chamber as Corcoran died." Smith reported that Leitzel said of Corcoran, "his greatest fear was that it would not be peaceful. From my perspective, it was very, very peaceful." *Id.*

42. Further, Smith reported that a "DOC statement was issued at 12:59 a.m., in the minutes following the conclusion of Corcoran's execution, indicating his time of death and last words." *Id.*

43. Smith's reporting "filled in key gaps" in the government's statements about Corcoran's execution proceeding. Liliana Segura, *Indiana's Midnight Executions Are a Relic of Another Age*, The Intercept (Dec. 22, 2024), https://theintercept.com/2024/12/22/indiana-execution-joseph-corcoran-death-penalty/.

44. On or about April 15, 2025, the Indiana Supreme Court scheduled the execution of Benjamin Ritchie for May 20, 2025.

45. Plaintiffs each intend to send a reporter in person to the execution chamber to observe the proceeding on May 20, 2025 and afterwards publish their reporting. However, this proposed course of conduct is prohibited by Indiana Code § 35-38-6-6(a) and Defendants' implementation of that statute.

46. Upon information and belief, the State of Indiana intends to schedule further executions following the execution of Ritchie on May 20, 2025.

47. Upon information and belief, five other individuals in addition to Ritchie are awaiting execution on death row at the Indiana State Prison. Ind. Dep't of Corr., State of Indiana Offenders Sentenced to Death (Nov. 21, 2019) (attached hereto as **Exhibit C**) (noting that a sixth individual on death row is not presently competent for execution); *see also Here's Who's on Indiana's Death Row After the Execution of Joseph Corcoran*, Indianapolis Star (Dec. 18, 2024), https://www.indystar.com/story/news/local/2024/12/18/whos-on-indianas-death-row-after-the-execution-of-joseph-corcoran/77066289007/.

48. Plaintiffs each intend to cover future executions scheduled in Indiana, including by sending their reporters to directly observe proceedings in the execution chamber. Plaintiffs intend to publish the observations of their reporters who witness those in-person proceedings.

49. Plaintiffs' proposed course of conduct is prohibited by Indiana Code § 35-38-6-6(a) and Defendants' implementation of that statute in violation of the First Amendment.

50. Plaintiffs respectfully ask this Court to issue a declaration that Indiana Code § 35-38-6-6(a) and ISP 06-26 are unconstitutional and issue an injunction against their enforcement by Defendants.

## COUNT I
### Deprivation of the Qualified First Amendment Right to Attend and Observe Executions as Surrogates for the Public (As Applied)

51. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

52. Plaintiffs each intend to send a reporter in person to the execution chamber to observe Ritchie's execution proceeding, and any future execution proceedings in the state of Indiana, and publish their reporting.

53. Plaintiffs' proposed course of conduct is protected by the First Amendment, which secures for the public a qualified right of access to certain government proceedings. *Press-Enter. Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"). That right attaches to proceedings (i) which have historically been open to the public, and (ii) where access would serve a significant role in the functioning of the proceeding. *Id.* at 8–9.

54. Plaintiffs' proposed course of conduct is proscribed by Indiana Code § 35-38-6-6(a) and ISP 06-26.

55. Indiana Code § 35-38-6-6(a) and ISP 06-26 deny Plaintiffs access to execution proceedings, which have been historically open to the public. *Cal. First Amend. Coal. v.*

*Woodford*, 299 F.3d 868, 875 (9th Cir. 2002) ("Historically, executions were open to all comers."); *see also El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150 (1993) (the relevant history to consider is not "the particular practice of any one jurisdiction, but instead . . . the experience in that *type* or *kind* of hearing throughout the United States" (citation and internal quotation marks omitted)).

56.  "In early America, as in England, public hangings were the most common method of execution. Public hangings both served as deterrents and symbols of municipal or societal power." Sheherezade C. Malik & D. Paul Holdsworth, *A Survey of the History of the Death Penalty in the United States*, 49 U. Rich. L. Rev. 693, 696 (2015); *see also Woodford*, 299 F.3d at 875.

57.  The tradition of public hangings continued well after the founding. In New York, for instance, large public executions were carried out until the state legislature adopted a private execution statute in 1835. John D. Bessler, *Televised Executions and the Constitution: Recognizing A First Amendment Right of Access to State Executions*, 45 Fed. Commc'ns L.J. 355, 361–62 (1993). "According to one account, at the last public hanging in Philadelphia, which took place on May 19, 1837, an estimated crowd of 20,000 people witnessed the execution of nineteen-year-old James Moran." *Id.* at 359; *see also Woodford*, 299 F.3d at 875.

58.  "When executions were moved out of public fora and into prisons, the states implemented procedures that ensured executions would remain open to some public scrutiny. In abolishing public executions in 1858, for example, California provided that a minimum of 'twelve respectable citizens' should be present at the private execution." *Woodford*, 299 F.3d at 875.

59. The United States government carries out its executions in Indiana, at United States Penitentiary Terre Haute. Up to "ten representatives of the press" are permitted at federal executions, including those conducted in Indiana. 28 C.F.R. § 26.4.

