**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

THE ASSOCIATED PRESS, STATES
NEWSROOM d/b/a Indiana Capital Chronicle,
GANNETT CO., INC., CIRCLE CITY
BROADCASTING I, LLC, and TEGNA INC.,

        *Plaintiffs*,

    v.

RON NEAL, *in his official capacity as the
Superintendent of Indiana State Prison*, and
LLOYD ARNOLD, *in his official capacity as
the Commissioner of the Indiana Department
of Correction*,

        *Defendants*.

Case No. 1:25-cv-872-JMS-MJD

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

Kristopher L. Cundiff
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
PO Box 150
Fishers, IN 46038
Tel: (463) 271-4676
Fax: (202) 795-9310
kcundiff@rcfp.org

Lin Weeks*
Elizabeth J. Soja*
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Tel: (202) 795-9300
Fax: (202) 795-9310
lweeks@rcfp.org
esoja@rcfp.org
*admitted pro hac vice*

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................. 3

    A.    Plaintiffs are members of the press who frequently report on law enforcement and the criminal justice system, including executions in Indiana. .......................... 3

    B.    Defendants' enforcement and implementation of Indiana Code § 35-38-6-6(a) prevented all but one member of the press from attending the execution of Joseph Corcoran. ................................................................ 4

    C.    Defendants' enforcement and implementation of Indiana Code § 35-38-6-6(a) will prevent the press from attending execution proceedings in Indiana. ....... 5

STANDARD OF REVIEW .......................................................................................... 6

ARGUMENT ............................................................................................................... 7

I.    Plaintiffs are likely to succeed on the merits of their claims that Indiana Code § 35-38-6-6(a) and ISP 06-26 deprive them of their First Amendment rights. ................. 7

    A.    Indiana Code § 35-38-6-6(a) and ISP 06-26, as applied to Plaintiffs, violate their First Amendment right to attend criminal proceedings (Count I). ................ 7

        1.    Plaintiffs have a presumptive right of access to executions under *Press-Enterprise II.* ............................................................................ 7

            a.    The United States has a strong historical tradition of permitting the press to witness executions. ................................... 11

            b.    Permitting Plaintiffs and other, similarly situated members of the press to attend future executions in Indiana is essential to the proper functioning of those proceedings. ............ 13

        2.    Defendants cannot overcome Plaintiffs' presumptive right of access to executions. .......................................................................... 15

    B.    Indiana Code § 35-38-6-6(a) and ISP 06-26, as applied to Plaintiffs, violate the Press Clause of the First Amendment by treating members of the press less favorably than some members of the public (Count II). ................. 17

        1.    Indiana Code § 35-38-6-6(a) and ISP 06-26 are not neutral and generally applicable. ................................................................ 18

        2.    Defendants cannot overcome strict scrutiny. ............................................. 19

II.    The remaining preliminary injunctive factors favor granting relief. ................................ 20

CONCLUSION ............................................................................................................. 20

## INTRODUCTION

Benjamin Ritchie was convicted of murder and sentenced to death in 2002 after shooting a police officer, William Toney, who had apprehended Ritchie and a companion in a van they had stolen in Beech Grove. *Ritchie v. State*, 254 N.E.3d 1064, 1064–65 (Ind. 2025). Ritchie's crime, and the criminal case that followed, has been the subject of intense public interest since it occurred in 2000. The public followed day-by-day accounts of Ritchie's trial reported by members of the press who attended the proceedings. ECF 9, Compl. ¶ 18. It learned that Ritchie would be sentenced to death through stories filed by journalists who attended his sentencing hearing. *Id.* And last week, the public was informed that Ritchie expressed remorse, shed tears, and pleaded for clemency from the Indiana Parole Board through press accounts of a hearing held in Indiana State Prison ("ISP") and livestreamed to the public. *See* Smith Decl. ¶ 34; Nye Decl. ¶¶ 23–24.[1]

Ritchie's execution, set for May 20, 2025, will be the second in Indiana carried out in the last six months after a fifteen-year hiatus ended with the execution of Joseph Corcoran in December 2024. It will also be the second that the Indiana Department of Correction ("IDOC") has carried out using a single-drug protocol in which pentobarbital is administered intravenously.[2] But next week, due to Indiana Code § 35-38-6-6(a) and Defendants' policy implementing that statute, Ind. Dep't of Corr., Indiana State Prison Facility Directive, ISP 06-26: Execution of Death Sentence, Sec. C (June 17, 2024) (hereinafter "ISP 06-26"); ECF 9-1, Compl. Ex. A, it is virtually certain that no member of the press will be in attendance to report to the public on Ritchie's execution. The closest the public will come to a first-hand account of the execution will likely be

---

[1]     Casey Smith, *'I am so Sorry': Clemency Hearings Begin for Indiana Death Row Inmate Benjamin Ritchie*, Ind. Cap. Chron. (May 6, 2025), https://indianacapitalchronicle.com/2025/05/06/i-am-so-sorry-clemency-hearings-begin-for-indiana-death-row-inmate-benjamin-ritchie/.

[2]     *See* Smith Decl. ¶ 4; *see also* Compl. Ex. A, App'x A § B.2.

a statement written by IDOC and left in a mailbox in ISP's parking lot for the assembled press to read and—IDOC hopes—transcribe.  Tareen Decl. ¶¶ 14–17; Spears Decl. ¶ 13; Smith Decl. ¶ 16.

