UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| THE ASSOCIATED PRESS, STATES NEWSROOM d/b/a Indiana Capital Chronicle, GANNETT CO., INC., CIRCLE CITY BORADCAST-ING I, LLC, and TEGNA INC., *Plaintiffs*, v. WARDEN RON NEAL, *in his official capacity as the Superintendent of Indiana State Prison,* and COMMIS-SIONER LLOYD ARNOLD, *in his official capacity as the Commissioner of the Indiana Department of Correction,* *Defendants*. | No. 1:25-cv-872-MPB-MJD |

**Response in Opposition to Motion for Preliminary Injunction**

Defendants, Lloyd Arnold and Ron Neal, respectfully request that this Court deny the plaintiffs' motion for a preliminary injunction. Plaintiffs—several media outlets—waited to file their complaint until days before the date ordered by the Indiana Supreme Court for the execution of Benjamin Ritchie then a whole week after that to file their motion for a preliminary injunction. Given this delay, the motion for a preliminary injunction should be denied on the equities alone. But the motion should be decided in the defendants' favor on the merits of the case as well. Either way, the Court should deny plaintiffs' motion for a preliminary injunction.

## Background

### 1.    Indiana resumes executions with the same general law governing who may attend

Plaintiffs are and have been aware of the Indiana law describing the categories of who may attend an execution. Thomas J. Coyne, a veteran reporter for the Associated Press, acknowledges he covered eleven of the twelve executions carried out in Indiana from 2002 to 2007. ECF 20-5 at 1, ¶ 4. While he expressed an interest in attending executions, "routinely t[elling] attorneys for the condemned" that he wanted to attend, he was never invited and "found it strange that reporters were not allowed to be there to witness the execution." ECF 20-5 at 2, ¶ 6. This is wrong—reporters are allowed to attend, but, as Mr. Coyne acknowledges, they need to be invited by the condemned inmate.

Joseph Corcoran had been sentenced to death in 1999. Twenty-five years later, on June 26, 2024, the State of Indiana filed a motion asking the Indiana Supreme Court to schedule his execution date. *Corcoran v. State*, 246 N.E.3d 782, 793 (Ind. 2024). The court granted the motion on September 11, 2024, and set an execution date for December 18, 2024. *Id.* at 794. Corcoran's death sentence was carried out on that day. Reporters knew the law then too. In fact, Casey Smith, a reporter for plaintiff Capital Chronicle, observed Mr. Corcoran's execution after he had added her to the list of invitees permitted under Indiana law. ECF 20-7 at 3, ¶¶ 13-14.

Benjamin Ritchie received a sentence of death in 2002. *Ritchie v. State*, 254 N.E.3d 1064, 1064 (Ind. 2025), *reh'g denied*, *cert. pending*. He has remained on Indiana's death row since then. On September 17, 2024, three months before the

execution of Joseph Corcoran and three months after the State publicly announced it was resuming executions, the State of Indiana requested that the Indiana Supreme Court schedule a date for his sentence to be carried out, which the court granted on April 15, 2025. *Id.* at 1065. The court ordered Ritchie's execution be carried out on May 20, 2025, before the hour of sunrise. *Id.*

> **2.    Despite the law being the same and the execution date being requested eight months ago, Plaintiffs wait until days before the execution to file their complaint.**

Indiana Code section 35-38-6-6, enacted in 1983, describes who is permitted to be present during an execution. It has never specifically designated members of the press as witnesses to an execution. Ind. Code § 35-38-6-6 (1983), as added by P.L. 311-1983, SEC. 3. But the law has always allowed the convicted person to invite a specific number of people to attend. *Id.* Nineteen years ago, the law was amended to allow members of the victim's family to attend an execution. I.C. § 35-38-6-6(a)(8) and (b), P.L. 56-2006, SEC. 1.

Forty-five years ago, the Supreme Court recognized a First Amendment right for the public, and the press, to access criminal trials. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980) (finding that the right attend criminal trials is implicit in the First Amendment). Since then, the Court has recognized that right includes other phases of the criminal adjudicative process. *See Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) [*Press-Enterprise I*] (voir dire); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–14 (1986) [*Press-Enterprise II*] (preliminary hearings); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603–11 (1982)

(testimony of child victims of sex offense). The only circuit court to hold that the right to access criminal adjudicative proceedings extends to attendance at executions is the Ninth Circuit, and that opinion was issued 23 years ago. *California First Amendment Coalition v. Woodford*, 299 F.3d 868, 877 (9th Cir. 2002).