60. Indiana Code § 35-38-6-6(a) and ISP 06-26 prohibit a core purpose for public access to executions: "Independent public scrutiny—made possible by the public and media witnesses to an execution—[which] plays a significant role in the proper functioning of capital punishment. An informed public debate is critical in determining whether execution by lethal injection comports with the evolving standards of decency which mark the progress of a maturing society." *Woodford*, 299 F.3d at 876 (citation and internal quotation marks omitted).

61. The public must have reliable information about the execution in order to take part in that "informed public debate." That information "is best gathered first-hand or from the media, which serves as the public's surrogate." *Id.*

62. In addition, "public observation of executions fosters the same sense of catharsis that public observation of criminal trials fosters. Although this may reflect the dark side of human nature, the Supreme Court has recognized that the public must be permitted to see justice done, lest it vent its frustration in extralegal ways." *Id.* at 877 (citing *Richmond Newspapers*, 448 U.S. at 571–72).

63. The First Amendment, made applicable to the states through the Fourteenth Amendment, guarantees the public a qualified right of access to executions.

64. Plaintiffs are "surrogates for the public." *Richmond Newspapers*, 448 U.S. at 573. "While media representatives enjoy the same right of access as the public, they often are provided special seating and priority of entry so that they may report what people in attendance have seen and heard." This "contribute[s] to public understanding of the rule of law and to comprehension

of the functioning of the entire criminal justice system." *Id.* (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring in judgment)).

65. Upon information and belief, Defendants cannot make the fact showing necessary to overcome Plaintiffs' qualified right of access to future executions.

66. Defendants, through their implementation of Indiana Code § 35-38-6-6(a), will deprive Plaintiffs and others similarly situated of their First Amendment right to access upcoming executions, including the May 20, 2025 execution of Benjamin Ritchie.

67. Accordingly, Plaintiffs seek declaratory and injunctive relief under 42 U.S.C. § 1983 to prevent Defendants from depriving Plaintiffs of their First Amendment right to attend and observe executions carried out by the State of Indiana.

## COUNT II
**Deprivation of Rights Under the Press Clause of the First Amendment (As Applied)**

68. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

69. Defendants, through their enforcement and implementation of Indiana Code § 35-38-6-6(a), are treating non-media witnesses—namely, friends and relatives of the condemned, the spiritual advisor of the condemned, and relatives of the victim—more favorably than members of the press. Indeed, ISP 06-26 singles out the press for disfavorable treatment, stating "Media personnel shall not be permitted to witness the execution or to be in the Execution Chamber."

70. The First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. 1.

71. Just as "[a] law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021), a law also lacks general applicability if it restricts the freedom of the press while permitting conduct by other actors that would undermine the government's asserted interest in a similar way. Strict scrutiny is triggered in either situation. *Id.* at 533; *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) ("Differential taxation of the press, then, places such a burden on the interests protected by the First Amendment that we cannot countenance such treatment unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation.").

72. Similarly, just as a regulation is "not neutral and generally applicable, and therefore trigger[s] strict scrutiny under the Free Exercise clause," if it treats a secular activity "more favorably" than comparable religious exercise, *Tandon v. Newsom*, 593 U.S. 61, 62 (2021), strict scrutiny is also the appropriate standard when a regulation restricts the freedom of the press (or freedom of speech) while permitting conduct by other actors more favorably. *See Minneapolis Star & Trib. Co.*, 460 U.S. at 585 ("[D]ifferential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional.").

73. This analysis is not changed by the fact that members of the public not named in Indiana Code § 35-38-6-6(a) are *also* treated as disfavorably as the press. *Tandon*, 593 U.S. at 62 ("It is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue.").

74. Upon information and belief, Defendants cannot demonstrate that Indiana Code § 35-38-6-6(a) and their implementing policy are narrowly tailored in pursuit of a compelling governmental interest.

75. Defendants, through their implementation of Indiana Code § 35-38-6-6(a), will continue to unfavorably single out the press by depriving it of access to the May 20, 2025 execution of Benjamin Ritchie, and future executions thereafter, while affording that access to non-media witnesses.

76. Accordingly, Plaintiffs seek declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 to prevent Defendants from depriving Plaintiffs of their rights under the Press Clause of the First Amendment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request from this Court:

A. A declaratory judgment that Indiana Code § 35-38-6-6(a) and ISP 06-26 violate the First Amendment of the Constitution on its face and as applied to Plaintiffs and other, similarly situated members of the press;

B. An injunction restraining Defendants from enforcing Indiana Code § 35-38-6-6(a) and ISP 06-26 against members of the press, and requiring Defendants to permit Plaintiffs and other members of the press to access the execution of Benjamin Ritchie and future executions conducted by the State of Indiana in Indiana State Prison;

C. An award of attorney's fees pursuant to 42 U.S.C. § 1988;

D. Costs of suit; and

E. Such other and further relief as the Court may deem just and proper.

Dated:  May 5, 2025

/s/ *Kristopher L. Cundiff*
Kristopher L. Cundiff
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
PO Box 150
Fishers, IN 46038
Tel: (463) 271-4676
Fax: (202) 795-9310
kcundiff@rcfp.org

Lin Weeks*
Elizabeth J. Soja*
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Tel: (202) 800-3533
Fax: (202) 795-9310
lweeks@rcfp.org
esoja@rcfp.org
*Pro hac vice application forthcoming*

*Counsel for Plaintiffs*