This is unconstitutional for two reasons.  ***First***, it deprives Plaintiffs, in their role as "surrogates for the public," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion), of their ability to observe the execution proceeding.  Executions are a proceeding that disinterested public observers, including the press, have historically been permitted to attend, and their first-hand reporting plays a significant positive role in the functioning of executions.  Under the test set out by the Supreme Court in *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"), those factors mean that the public is vested with a qualified constitutional right of access to observe execution proceedings.  If Defendants cannot overcome that qualified right under the appropriate standard—and here, they almost certainly cannot—the law and policy preventing Plaintiffs from attending execution proceedings violate their constitutional rights.  And ***second***, Indiana Code § 35-38-6-6(a) and ISP 06-26 provide exceptions for certain individuals—friends and relatives of the condemned, the spiritual advisor of the condemned, and relatives of the victim—but *not* the press.  Because there is no compelling and narrowly tailored reason for disadvantaging the freedom of the press in that manner, Defendants' enforcement of the statute and policy violates the First Amendment's Press Clause.

Preliminary injunctive relief is appropriate.  Plaintiffs will suffer irreparable harm if they are not permitted to attend executions in Indiana, including Ritchie's, that occur during the pendency of this lawsuit.  The public interest heavily favors trustworthy first-person accounts of executions, and Defendants will suffer no harm from the relief sought.  Most importantly, Plaintiffs are likely to prevail on the merits of their constitutional claims.  The law and policy that prevent press access to executions in Indiana are extreme outliers, both historically and in present day.  In

fact, when the federal government carries out its own executions at United States Penitentiary, Terre Haute ("USP Terre Haute"), it does so pursuant to regulations that ensure up to eight members of the public and ten members of the press attend and bear witness. 28 C.F.R. § 26.4. Accordingly, Plaintiffs respectfully request that this Court bar Defendants from enforcing Indiana Code § 35-38-6-6(a) and require that Plaintiffs, and other similarly situated members of the press, be permitted to attend executions until a decision in this case is reached.

## BACKGROUND

### A. Plaintiffs are members of the press who frequently report on law enforcement and the criminal justice system, including executions in Indiana.

Plaintiffs are organizations that gather and report news in Indiana. Compl. ¶¶ 8–12. Each employs professional journalists who are assigned to cover government proceedings—including proceedings involving law enforcement, the criminal justice system, and corrections. *Id.* ¶¶ 15–20. And each has a well-documented history of assigning its reporters to cover capital punishment carried out by the State of Indiana. *See, e.g.*, *id.* ¶ 23. Nine journalists currently or formerly employed by Plaintiffs have submitted declarations in support of Plaintiffs' motion:

- **Sophia Tareen**, a reporter for The AP responsible for covering Northwest Indiana. Tareen reported on Joseph Corcoran's death sentence and intends to report on the execution of Benjamin Ritchie at ISP. Tareen Decl. ¶¶ 1–3, 6, 36.

- **Thomas J. Coyne**, a former reporter for The AP based in Northern Indiana. Coyne covered eleven state executions in Indiana from 2001 to 2007. Coyne Decl. ¶¶ 1–4.

- **Niki Kelly**, the Editor-in-Chief of the Indiana Capital Chronicle, who spent 26 years working at the Fort Wayne Gazette. Kelly has reported on state and federal executions in Indiana, including that of Timothy McVeigh at USP Terre Haute in 2001. Kelly Decl. ¶¶ 1–2, 5.

- **Casey Smith**, an investigative journalist with the Indiana Capital Chronicle. Smith was the only journalist who attended the execution of Corcoran; she did so at Corcoran's invitation under a provision of Indiana Code § 35-38-6-6(a) that permits up to five "friends or relatives" of the condemned individual to attend. Smith intends to cover Ritchie's execution. Smith Decl. ¶¶ 1, 13–14, 34–37; *see* Ind. Code § 35-38-6-6(a)(7).

- **Kristine Phillips**, an investigative reporter for the Indianapolis Star ("IndyStar"), a publication of Gannett Co., Inc. Phillips has covered federal executions, and she wrote about Corcoran's life and case in the months preceding his execution. Phillips intends to cover Ritchie's execution. Phillips Decl. ¶¶ 1, 5, 11–12, 18–19.

- **Joseph Dits**, a reporter for the South Bend Tribune, a publication of Gannett Co., Inc. Dits covered Corcoran's execution and reported on the protests taking place during that execution outside ISP. Dits Decl. ¶¶ 1, 9.

- **Jennie Runevitch**, the weekend anchor at WTHR, a station owned by TEGNA Inc. Runevitch, who has been a reporter and anchor for nearly two decades, attended the 2005 execution of Alan Matheney in ISP at Matheney's invitation under Indiana Code § 35-38-6-6(a)(7).Runevitch Decl. ¶¶ 1, 5.

- **Rich Nye**, a reporter at WTHR. Nye was a personal acquaintance of Ritchie's victim, officer Toney, and he has reported on Ritchie's crime multiple times, including for stories about the death penalty and officers killed while on duty. Nye covered Corcoran's execution and intends to cover Ritchie's execution. Nye Decl. ¶¶ 1, 12, 21–22, 25.

- **Tim Spears**, a weekend evening anchor and investigative journalist at WISH-TV, a station owned by Circle City Broadcasting I, LLC. Spears covered the execution of Corcoran and intends to cover Ritchie's execution. Spears Decl. ¶¶ 1, 7, 23.