And although Plaintiffs assert that "[it] quickly became apparent that Indiana Code § 35-38-6-6(a) and Defendants' implementing policy, ISP 06-26, would severely limit Plaintiffs' ability to cover" Corcoran's execution, (ECF 20 at 4), Plaintiffs waited until May 7, 2025, ECF 9, 320 days after the State of Indiana first publicly sought to reinitiate executions to assert a right they claim was recognized by the Supreme Court more than 40 years ago—23 years after the Ninth Circuit, the only circuit to do so, extended the right to view criminal adjudicative proceedings to executions.

### 3. Planning/coordination for scheduled execution

Executions in Indiana take place at Indiana State Prison (ISP). Ex. A at 1, ECF 9-1 at 2. To ensure that executions are administered in compliance with state statutes the IDOC issued ISP 06-26. ECF 9-1 at 2. Among other considerations, the policy requires that communication systems exist among and in close proximity to the Execution Chamber to the Governor, the Indiana Supreme Court Administrator, the IDOC Central Office Command Center, the ISP Command Center, the Lethal Injection Chemical Room and the Physician's Room, and two-way communication radios separate from the frequency used for general in-house communications. ECF 9-1 at 3.

The Warden appoints members to the Execution Team when a vacancy occurs. ECF 9-1 at 5. The Execution Team consists of the Execution Chamber Security Squad, the Injection Team, the Extraction Team, the IV Team, the Execution Director, and the Death Watch Team. Ex. A at 2. Before a person can be appointed to the Execution Team, he or she must undergo a screening process that considers the person's personal history and background, medical and psychological background, and personal experience. ECF 9-1 at 5-6.

To ensure that the Execution Team is properly trained, it routinely practices the execution procedures to ensure that there are no missteps. Ex. A at 2. The training consists of intensive cell extraction and restraint training; training in starting IVS, including practical training with regional EMS oversight and use of intravenous light and equipment to assist with identification and finding veins to start the IV. Ex. A at 2-3. The training also includes walking the condemned's witnesses to their viewing room and the victim's witnesses to their viewing room, to ensure that the two groups do not overlap. Ex. A at 3.

Since 2014, the Execution Team has met to train every two to three months. Ex. A at 3. The frequency of training increased to once every two weeks when it became more likely that the Indiana Supreme Court would issue a death warrant. Ex. A at 3. After a death warrant has been issued, the Execution Team meets weekly to train. Ex. A at 3. The Execution Team has been meeting weekly to train and practice since April 15, 2025, when Ritchie's death warrant was issued. Ex. A at 3.

Thirty days before an execution, or one week after receiving an execution order, officials meet with the condemned and the condemned's contact person to discuss lethal injection procedures, establish a visiting list, and determine if the offender wishes to prepare a will and write a last statement. ECF 9-1 at 6-7. Also 30 days before an execution, the condemned will receive a medical evaluation, and thereafter a weekly assessment of the condemned's veins. ECF 9-1 at 7. The Warden also ensures that the Execution Chamber is properly equipped and all necessary supplies have been ordered. ECF 9-1 at 7. An inspection of the building and area housing the Execution Chamber is inspected weekly, beginning 30 days before the execution, and five days prior to the execution it is inspected daily. ECF 9-1 at 7.

## Standard of Review

A preliminary injunction is an "extraordinary" remedy. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

## ARGUMENT

### I.    The plaintiffs are unlikely to succeed on the merits.

Executions in Indiana are not open to the general public; neither are they closed to the press. Indiana Code section 35-38-6-6(a) and ISP 06-26 do not prohibit the press from being present to witness an execution in Indiana. Section 35-38-6-6(a) defines the "only" eight categories of people allowed to witness an execution. Like all members of the public, the press may attend an execution if they fall within one of

those eight categories. Contrary to their claims, Plaintiffs do not seek to establish access for members of the public or remove targeted treatment disadvantaging the press. Their claims seek to establish *privileged* access for the press beyond what the law generally provides the public. The Constitution does not mandate privileging the press.

"[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally. . . ." *Pell v. Procunier*, 417 U.S. 817, 833 (1974) (citing *Branzburg v. Hayes*, 408 U.S. 665 (1972)) (omission in original). "The First and Fourteenth Amendments bar government from interfering in any way with a free press. The Constitution does not, however, require the government to accord the press special access to information not shared by members of the public generally." *Id.* And the Constitution does not offer the press or public "a right of access to all sources of information within government control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978). "There is an undoubted right to gather news 'from any source by means *within the law*,' but that affords no basis for the claim that the First Amendment compels others—private persons or governments— to supply information." *Id.* (emphasis supplied).

"Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, [Supreme Court] conferences, the meetings of other official bodies gathering in executive session, and the meetings of private organizations." *Pell*, 417 U.S. at 833–34. Similarly, the press has "no constitutional right of access to the scenes of crime or disaster when the general public is excluded."

*Id.* Specific to the operations of a prison, the press has "no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Id.*

### A.   Indiana Code § 35-38-6-6(a) and ISP 06-26 do not violate the First Amendment.

Plaintiffs claim a First Amendment right to public access to executions based on their incorrect assertion that executions are part of the criminal adjudicative process to which the public does have a qualified right of access. But neither the U.S. Supreme Court nor the Seventh Circuit have recognized such a right. Executions are not part of the judicial or adjudicative process. And as long ago as 1890, the Supreme Court recognized that the circumstances under which executions should be carried out are "regulations which the legislature, in its wisdom, and for the public good, could legally prescribe…." *Holden v. State of Minnesota*, 137 U.S. 483, 491 (1890). This includes determining the time and location of the execution as well as "the number and character of those who may witness the execution, and the exclusion altogether of reporters or representatives of newspapers." *Id.* The Supreme Court has never held otherwise regarding the power of states to legislate the conditions under which executions are carried out or held that they may not define who may be present to witness. Plaintiffs' attempt to invalidate Indiana's exercise of this essential legislative authority to regulate the manner of conducting executions so long recognized by the Supreme Court as its prerogative must fail.

### 1.  The qualified right of access extends only to judicial proceedings.

The right Plaintiffs assert has only been recognized within this jurisdiction as it applies to judicial proceedings. The Supreme Court has held "that the right to

attend criminal trials is implicit in the guarantees of the First Amendment . . . " *Richmond Newspapers*, 448 U.S. at 580. But the Supreme Court has not extended this beyond proceedings that are a part of the criminal prosecution. *See id.* Instead, the holdings of each Supreme Court case relied on by Plaintiffs have limited extension of *Richmond Newspapers* to some other part of the criminal trial. *See Globe Newspaper Co.*, 457 U.S. at 610 (finding a state statute "exclud[ing] the press and general public from the courtroom during the testimony of [a minor] victim" of a sex offense was unconstitutional under the First Amendment); *Press-Enterprise I*, 464 U.S. at 511 ("Absent consideration of alternatives to closure, the trial court could not constitutionally close the *voir dire*."); *Press-Enterprise II*, 478 U.S. at 13 (concluding "that the qualified First Amendment right of access to criminal proceedings applies to preliminary hearings"). Likewise, the Seventh Circuit has recognized the *Press-Enterprise* test as "the framework for analyzing restrictions on the press's right of access to *court proceedings and documents*," *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1070 (7th Cir. 2018) (emphasis added), and has not applied it beyond the confines of judicial proceedings. *Compare Matter of Cont'l Illinois Sec. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984) ("[T]he policy reasons for granting public access to criminal proceedings apply to civil cases as well.), *with United States v. Franklin*, 546 F. Supp. 1133, 1139 (N.D. Ind. 1982) (declining to find the press had a right of access to perform "post-verdict inquiry into the contents of jury deliberations" relying, in part, on the notion that "the First Amendment does not guarantee the press a constitutional right of special access to  information  not  available  to  the public generally.") (citations

- 9 -

omitted).

This limited extension only to other judicial proceedings, and not all judicial proceedings, comports with the essential reasoning of the Supreme Court in *Richmond Newspapers*. The Court discussed "[t]he origins of the proceeding [that] has become the modern criminal trial in Anglo-American justice" which "can be traced back beyond reliable historical records." *Richmond Newspapers*, 448 U.S. at 564-65. A survey of the history of criminal prosecutions "evince[d] a recognition of the importance of public attendance apart from the 'jury duty' aspect." *Id.* (citation omitted). "From this unbroken, uncontradicted history, which the Court found was "supported by reasons as valid today as in centuries past," the Court "conclude[d] that a presumption of openness inheres in the very nature of a criminal trial under our system of justice." *Id.* at 573-74.