**B.    Defendants' enforcement and implementation of Indiana Code § 35-38-6-6(a) prevented all but one member of the press from attending the execution of Joseph Corcoran.**

In 2024, Indiana scheduled the execution of Joseph Corcoran, which was to be the state's first execution in 15 years. *See* Nye Decl. ¶ 10; Whitney Downard & Niki Kelly, *State Seeks Execution Date for Convicted Fort Wayne Murderer*, Ind. Cap. Chron. (June 26, 2024), https://indianacapitalchronicle.com/2024/06/26/states-seeks-execution-date-for-convicted-fort-wayne-murderer/. It quickly became apparent that Indiana Code § 35-38-6-6(a) and Defendants' implementing policy, ISP 06-26, would severely limit Plaintiffs' ability to cover that proceeding. Indiana Code § 35-38-6-6(a) provides that only certain, limited categories of witnesses may attend executions in the state. And similarly, ISP 06-26 states that the press "shall not be permitted to witness the execution or to be in the Execution Chamber." Compl. Ex. A § C.3.

Plaintiffs—with the exception of the Capital Chronicle—were unable to access the

execution of Corcoran to observe the proceeding in person.[3]  The AP contacted IDOC and asked if it would permit media witnesses to Corcoran's execution.  Tareen Decl. ¶ 8.  IDOC responded that Indiana Code § 35-38-6-6(a) prevented the agency from permitting media witnesses, and that "[a]ny modifications to this law, including adding media witnesses, would require legislative action and cannot be changed at the discretion of the department or its leaders."  Tareen Decl. ¶ 8, Attach. 3.  Other outlets did not request to access the execution proceeding because they were aware that they would be prevented from attending by IDOC's implementation of the statute. Phillips Decl. ¶ 11; Nye Decl. ¶ 15; Spears Decl. ¶ 10.  Instead of first-person reporting, these outlets covered the December 2024 execution of Corcoran—the first ever carried out under a new drug protocol—from ISP's parking lot.  Tareen Decl. ¶ 14; Spears Decl. ¶ 13; Dits Decl. ¶ 13; *see also* Smith Decl. ¶¶ 4, 15–16.  IDOC officials communicated with the assembled press through email and by silently placing written information in a box marked "media statements.".  Tareen Decl. ¶ 16; Smith Decl. ¶ 16.  The assembled press learned that Corcoran had been executed through those same channels.  Tareen Decl. ¶ 20; Phillips Decl. ¶ 14, Attach. 4; Dits Decl. ¶ 14.

### C.    Defendants' enforcement and implementation of Indiana Code § 35-38-6-6(a) will prevent the press from attending execution proceedings in Indiana.

Plaintiffs have extensively covered Ritchie's crime, prosecution, and now, his impending execution.  *See* Compl. ¶ 18–19.  On April 15, 2025, the Indiana Supreme Court set an execution date for Ritchie of May 20, 2025, by issuing an order that "constitutes the warrant for execution described in Indiana Code sections 35-38-6-2, -3, and -8."  *Ritchie*, 254 N.E.3d at 1065.  It denied Ritchie's request for a rehearing on April 30, 2025.  *Ritchie v. State*, No. 24S-SD-342, 2025 WL 1248038 (Ind. Apr. 30, 2025).  The Supreme Court warrant directed that "[t]he superintendent of

---

[3]     A reporter for the Capital Chronicle was invited to attend in person by Corcoran.  Smith Decl. ¶¶ 13–17.

the Indiana State Prison . . . carry out the execution in accordance with law." *Ritchie*, 254 N.E.3d at 1065. In recent weeks, Plaintiffs have continued to cover Ritchie's case, including a clemency hearing held at ISP and livestreamed publicly on May 5, 2025. Smith Decl. ¶¶ 34–36; Nye Decl. ¶¶ 22–24. Although Plaintiffs intend to observe Ritchie's execution in person to report on the events that occur during that proceeding, Defendants' enforcement of Indiana Code § 35-38-6-6(a) and ISP 06-26 will prevent them from doing so. Smith Decl. ¶¶ 36–39; Nye Decl. ¶¶ 26–28; Tareen Decl. ¶¶ 36–39; Phillips Decl. ¶¶ 18–19; Spears Decl. ¶¶ 23–24. And although no further executions are currently scheduled, five other individuals on death row are awaiting executions. ECF 9-3, Compl. Ex. C. Indiana Code § 35-38-6-6(a) and ISP 06-26 will similarly prevent Plaintiffs from attending any future execution proceedings ordered by the Indiana Supreme Court.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "[I]n First Amendment cases, 'the likelihood of success on the merits will often be the determinative factor,'" *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012)), because "even short deprivations of First Amendment rights constitute irreparable harm," *Higher Soc'y of Ind. v. Tippecanoe Cnty.*, 858 F.3d 1113, 1116 (7th Cir. 2017), and "injunctions protecting First Amendment freedoms are always in the public interest," *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

## ARGUMENT

I.    **Plaintiffs are likely to succeed on the merits of their claims that Indiana Code § 35-38-6-6(a) and ISP 06-26 deprive them of their First Amendment rights.**

    A.    **Indiana Code § 35-38-6-6(a) and ISP 06-26, as applied to Plaintiffs, violate their First Amendment right to attend criminal proceedings (Count I).**

Under the analysis set forth in *Press-Enterprise II*, executions conducted by the State of Indiana are government proceedings to which a qualified First Amendment right of access attaches. Defendants likely cannot overcome that qualified right.