Plaintiffs attempt to extend this authority far beyond its rationale. Plaintiffs contend that, "the First Amendment did not inhere only in access to criminal trials, but that it extended to other government proceedings—especially, but not necessarily exclusively, those similarly conducted under the state's authority to enforce criminal law." (ECF 20 at 16). The proposition that First Amendment jurisprudence extends beyond judicial proceedings to "other governmental proceedings . . . to enforce criminal law" is not supported by any Supreme Court case, or any authority that this Court is obligated to follow. For instance, the Seventh Circuit found "the reasons for granting public access to criminal proceedings appl[ied] to civil cases" because of "the public's right to monitor the functioning of *our courts* thereby insuring quality, honesty

and respect for our legal system." 732 F.2d 1302, 1308 (7th Cir. 1984) (citations omitted, emphasis supplied). *See also Fort Wayne Journal-Gazette v. Baker*, 788 F. Supp. 379, 386 (N.D. Ind. 1992) (extending *Matter of Cont'l Ill. Sec. Litig.* to guardianship proceedings). Neither logic nor binding authority extend this right of access beyond attendance at judicial proceedings.

### 2.    Executions are not part of the criminal judicial proceedings.

Plaintiffs rely almost exclusively on the Ninth Circuit and the reasoning in *California First Amend. Coal. v. Woodford*,[1] where the court extended "public access to governmental proceedings . . . to the process of executing a condemned inmate within the confines of the prison." 299 F.3d 868, 874 (9th Cir. 2002). But the court did so with little effort to explain the massive leap beyond judicial proceedings, such as a criminal prosecution, to execution of a sentence within the confines of a prison wall. *Id.* The court's reasoning can be summarized as a statement borrowed from *Pell*, that "the conditions in this Nation's prisons are a matter that is both newsworthy and of great public importance," and "the Supreme Court has never flatly held that the press has no First Amendment right to view events inside prison walls." *Id.* at 875-76. That reasoning, which is essentially advanced by Plaintiffs, is underwhelming and still fails to address exactly *how* executions fall within the criminal prosecution.

Plaintiffs conclude, without supporting, that "executions are criminal justice

---

[1] Each case from the Ninth Circuit cited by Plaintiffs either expressly relied on *Woodford* or were obligated to follow it. *See Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012); *First Amend. Coal. of Ariz., Inc. v. Ryan*, 938 F.3d 1069, 1075 (9th Cir. 2019); *Associated Press v. Tewalt*, No. 1:24-cv-00587-DKG, 2025 WL 1237762, at *4–8, 14 (D. Idaho Apr. 29, 2025).

proceedings initiated under judicial authority and administered by a state agency." ECF 20 at 9. Only the latter part is true. While the execution, or any punishment for that matter, is a part of the criminal justice system generally, *see Houchins,* 438 U.S. at 8, it is not a part of a criminal prosecution. "In the legal sense, a [criminal] prosecution terminates [] when [the] sentence is imposed." *Bradley v. United States*, 410 U.S. 605, 609 (1973) (citations omitted, alterations supplied). In other words, once the judge presiding over the criminal case imposes a sentence, the criminal prosecution is concluded, and the individual is committed to the executive for execution of the sentence. This is the case in Indiana. *See Barnes v. State*, 435 N.E.2d 235, 242 (Ind. 1982) ("After sentencing, the custody of the defendant is with the Executive branch, represented by the Department of Correction[].").

In analogous contexts, the Supreme Court has consistently held that matters occurring after sentencing are not part of the criminal prosecution. *See Morrissey v. Brewer*, 408 U.S. 471, 480 (1972) ("revocation of parole is not part of a criminal prosecution"); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) ("[p]robation revocation, like parole revocation, is not a stage of a criminal prosecution"); *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) ("[p]rison disciplinary proceedings are not part of a criminal prosecution"). With the exception of *Gagnon*, the Court stated as much despite dealing with administrative proceedings held by, for example, the parole board or a prison disciplinary hearing board, each still within the executive branch, where the Supreme Court required at least some semblance of an informal proceeding. *Wolff*, 418 U.S. at 556; *Morrissey*, 408 U.S. at 480. But to say that the execution is a "proceeding" within

the meaning of the line of cases relied on by Plaintiffs merely because the "procedures" used by the IDOC in carrying out the execution "ha[ve] all the hallmarks of other administrative proceedings" (ECF 20 at 9) does not logically follow. Even if the execution can be fairly characterized as an administrative proceeding (though, it can't), merely because there are procedures used by the IDOC in carrying it out, *Morrissey* and *Wolff* expressly cut against Plaintiffs' argument that this somehow makes the execution part of the underlying criminal prosecution.