        1.    **Plaintiffs have a presumptive right of access to executions under *Press-Enterprise II*.**

In Indiana, executions are criminal justice proceedings initiated under judicial authority and administered by a state agency. To commence an execution, "[t]he court in which a death sentence is ordered shall issue a warrant . . . that orders the warden to execute the convicted person at a specified time and date in the state prison." Ind. Code § 35-38-6-2.[4] IDOC is permitted by statute to "adopt rules" to govern the execution; those rules document the procedure by which executions are carried out. *See generally* Compl. Ex. A (ISP 06-26). The procedure has all the hallmarks of other administrative proceedings; IDOC specifies record keeping practices, *id.* § H, requires a log of "steps taken during the execution process," *id.* § I.7, requires that the execution order be read to the condemned offender, *id.* § I.7.i, and specifies when and how various IDOC employees should carry out their roles, *id.* § I.7.j–p.

In a series of decisions throughout the 1980s, the Supreme Court established a "general First Amendment right of access" to criminal proceedings, culminating with the announcement of two "complementary considerations" that lower courts must use to determine whether a qualified

---

[4]    *See also Ritchie*, 254 N.E.3d at 1065; *see generally* Ind. Code §§ 35-38-6-1 *et seq.* (codifying execution procedure within article for "Proceedings Following Dismissal, Verdict, or Finding").

right attaches to "the particular proceeding in question." *Press-Enterprise II*, 478 U.S. at 8–9. Those considerations are (i) "whether the place and process have historically been open to the press and general public," and (ii) "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* at 8; *In re Associated Press*, 162 F.3d 503 (7th Cir. 1998). The development of this doctrine illuminates its applicability to this case. In *Richmond Newspapers, Inc. v. Virginia*, the Supreme Court held that a trial judge violated the First Amendment when he relied on a statute to prohibit the public, including newspaper reporters, from attending a murder trial, explaining "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." 448 U.S. at 572. The Court's reasoning was elucidated in *Globe Newspaper Co. v. Superior Court*, which held that "[u]nderlying the First Amendment right of access to criminal trials is the common understanding that 'a major purpose of that Amendment was to protect the free discussion of governmental affairs.'" 457 U.S. 596, 604 (1982) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)); *see United States v. Peters*, 754 F.2d 753, 758–59 (7th Cir. 1985) (noting access right is derived from "'core purpose'" of First Amendment to "assuring free public discussion").

The Court soon made clear that this "major purpose" of the First Amendment did not inhere only in access to criminal trials, but that it extended to other government proceedings—especially, but not necessarily exclusively, those similarly conducted under the state's authority to enforce criminal law. In *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) ("*Press-Enterprise I*"), the Court determined that the "guarantees of open public proceedings" cover *voir dire* proceedings in criminal cases. *Id.* at 501. And in *Press-Enterprise II*, the Court announced a standard for lower courts to apply, holding that "[i]f the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches."

478 U.S. at 9.  Under that rubric, the Seventh Circuit has extended the qualified constitutional right of access first established in *Richmond Newspapers* to an array of proceedings.  *E.g.*, *United States v. Eppinger*, 49 F.3d 1244 (7th Cir. 1995) (sentencing hearings); *United States v. Danovaro*, 877 F.2d 583 (7th Cir. 1989) (plea hearings); *see also In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302 (7th Cir. 1984) (civil proceedings) (applying *Press-Enterprise I* and *Globe Newspaper*); *Fort Wayne J.-Gazette v. Baker*, 788 F. Supp. 379 (N.D. Ind. 1992) (guardianship proceedings).[5]

Courts elsewhere have held that the qualified constitutional right of access attaches to execution proceedings.  In *California First Amendment Coalition v. Woodford*, the Ninth Circuit held that the public has a qualified "First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death."  299 F.3d 868, 877 (9th Cir. 2002); *see also Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012) (applying *Woodford* to Idaho execution access procedure); *First Amend. Coal. of Ariz., Inc. v. Ryan*, 938 F.3d 1069, 1075 (9th Cir. 2019) (applying *Woodford* to Arizona execution procedure); *Associated Press v. Tewalt*, No. 1:24-cv-00587-DKG, 2025 WL 1237762, at *4–8, 14 (D. Idaho Apr. 29, 2025) (granting preliminary injunction and finding qualified constitutional right of access to preparation and administration of lethal injection drugs).  Similarly, in *Philadelphia Inquirer v. Wetzel*, the district court found that the public has a qualified right of access to execution proceedings and preliminarily enjoined a protocol in which a curtain periodically blocked observers' view of the execution chamber.  906 F. Supp. 2d 362, 368 (M.D. Pa. 2012).

---

[5]    While the Seventh Circuit has never had occasion to determine whether the public has a qualified constitutional right to access execution proceedings, it has implied in passing that *Richmond Newspapers* and its progeny would control its inquiry if the public had no statutory right of access.  *Wis. Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614, 627 (7th Cir. 2011) ("[T]he public and media often have the right—either by statute or even the Constitution (see *Richmond Newspapers, Inc. v. Virginia*, [448 U.S. 555 (1980)])—to attend a public proceeding *like an execution or trial*." (emphasis added)).

Plaintiffs are aware of three district court decisions in the post-*Press-Enterprise II* era that have held otherwise. Two of these cases misunderstood and misapplied a separate line of Supreme Court caselaw; the third erred for a different reason.[6] Specifically, *BH Media Group, Inc. v. Clarke*, 466 F. Supp. 3d 653 (E.D. Va. 2020), *vacated as moot*, 851 F. App'x 368 (4th Cir. 2021), and *Oklahoma Observer v. Patton*, 73 F. Supp. 3d 1318 (W.D. Okla. 2014), erred by treating a line of cases from the 1970s as controlling over the public right of access to government proceedings in *Richmond Newspapers* and its progeny. *See BH Media Grp.*, 466 F. Supp. 3d at 660–65 (discussing *Pell v. Procunier*, 417 U.S. 817 (1974), and *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978)); *Okla. Observer*, 73 F. Supp. 3d at 1323–24, 1330–32 (same). These decisions incorrectly viewed *Press-Enterprise II* as a cabined exception to *Pell* and *Houchins*, rather than applying its framework to determine whether there is a qualified constitutional right to access a particular proceeding. *Richmond Newspapers*, 448 U.S. at 586–87 (Brennan, J., concurring).