### 3.    Other courts have correctly rejected Plaintiffs' argument.

The execution will take place long after the sentence was imposed. The authority on which Plaintiffs rely apply to "stages of the criminal adjudication process that occur in a courtroom before the entry of a judgment that ends the criminal adjudication process." *BH Media Grp., Inc. v. Clarke*, 466 F. Supp. 3d 653, 663 (E.D. Va. 2020), *vacated and remanded*, 851 F. App'x 368 (4th Cir. 2021) (finding the case moot because "the Virginia General Assembly passed legislation abolishing the death penalty in Virginia and converting the sentences of those on death row to life imprisonment without parole."). There is a profound difference, in both history and purpose, between the adjudicative process that determines when and based on what evidence the government may impose upon the liberty of its citizens and the administrative process of carrying out the resulting orders.

Reflecting these differences, several courts have expressed "considerable doubt that the *Press-Enterprise* exception even potentially applies to" right of access to executions. *Oklahoma Observer v. Patton*, 73 F. Supp. 3d 1318, 1324 (W.D. Okla. 2014); *see also BH Media Grp., Inc.*, 466 F. Supp. 3d at 663. The court in *Oklahoma Observer*

found two primary reasons in support. The first was because the Supreme Court's "most recent opinion, which extended the exception to preliminary hearings, define[d] the scope of this exception as 'criminal proceedings.'" *Oklahoma Observer*, 73 F. Supp. 3d at 1324 (citing *Press-Enterprise II*, 478 U.S. at 8). And the second was because of the Supreme Court's "different treatment of access issues in the prison context, where the implementation of criminal sentences normally occurs. Unlike the tradition of openness which exists as to criminal trials, the [Supreme] Court has emphasized the closed nature of prisons." *Id.* (citing *Richmond Newspapers*, 448 U.S. at 577 n.11). "Recognizing that difference, the [Supreme] Court has upheld limits on access to penal institutions even where serious issues as to inmate welfare have existed." *Id.* (citing *Houchins*, 438 U.S. at 3, 15). This is the correct framework.

### 4. Plaintiffs have no more right to observe imposition of a sentence of death than to access inmates serving a sentence of incarceration.

The Supreme Court has held that the press "ha[s] no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Pell*, 417 U.S. at 834. There the Court held that the First Amendment does not give "members of the press … a constitutional right to interview any inmate who is willing to speak with them" rather than one selected by prison officials at random. *Id.* at 829. In coming to its holding, the Court reiterated "that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Id.* at 833-34. Likewise, the Supreme Court has recognized the state's legislative prerogative to determine who may witness an execution. *Holden*, 137 U.S. at 491. Indiana exercised that prerogative in the passage of Indiana Code

section 35-38-6-6(a), and the press is not entitled to special treatment under the law.

Despite their claims to the contrary, that is what Plaintiff seek. Plaintiffs essentially argue that they are entitled to special access to view the execution by nature of their standing as members of the press. They argue that the press serves an important role in the "proper functioning" of executions in ensuring that they comport with the Eighth Amendment, i.e., it isn't cruel and unusual. (ECF 20 at 15). This argument is misguided and a similar one advanced in *Houchins* was rejected by the Supreme Court. 438 U.S. at 8 ("The media are not a substitute for or an adjunct of government and, like the courts, they are 'ill equipped' to deal with problems of prison administration.") (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974))). The *Houchins* Court even went so far as to characterize the argument as "flawed, not only because it lack[ed] precedential support and [was] contrary to statements in [the] Court's opinions, but also because it invite[d] the Court to involve itself in what is clearly a legislative task which the Constitution has left to the political processes." *Id.* at 12. "Whether the government should open penal institutions in the manner sought . . . is a question of policy which a legislative body might appropriately resolve one way or the other." *Id.* The same is true of access to observe an execution. While the death penalty may be of particular interest, the balance between the state's legislative authority and the First Amendment rights of its citizens do not turn on the degree of interest in the topic to be reported. *See Garrett v. Estelle*, 556 F.2d 1274, 1279 (5th Cir. 1977) ("While we agree that the death penalty is a matter of wide public

interest, we disagree that the protections of the first amendment depend upon the notoriety of an issue.").

### 5. Even assuming the Experience/Logic test is proper in this context, Plaintiffs cannot establish that this test has been met.