The Seventh Circuit has avoided this error. *See, e.g.*, *Eppinger*, 49 F.3d at 1252–53; *Danovaro*, 877 F.2d 583; *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893 (7th Cir. 1994); *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302. And rightly so—*Press-Enterprise II* directly instructs that its framework is applicable to a broad range of "criminal proceedings." 478 U.S. at 8–10; *see also id.* at 27–28 (Stevens, J., dissenting) ("In fact, the logic of the Court's access right extends even beyond the confines of the criminal justice system to encompass proceedings held on the civil side of the docket as well. . . . [T]he *ratio decidendi* of today's decision knows no bounds."). Moreover, there is a major difference between previous execution access cases—

---

[6] The court in *Arkansas Times, Inc. v. Norris* assumed without deciding that *Press-Enterprise II* was the correct framework for its analysis, but erroneously limited its analysis of the history of Arkansas, without considering the prevailing history throughout the United States. No. 07-cv-195, 2008 WL 110853, at *4 (E.D. Ark. Jan. 7, 2008); *cf. El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150 (1993) ("[T]he 'experience' test of *Globe Newspaper* does not look to the particular practice of any one jurisdiction, but instead to the experience in that *type* or *kind* of hearing throughout the United States[.]" (citation and internal quotation marks omitted)).

however decided—and this one.  In each case discussed *supra*, the press or public asked a court to permit *additional* access—beyond that *already permitted* to disinterested public observers.  This case presents a much easier constitutional question.  Indiana Code § 35-38-6-6(a) provides no access at all for Plaintiffs, nor, indeed, anyone not connected with the proceeding through a relationship with the condemned or the victim, or through employment with IDOC or ISP.  Tareen Decl. ¶¶ 14–15; Spears Decl. ¶ 13; Dits Decl. ¶¶ 11–13; *see also* Smith Decl. ¶¶ 13–15.

### a.    The United States has a strong historical tradition of permitting the press to witness executions.

The experience prong of *Press-Enterprise II* favors Plaintiffs because access to executions has historically been provided to the public, including members of the press.  In present day, Indiana is an extreme outlier; among the twenty-seven states that carry out executions, only Indiana and Wyoming restrict access to the press and public so severely.  Compl. ¶ 23; Ind. Code § 35-38-6-6(a); Wyo. Stat. § 7-13-908.  Of the other twenty-five death penalty states, nearly all have enacted a statutory requirement that public witnesses—often specified as members of the press—be permitted to attend.[7]  Even those states that don't *statutorily* require public or press witnesses instead have promulgated policies or rules allowing press access.[8]  The federal government—which *carries out its executions exclusively in Indiana*—also requires access for the press and public—up to "ten representatives of the press" and "eight citizens" may be present at federal executions taking place at USP Terre Haute.  28 C.F.R. § 26.4(c)(4)(i)–(ii).

---

[7]    *See, e.g.*, Ky. Rev. Stat. § 431.250; Ohio Rev. Code § 2949.25; Ala. Code § 15-18-83; Fla. Stat. § 922.11; Miss. Code § 99-19-55; Mont. Code § 46-19-103; Neb. Rev. Stat. § 83-970; 22 Okla. Stat. § 1015; Ore. Rev. Stat. § 137.473; S.C. Code § 24-3-550; S.D. Code § 23A-27A-34; Tenn. Code § 40-23-116; Utah Code § 77-19-11.

[8]    Those states are Texas and Georgia; both have policies in place that specifically permit press access. *Compare* Tex. Code Crim. Proc. art 43.20, *with Viewing Executions*, Tex. Dep't of Crim. Just., https://www.tdcj.texas.gov/divisions/vs/viewing_executions.html (last visited May 12, 2025); *compare* Ga. Code § 17-10-41, *with For Media – Access for Scheduled Executions*, Ga. Dep't of Corr., https://gdc.georgia.gov/media/media-access-scheduled-executions (last visited May 12, 2025).

This is not a new development.  Compl. ¶ 58.  Kentucky, for example, has a statutory tradition of permitting press access to its executions dating to at least 1910.  1910 Ky. Acts 112 (permitting "one representative of every newspaper published in the county in which the condemned was convicted, and one representative of every daily newspaper published in the State" to be present at the execution) (attached hereto as **Exhibit A**).  Ohio's statutory tradition dates to at least 1885.  1885 Ohio Laws 170 (permitting "a reporter for each one of the two leading newspapers of opposite politics published in said county that the sheriff may designate" to be present at the execution) (attached hereto as **Exhibit B**).  More broadly, there is a tradition of providing public access to executions in the United States that bridged the historical shift in the mid- to late-1800s from hangings in the public square to the proceedings more characteristic of the 1900s and present day.  *Woodford*, 299 F.3d at 875; *First Amend. Coal. of Ariz.*, 938 F.3d at 1075–76; *Phila. Inquirer*, 906 F. Supp. 2d at 370.