Plaintiffs' reliance on *Press–Enterprise II*, 478 U.S. at 8–9 (1986) is inapposite. In *Press Enterprise II*, the Supreme Court emphasized two "complementary" factors courts should evaluate in determining whether there is a First Amendment right of access to criminal proceedings: 1.) the "experience" element, which considers whether the place and process have historically been open to the public and press; and 2.) the "logic" element, which considers whether public access plays a significant positive role in the functioning of the particular process in question. 478 U.S. at 8–9. For the reasons explained above though, *Press Enterprise II* is inapplicable to the circumstances in this case, which does not involve a criminal prosecution or proceeding but rather the application of a judgment following a prosecution. Even if the *Press Enterprise II* test were applicable, Plaintiffs cannot show that experience and logic support a constitutional right to public executions.

The "experience" element does not support finding a constitutional right of the public to attend executions. "In contrast to the unbroken, uncontradicted history of public access to criminal trials, in the 1830s, executions in the United States became private events and moved from the public square to inside prison walls." *Arkansas Times, Inc. v. Norris*, No. 5:07-cv-195, 2008 WL 110853, at *4 (E.D. Ark. Jan. 7, 2008) (citing Michael Madow, *Forbidden Spectacle: Executions, the Public and the Press in Nineteenth Century New York*, 43 Buff. L.Rev. 461, 557 (1995)). In Indiana, all

executions by the State since 1897 have taken place at the Indiana State Prison. *See* Dawn Mitchell, *A History of Executions in Indiana*, IndyStar (Dec. 11, 2019), https://www.indystar.com/story/news/2019/12/11/indiana-executions-full-list-people-executed-since-1897/4357164002/. Given this history, Plaintiffs cannot show the tradition of continued, uninterrupted openness necessary to satisfy the "experience" prong of the of the *Press–Enterprise* test. *See Oklahoma Observer v. Patton, et al.*, 73 F. Supp.3d 1318, 1327 (W.D. Oklahoma 2014) (finding no historical tradition of public openness for executions that would support a First Amendment right to attend and noting that all executions in Oklahoma since 1915 have taken place at the Oklahoma State Penitentiary rather than a more public venue such as a public square).

The "logic" element also does not support finding a constitutional right of the public to attend executions. Plaintiffs contend that several policy considerations support having executions be open to the public, including allowing greater accountability and informed public debate. [ECF 20 at 15.] While these policy considerations may have a certain appeal, other considerations weigh against making executions public, including protecting the anonymity of staff involved in the execution and the dignity of the individual being executed. *See Furman v. Georgia*, 408 U.S. 238, 297 (1972) (Brennan, J., concurring) ("No longer does our society countenance the spectacle of public executions, once thought desirable as a deterrent to criminal behavior by others. Today we reject public executions as debasing and brutalizing to us all."). Here, the legislature has chosen to balance these considerations by allowing journalists to be present for the execution if chosen as witnesses by the individual being executed.

In the absence of a longstanding historical tradition to the contrary, the court should not disturb the legislature's judgment regarding these issues. *See Houchins*, 438 U.S. at 13 (emphasizing that courts should not confuse policy considerations for what is constitutionally commanded by the First Amendment).

**B.    Indiana Code § 35-38-6-6(a) and ISP 06-26 treat members of the press the same as members of the public.**

Plaintiffs incorrectly assert that members of the press are being singled out from other members of the general public and being excluded from witnessing executions. Instead, members of the general public, including the press, are prohibited from being present during an execution. Indiana Code section 35-38-6-6 provides that "only" the persons designated in the statute may be present during an execution. In other words, the statute prohibits the general public from attending an execution and creates an exception for those necessary to carry out the execution, a spiritual advisor, up to five people designated by the condemned person, and up to eight members of the victim's immediate family. Ind. Code § 35-38-6-6(a). This limited number of persons permitted to witness an execution is not akin to allowing the general public access. Indeed, those identified in the statute are not "general public," but rather a limited number of people with a unique relationship to and interest in the execution.

The First Amendment does not guarantee members of the press greater access than that available to the public generally. "It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Pell*, 417 U.S. at 833 (quoting *Branzburg*, 408 U.S. at 684–85). In sum, "[t]he Constitution does not … require

government to accord the press special access to information not shared by members of the public generally." *Id.* at 834. The First Amendment does not require that the press be permitted to access what the general public cannot. Therefore, because the general public is excluded from witnessing an execution inside the prison, the press is also properly excluded.