Dating back further still, "[i]n early America, as in England, public hangings were the most common method of execution."  Sheherezade C. Malik & D. Paul Holdsworth, *A Survey of the History of the Death Penalty in the United States*, 49 U. Rich. L. Rev. 693, 696 (2015); *see also Woodford*, 299 F.3d at 875.  In New York, for instance, large public executions were carried out until the state legislature adopted a private execution statute in 1835.  John D. Bessler, *Televised Executions and the Constitution: Recognizing A First Amendment Right of Access to State Executions*, 45 Fed. Commc'ns L.J. 355, 361–62 (1993).  And "[a]ccording to one account, at the last public hanging in Philadelphia, which took place on May 19, 1837, an estimated crowd of 20,000 people witnessed the execution of nineteen-year-old James Moran."  *Id.* at 359.

The geographically encompassing review set forth above is the right one—the Court may not limit its historical analysis to the history of executions in Indiana.  In *El Vocero de Puerto Rico*

*v. Puerto Rico*, the Supreme Court held that a Puerto Rican court's flawed "reliance on Puerto Rican tradition" to find that no First Amendment right of access attached to a criminal pretrial hearing was reversible error, explaining "the 'experience' test . . . does not look to the particular practice of any one jurisdiction, but instead to the experience in that *type* or *kind* of hearing throughout the United States[.]" 508 U.S. 147, 150 (1993) (citation and internal quotation marks omitted). While the history of public access to execution proceedings in Indiana is mixed, given ongoing access at USP Terre Haute, the history of public access to such proceedings *throughout the United States* makes plain that disinterested members of the public, and their surrogates in the press, have historically been permitted to access executions.

> **b.    Permitting Plaintiffs and other, similarly situated members of the press to attend future executions in Indiana is essential to the proper functioning of those proceedings.**

The "logic" prong of *Press-Enterprise II* will also be met by Plaintiffs because "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8. Permitting Plaintiffs to access execution proceedings as surrogates for the public will ensure that executions are competently and humanely administered, inform public debate on a topic of intense interest, and "provid[e] an outlet for community concern, hostility, and emotion." *Richmond Newspapers*, 448 U.S. at 571. Indeed, enjoining enforcement of Indiana Code § 35-38-6-6(a) and ISP 06-26 will help the public evaluate whether Indiana's lethal injection procedure is competently administered and consistent with the Eighth Amendment. *Woodford*, 299 F.3d at 876; *see also Phila. Inquirer*, 906 F. Supp. 2d at 371.

In Indiana, the positive role of access is undeniable. Because the press is not permitted to attend *any* part of Ritchie's execution on May 20, 2025, "[t]he public will be left with only questions: How did the execution happen? How long did it take for the drugs to take effect? . . . Was there struggle or suffering? How did the people administering the execution accord

13

themselves?"  Nye Decl. ¶ 27.  First-person accounts from an independent observer—such as a member of the press—will illuminate issues with IDOC's processes that accounts from IDOC officials and/or witnesses related to the condemned individual or their victim simply will not.  Two historical executions in Indiana demonstrate this.  In 1985, Indiana executed William Vandiver by electrocution.  Compl. ¶ 28.  Contemporaneous news reporting relied on the account of a prison doctor, who stated that after an initial administration of 2,300 volts, "[t]he current was applied three more times before [Vandiver] was pronounced dead 17 minutes later."[9]  Vandiver's attorney, who witnessed the execution, called the proceeding "outrageous," and a spokesperson for IDOC said the execution "did not go according to plan," but few other details were made available to the public.  *Id.  See also id.* ¶ 29.  (discussing 1996 execution of Tommy Smith).

Relatedly, permitting Plaintiffs to access executions will contribute to an informed public debate about the death penalty.  *Woodford*, 299 F.3d at 876.  In-person reporting has a compounding positive effect on the reliability and depth of coverage, as it "gives a reporter both facts about the current situation and a base of knowledge for the next time they witness and report on an execution."  Tareen Decl. ¶ 32.  Indeed, reporters who cover multiple executions "know what to look for, what is usual and what is unusual.  They can pick up on nuances and report this information objectively to the public."  *Id.* ¶ 33.  And allowing media access provides multiple accounts for more complete reporting.  Runevitch Decl. ¶ 16.  Simply put, consistent, mandatory access for the press "promote[s] the public perception of fairness and transparency concerning the death penalty, which can only be achieved by permitting full public view of the execution."  *Phila. Inquirer*, 906 F. Supp. 2d at 371.

---

[9]    *Man Who Murdered His Father-in-Law Executed in Indiana*, N.Y. Times (Oct. 17, 1985), https://www.nytimes.com/1985/10/17/us/man-who-murdered-his-father-in-law-executed-in-indiana.html.

Last, access to execution proceedings "serve[s] an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion." *Richmond Newspapers*, 448 U.S. at 571. "Although this may reflect the dark side of human nature . . . the public must be permitted to see justice done[.]" *Woodford*, 299 F.3d at 877. Both Ritchie and his victim, officer Toney, were part of the Indianapolis community. Nye Decl. ¶ 21. Nye, of WTHR, knew Toney personally, and has interviewed his "widow multiple times throughout the years for various stories on the death penalty and officers killed while on duty." *Id.* ¶¶ 20–21. "When a shocking crime occurs," as here, "no community catharsis can occur if justice is done in a corner [or] in any covert manner." *Richmond Newspapers*, 448 U.S. at 571 (citation and internal quotation marks omitted).