Plaintiffs' argument that because an exception is made for some it must be extended to include members of the press is misplaced. ECF 20 at 18–19. The Plaintiffs' "proposed 'equal access' framework is really an argument that any restriction on someone acting as a member of the press must be subject to strict scrutiny." *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 611 (7th Cir. 2021). That "argument fails," however, because there isn't ev "reporters are not cloaked with automatic 'strict scrutiny protection' merely because they are members of the press." *Id.*

Moreover, the Plaintiffs cite no support for their proposition that a law is no longer neutral and generally applicable, and thus subject to heightened scrutiny, if it allows for some persons to access a government proceeding and not for the press to access the same proceeding. Instead, they rely on case law from a different branch of First Amendment jurisprudence, the Free Exercise Clause. In Free Exercise Clause jurisprudence, the Supreme Court has held that a law is no longer neutral and generally applicable, and therefore subject to strict scrutiny, when a law or regulation treats any comparable secular activity more favorably than religious exercise. *See, e.g., Tandon v. Newsom*, 593 U.S. 61, 62 (2021). The Court has never extended that line of case law to questions concerning the press's ability to access certain areas. Nor

would it make sense for it to do so. As the Court has recognized there are many areas within government control that exclude the public, but permit certain groups. For example, in *Pell*, the Court recognized that "[n]ewsman have no constitutional right of access to the scenes of crime or disaster where the general public is excluded." 417 U.S. at 834. That is true even though some members of the public, including emergency responders, are undoubtedly present at those scenes. Members of the press are being treated the same as other members of the general public. Accordingly, Plaintiffs are unlikely to succeed on the merits of their claim.

## II.     The Equities Militate Against a Preliminary Injunction.

### A.     Plaintiffs' delay disentitles them to extraordinary relief.

Ritchie's execution is imminent, and this lawsuit seeks to interpose last-minute delay of that date given the breadth of the relief that Plaintiffs have requested. The Supreme Court, when the person seeking delay is the condemned himself, has decried eleventh hour delay: It has held that "'last-minute' claim[s]" from prisoners to "forestall an execution" is a practice that it will "not for a moment countenance." *Nance v. Ward*, 597 U.S. 159, 174 (2022). Further, "last-minute claims arising from long-known facts" can justify "denying equitable relief." *Ramirez v. Collier*, 595 U.S. 411, 434 (2022) (citing *Gomez v. U.S. Dist. Court for Northern Dist. of Cal.*, 503 U.S. 653, 654 (1992) (per curiam)). "[A] party's inequitable conduct can make equitable relief inappropriate." *Id.*

Plaintiffs could have brought this challenge a long time ago, and yet they waited until days before an execution date to seek injunctive relief. The statute they

challenge has been the law since 1983—no suit challenging its constitutionality has been brought in that time, to the defendants' knowledge. Even so, the State of Indiana announced its intention to resume executions after a long pause in July 2024—no suit challenging the statue's constitutionality was lodged after that announcement. The State then performed an execution in December 2024—again, no suit was filed. Now, only days before an execution, which requires the coordination of numerous persons acting consistently with months of training and under the cloak of anonymity, Ex. A at 2–3; *see* Ind. Code § 35-38-6-6(e)(1) (requiring anonymity of "persons who assist" with an execution), they seek not only unprecedented access to the execution process but also seek that access for an unknown number of "similarly situated" persons. ECF 9 at 18. Despite having more than four decades to challenge this statute, or, at least, since last summer, Plaintiffs delayed bringing this suit at a precise time to delay a lawfully imposed death sentence. This Court should "not for a moment" countenance this inequitable behavior. *Nance*, 597 U.S. at 174.

As proof of the extent of Plaintiff's inequitable behavior, this Court can look to *Dunn v. Ray*, 586 U.S. 1138 (2019). There, the Supreme Court denied a stay for a prisoner who raised a religious-liberties claim (one actually emanating from the First Amendment) because he had waited a little more than a week before his execution date to seek relief, even though that date had been set for approximately two months. *Id.* at 1138. Here, Plaintiffs waited to file their motion and supporting memorandum for 40-plus years after the challenged statute became law, 320 days after the State of Indiana first publicly sought to reinitiate executions, 227 days after the State moved

to set a date for Benjamin Ritchie's execution, 145 days after the last execution in Indiana, and until only seven days and three minutes before the scheduled initiation of the execution they now seek to enjoin. Their attempt to interpose delay through the extraordinary grant of an injunction for incalculably broad relief should be rejected. The delay in filing this suit, which is entirely a product of Plaintiff's own making, cuts strongly against the grant of their motion for a preliminary injunction.