## 2.    Defendants cannot overcome Plaintiffs' presumptive right of access to executions.

If Plaintiffs succeed in establishing that they have a presumptive First Amendment right of access to execution proceedings, Defendants will bear the burden of overcoming that presumption. *Grove Fresh Distribs.*, 24 F.3d at 898. Defendants will need to demonstrate "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise I*, 464 U.S. at 510. This standard, rather than the more deferential standard in *Turner v. Safley*, 482 U.S. 78 (1987), is the correct one. *See Phila. Inquirer*, 906 F. Supp. 2d at 372; *but see Woodford*, 299 F.3d at 878 (utilizing *Turner* factors after finding qualified First Amendment right of access). The *Turner* factors apply to prison rules that infringe on inmates' constitutional rights and apply a "lesser standard of scrutiny . . . appropriate in determining the constitutionality of [] prison rules" in some cases, depending on whether a rule is a "reasonable" or an "exaggerated" response to legitimate penological interests. *Turner*, 482 U.S. at 81. For obvious reasons, the Court should not apply this framework to a statute that governs the press and public's access to a rarely held, precisely scheduled, and time-limited proceeding.

*Johnson v. California*, 543 U.S. 499, 510 (2005) (the Supreme Court has "applied *Turner*'s reasonable-relationship test *only* to rights that are inconsistent with proper incarceration" (citation and internal quotation marks omitted)).  Defendants should therefore be required to meet the higher standard set forth in *Press-Enterprise I*.  Still, Defendants are unlikely to overcome Plaintiffs' qualified right under either standard and, accordingly, the *Turner* factors are discussed below.

To satisfy the first *Turner* factor, Defendants must demonstrate a "valid, rational connection" between the prohibition on press access in Indiana and a legitimate penological interest.  *Turner*, 482 U.S. at 89–90 (citation omitted).  Here, there is none.  Nearly every other death penalty state, as well as the federal government, provides for members of the general public and/or members of the press to attend execution proceedings.  *See* Section I.A.1.a, *supra*.  And execution witnesses at ISP already submit to an intensive security process.  Smith Decl. ¶¶ 17, 20–21; Compl. Ex. A § I.7.e, I.7.i (ISP 06-26); Runevitch Decl. ¶¶ 7, 9, 12.  The second *Turner* factor, "whether there are alternative means of exercising the right that remain *open to prison inmates*," 482 U.S. at 90 (emphasis added), further demonstrates why *Turner* is not the right analysis, and in any case, the qualified constitutional right of access is not vindicated when reporters are constricted to seek access as part of a condemned inmate's limited group of "friends or relatives."  Ind. Code § 35-38-6-6(a)(7).  "If a reporter is in the execution room as 'friend or family,' it can change the relationship between the reporter and the subject, and it may change what a journalist can and can't report," Tareen Decl. ¶ 39, and does not permit the fulsome reporting achieved when multiple journalists cover the proceeding.  Smith Decl. ¶¶ 28–32; Runevitch Decl. ¶ 15.

The third *Turner* factor, whether accommodation of an asserted right will have a significant effect on other inmates or prison staff, is not relevant here.  As in *Woodford*, enjoining Defendants' enforcement and implementation of Indiana Code § 35-38-6-6(a) "is straightforward and will not

unduly strain prison resources." *Woodford*, 299 F.3d at 884. And finally, the fourth *Turner* factor, "[t]he presence or absence of ready, low-cost alternatives" that would address Defendants' penological concerns, *id.*, is contingent on the specific concerns raised by Defendants. However, just as it is unlikely that Defendants will be able to demonstrate that the current total prohibition on public and press access is needed, conversely it is likely that any concern Defendants do raise may be efficiently addressed by looking to the practices of other death penalty states. Moreover, when the press and public *are* able to obtain some measure of access to proceedings in ISP, the administration of the prison is not undermined in any way. Smith Decl. ¶¶ 19–24. Although the *Turner* factors are not the correct framework, Defendants likely cannot demonstrate that Indiana Code § 35-38-6-6(a) and ISP 06-26 are justified even under that overly deferential standard. Accordingly, Plaintiffs are overwhelmingly likely to prevail on Count I of their complaint.

    **B.**    **Indiana Code § 35-38-6-6(a) and ISP 06-26, as applied to Plaintiffs, violate the Press Clause of the First Amendment by treating members of the press less favorably than some members of the public (Count II).**

Plaintiffs are members of the press, and they seek to fulfill a core press function— attending, reporting on, and publishing a description of a proceeding in which the state carries out the most severe criminal sanction. *See, e.g.*, *Mills v. Alabama*, 384 U.S. 214, 219 (1966) ("The Constitution specifically selected the press, which includes not only newspapers, books, and magazines, but also humble leaflets and circulars, to play an important role in the discussion of public affairs." (citation omitted)); *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 584 (1983) ("When the Constitution was proposed without an explicit guarantee of freedom of the press, the Antifederalists objected. . . . The concerns voiced by the Antifederalists led to the adoption of the Bill of Rights.").

Like the press, religious groups have pride of place in the First Amendment. Just as the First Amendment prohibits "abridging the freedom . . . of the press," it proscribes a law that would

"prohibit[] the free exercise [of religion]."  *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 845 (1995) ("neutrality [is] commanded of the State by the separate Clauses of the First Amendment").  Both institutions—the press, and religious groups—are subject to the same neutral, generally applicable laws as other members of the public.  However, when an exception is made for a secular group, or for members of the public who are not carrying out press functions, the law is no longer neutral and generally applicable.  Instead, the court must consider "the asserted government interest that justifies the regulation at issue," and whether the risk alleviated by failing to similarly protect the First Amendment interest is justifiable under a strict scrutiny analysis. *Tandon v. Newsom*, 593 U.S. 61, 62, 64–65 (2021) (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)).  Indiana's statutory scheme, which restricts the press's ability to attend executions, but makes exceptions for other, non-press groups to attend, is unconstitutional unless it is narrowly tailored to advance a compelling government interest.