### B.  No irreparable harm will result from the denial of a preliminary injunction.

Plaintiff cannot show that they will suffer irreparable harm in the absence of a preliminary injunction. As explained above, there is no constitutional right for the public or members of the press to attend and witness executions. Plaintiffs apparently did not believe that they would suffer irreparable harm in December 2024 when Indiana performed its last execution; it is unclear why they are now going to so suffer. Because Plaintiffs will not suffer a First Amendment violation or any other irreparable harm, their motion for preliminary injunction should be denied.

### C.    The state and public interest cut against any relief.

When the government is the defendant in a preliminary injunction proceeding, the balance of harms and public interest factors merge. *Eli Lilly & Co. v. Cochran*, 526 F. Supp. 393, 409 (S.D. Ind. 2021). A plaintiff "must show that the probability of success on the merits is sufficiently high—or the injury from the enforcement of the order sufficiently great—to warrant a conclusion that the balance of error costs tilts in favor of relief." *Ill. Bell Tel. Co. v. WorldCom Techs., Inc.*, 157 F.3d 500, 503 (7th Cir. 1998). If the party opposing the motion for preliminary injunction is a political

branch of government, the restraint for issuing such an injunction is particularly high due to public policy considerations, as "the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance." *Id.* Indeed, "the government's interest is in large part presumed to be the public's interest." *United States v. Rural Elec. Convenience Coop. Co.*, 922 F.2d 429, 440 (7th Cir. 1991).

The State's interest here is high. Performing an execution is a complicated and difficult operation that requires numerous people working in coordination who are all stationed in different parts of the prison and even in different cities. Multiple teams and sub-teams have to perform defined tasks on defined schedules. Ex. A at 2–3; ECF 9-1 at 6–8. Adding an unknown number of persons into the facility and into this process to witness a currently undefined portion of this procedure greatly complicates the strong interest the State has in performing a complex operation that it is lawfully required to perform. ECF 9-1 at 6–8. "Both the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Bucklew v. Precythe*, 587 U.S. 119, 149 (2019). With the breadth of the relief requested, the imposition of Ritchie's sentence could well be interrupted, which is contrary to the public interest of the citizens of Indiana, some of whom imposed this sentence as members of the sentencing jury, as well as the victims and general public. This factor weighs heavily in favor of denying injunctive relief. Because Plaintiffs have not proved they are entitled to the extraordinary equitable relief of a preliminary injunction, this Court should deny their motion.

**Conclusion**

The motion for a preliminary injunction should be denied.

Respectfully submitted,

THEODORE E. ROKITA
INDIANA ATTORNEY GENERAL
Attorney No. 18857-49

Date: <u>May 15, 2025</u>    By:    <u>*/s/ Jefferson S. Garn*</u>
Jefferson S. Garn
Deputy Attorney General
Attorney No. 29921-49
OFFICE OF ATTORNEY GENERAL TODD ROKITA
Indiana Government Center South, 5th Fl.
302 West Washington Street
Indianapolis, IN 46204-2770
Phone: (317) 232-5933 Fax: (317) 232-7979
Email: Jefferson.Garn@atg.in.gov

<u>*/s/ Adrienne Pope*</u>
Adrienne Pope
Deputy Attorney General
Attorney No. 31911-49
OFFICE OF ATTORNEY GENERAL TODD ROKITA
Indiana Government Center South, 5th Fl.
302 West Washington Street
Indianapolis, IN 46204-2770
Phone: (317) 233-0878 Fax: (317) 232-7979
Email: Adrienne.Pope@atg.in.gov

<u>/s/ Brandyn L. Arnold</u>
Brandyn L. Arnold
Deputy Attorney General
Attorney No. 36287-53
Office of Attorney General Todd Rokita
Indiana Government Center South, 5th Floor

302 West Washington Street
Indianapolis, IN 46204-2770
Phone: (317) 234-7121
Fax: (317) 232-7979
Email: Brandyn.Arnold@atg.in.gov

/s/ *Thomas S. Pratt*
Deputy Attorney General
Attorney No. 36933-18
Office of Attorney General Todd Rokita
Indiana Government Center South, 5th Fl.
302 West Washington Street
Indianapolis, IN 46204-2770
Telephone:  (317)232-0493
Facsimile:  (317)232-7979
E-mail:  Thomas.Pratt@atg.in.gov