1.      **Indiana Code § 35-38-6-6(a) and ISP 06-26 are not neutral and generally applicable.**

Defendants, through enforcement and implementation of Indiana Code § 35-38-6-6(a), are treating non-media witnesses—namely, friends and relatives of the condemned, the spiritual advisor of the condemned, and relatives of the victim—more favorably than members of the press. Indeed, ISP 06-26 singles out the press for disfavorable treatment, stating "Media personnel shall not be permitted to witness the execution or to be in the Execution Chamber." Compl. Ex. A § C.3. A law or regulation is "not neutral and generally applicable," under the Free Exercise Clause if it treats a secular activity "more favorably" than comparable religious exercise.  *Tandon*, 593 U.S. at 62; *Fulton v. City of Phila.*, 593 U.S. 522, 534 (2021).  Similarly, a law or regulation also lacks general applicability if it restricts the freedom of the press while permitting conduct by other actors that would undermine the government's asserted interest in a similar way.  *Minneapolis Star &*

18

*Trib. Co.*, 460 U.S. at 585 ("[D]ifferential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional.").  This analysis is not changed by the fact that members of the public not named in Indiana Code § 35-38-6-6(a) are also treated as disfavorably as the press.  *Tandon*, 593 U.S. at 62.  Rather, strict scrutiny should be applied in either situation. *Id.* at 62, 64–65; *Fulton*, 593 U.S. at 533; *see Minneapolis Star & Trib. Co.*, 460 U.S. at 585.  Here, because Indiana Code § 35-38-6-6(a) and ISP 06-26 infringe upon the freedom of the press but provide an exception for other members of the public, they must pass strict scrutiny.

## 2. Defendants cannot overcome strict scrutiny.

Defendants cannot show the regulation furthers "interests of the highest order."  *Tandon*, 593 U.S. at 64–65 (quoting *Church of Lukumi Babalu Aye*, 508 U.S. at 546).  Concerns about staff safety and institutional security would not justify the exclusion here.  *Woodford*, 299 F.3d at 880; *First Amend. Coal. of Ariz.*, 938 F.3d at 1077.  The role the press plays in observing executions is no more intrusive than the witnesses already permitted.  In fact, a member of the press witnessed the most recent execution, though the observation took place in spite of the existing statute, without incident.  Smith Decl. ¶¶ 20–27.  The State also cannot show the regulation is "narrowly tailored in pursuit" of "interests of the highest order."  *Tandon*, 593 U.S. at 64–65 (quoting *Church of Lukumi Babalu Aye*, 508 U.S. at 546).  "A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)."  *Bauer v. Shepard*, 634 F. Supp. 2d 912, 940–41 (N.D. Ind. 2009) (citation omitted).  Depending on the interests asserted by Defendants, Indiana Code § 35-38-6-6(a) is either overinclusive or underinclusive, as it restricts

the press, yet permits witnesses to attend who surely pose the same purported risks. Moreover, it is not narrowly tailored, given the more permissive practices in other states.

## II.    The remaining preliminary injunctive factors favor granting relief.

Plaintiffs will suffer irreparable harm if Defendants are not enjoined prior to Ritchie's May 20 execution. "Under Seventh Circuit law, irreparable harm is presumed in First Amendment cases." *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chi.*, 56 F.4th 437, 450–51 (7th Cir. 2022) (citing *Christian Legal Soc'y*, 453 F.3d at 859). The balance of equities also weighs in Plaintiffs' favor based on the presumed harm from deprivation of First Amendment freedoms. *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (citing *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992)). Given that twenty-five states and the federal government currently provide more access to executions, Defendants will suffer little harm if enjoined.

And finally, "injunctions protecting First Amendment freedoms are always in the public interest." *Am. C.L. Union of Ill.*, 679 F.3d at 590 (quoting *Christian Legal Soc'y*, 453 F.3d at 859). This factor overwhelmingly favors Plaintiffs. *See* Section I.A.1.b, *supra*. "Any other time the state takes the life of a citizen, there is tremendous interest in transparency surrounding every detail [of] that killing." Spears Decl. ¶ 17. "The public should know what degree of suffering the condemned went through, how long did it take, what was their demeanor in the final moments. They should know how state employees carrying out the execution behave and perform their duties." Nye Decl. ¶ 16. "The execution itself is the last crucial step in a long, expensive process and press access to this step is essential to the public interest." Smith Decl. ¶ 41.

## CONCLUSION

Plaintiffs request that the Court issue a preliminary injunction that bars Defendants from enforcing Indiana Code § 35-38-6-6(a) and requires Defendants to permit Plaintiffs, and other similarly situated members of the press, to attend executions for the duration of this case.

Dated:  May 12, 2025

/s/ Kristopher L. Cundiff
Kristopher L. Cundiff
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
PO Box 150
Fishers, IN 46038
Tel: (463) 271-4676
Fax: (202) 795-9310
kcundiff@rcfp.org

Lin Weeks*
Elizabeth J. Soja*
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Tel: (202) 795-9300
Fax: (202) 795-9310
lweeks@rcfp.org
esoja@rcfp.org
*admitted pro hac vice

*Counsel for Plaintiffs*