IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| THE ASSOCIATED PRESS, STATES NEWSROOM d/b/a Indiana Capital Chronicle, GANNETT CO., INC., CIRCLE CITY BROADCASTING I, LLC, and TEGNA INC., Plaintiffs, | Cause No. 1:25-cv-00872-MPB-MJD |
| v. | Evansville, Indiana May 16, 2025 10:09 a.m. |
| RON NEAL, in his official capacity as the Superintendent of Indiana State Prison, and LLOYD ARNOLD, in his official capacity as the Commissioner of the Indiana Department of Correction, Defendants. | |

BEFORE THE HONORABLE MATTHEW P. BROOKMAN

TRANSCRIPT OF PROCEEDINGS
PRELIMINARY INJUNCTION HEARING

Court Reporter: Amy L. Hooten, RDR, CRR
United States District Court
101 N.W. MLK, Jr. Blvd.
Evansville, IN 47708
(812) 202-5603

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

APPEARANCES:

For the Plaintiffs:

Lin Weeks
Elizabeth Soja
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
1156 15th Street, NW
Suite 1020
Washington, DC 20005

Kristopher L. Cundiff
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
P.O. Box 150
Fishers, IN 46038

For the Defendants:

Jefferson S. Garn
Brandyn Lee Arnold
Thomas Pratt
OFFICE OF THE INDIANA ATTORNEY GENERAL
Indiana Government Center South
5th Floor
302 West Washington Street
Indianapolis, IN 46204-2770

## I N D E X

**PAGE**

**DEFENDANT'S EVIDENCE**

RON NEAL

Direct Examination by Mr. Garn...................... 9
Cross Examination by Mr. Weeks...................... 22

*(In open court.)*

THE COURT: Good morning, everyone. Today's date is May 16, 2025. We're here in the United States District Court for the Southern District of Indiana. Court is calling Cause No. 1:25-cv-872, The Associated Press, et al. v. Warden Ron Neal, et al.

This matter is set today for a hearing on a motion for preliminary injunction that was filed by the plaintiffs. Just by way of background, the case itself was filed May 5th, 2025. The motion for preliminary injunction was filed May 12th, 2025, along with a brief in support of that motion.

The defendants filed a responsive -- a response brief in opposition to the motion as directed by the Court on May 15th, and today is the date set for the hearing on this matter.

Let me start out by having the parties introduce who we have here in the courtroom today, starting with the plaintiffs.

MR. WEEKS: Good morning, Your Honor. Lin Weeks for plaintiffs.

MS. SOJA: Elizabeth Soja for plaintiffs.

MR. CONDUFF: Kris Conduff for plaintiffs.

THE COURT: Okay. And you all represent all of the plaintiffs; is that correct?

MR. WEEKS: Correct.

MS. SOJA: Yes, Your Honor.

THE COURT: Very good. All right. Thank you. Good morning. Welcome.

And on behalf of the defendants, if you would?

MR. GARN: Good morning, Your Honor. Jeff Garn from the Attorney General's Office for both defendants.

MR. ARNOLD: Good morning. Brandyn Arnold with the Attorney General's Office for both defendants.

MR. PRATT: Good morning, Your Honor. Thomas Pratt on behalf of both defendants from the Attorney General's Office.

THE COURT: All right. Very good. Well, good morning to all of you, too.

So what I would propose is we start with any evidence, any testimony or exhibits that you would like to present to the Court that haven't already been presented, beginning with the plaintiffs, and then I will give the defendants an opportunity to call any witnesses or present any evidence.

And then once we have heard the -- all of the evidence, I will give the parties 20 minutes a side to make arguments, and we will give the plaintiffs a brief five or so minutes of rebuttal after that.

Is that acceptable to the parties?

Mr. Weeks?

MR. WEEKS: Yes, Your Honor.

THE COURT: Mr. Garn?

MR. GARN: Yes, Your Honor.

THE COURT: And I assume, Mr. Weeks and Mr. Garn, you are all the leads here today?

MR. WEEKS: That's correct.

MR. GARN: Yes, Your Honor.

THE COURT: Very good. All right.

Any other preliminary matters that we need to take up, Mr. Weeks?

MR. WEEKS: None, Your Honor.

THE COURT: Anything, Mr. Garn?

MR. GARN: No, Your Honor. Thank you.

THE COURT: All right. With that then, Mr. Weeks, you've got the floor. You may call your first witness, or if you have a witness.

MR. WEEKS: No witnesses for plaintiffs. Plaintiffs intend to proceed on the record that we have created through the preliminary injunction motion and the exhibits attached to our complaint.

THE COURT: Okay. Very good.

And I would note -- I'll just note for the record that the Court has reviewed the motions, the motion, everything on the docket, along with the declarations, and the brief in opposition and those declarations as well.

All right. Very good. Thank you, Mr. Weeks.

MR. WEEKS: Thank you.

THE COURT: Mr. Garn, you have a witness?

MR. GARN: Yes, Your Honor. Warden Neal from the Indiana State Prison.

THE COURT: All right. And Mr. Neal is here via Zoom. There was a motion made for that and that was granted. If you want to turn his -- is he --

MR. GARN: Your Honor, if I may real quick, on the plaintiffs' exhibits, we were given no opportunity for discovery of any of those declarations. Those are -- we would argue that those are not properly before the Court. This is an evidentiary hearing. We should have had an opportunity to test the veracity of the testimony in the declaration.

It just -- we're, frankly, being sandbagged here with the late date of the -- and I will talk about this more in detail about the delay in this proceeding, but this is all created by the plaintiffs here. And then to have pages and pages of declarations and exhibits, to ask the Court just to take judicial notice of it or something, I am really not clear how they're getting that in front of the Court for an evidentiary purpose without given -- being given the opportunity to do discovery, see about what they're asking for. We don't even know what they're really asking for in this case. So we would object to that being in front of the

Court for the purpose of the preliminary injunction.

THE COURT: Okay, thank you. We will show that objection as overruled.

Of course, the Court is aware that, because of the timing, there was no really any meaningful discovery could take place. And the fact that the plaintiffs proceed by declarations as opposed to live witnesses, that's certainly something the Court can consider for weight. But I will allow the plaintiffs to proceed with that, with those exhibits. And we will show the objection. The objection is overruled.

With that, Mr. Garn, do you have a witness you would like to call?

MR. GARN: Yes, Warden Ron Neal from the Indiana State Prison.

THE COURT: Okay. Mr. Neal, if you would raise your right hand and be sworn, if you can see my courtroom deputy on the screen, maybe?

MR. RON NEAL: Yes, sir. I can see.

**RON NEAL, DEFENDANT'S WITNESS, SWORN**

THE COURT: All right. Thank you, Mr. Neal. If we -- Lauren, if you could raise the volume. I don't know if that's possible on his end.

Mr. Neal, can you hear us okay?

THE WITNESS: Yes, sir, I can hear you well.

THE COURT: All right.

Okay. Mr. Garn, you may proceed.
MR. GARN: Would it be all right if I sat?
THE COURT: You may, yeah.
MR. GARN: Okay.
THE COURT: And is Mr. Neal on everybody's screen?
MR. WEEKS: Yes, Your Honor.
THE COURT: Okay, very good.

**DIRECT EXAMINATION**

BY MR. GARN:
Q. Good morning, Mr. Neal. Would you please state your name for the record?
A. Good morning. My name is Ron Neal, and I am the warden of the Indiana State Prison.
Q. And your title again, please?
A. I am the warden of the Indiana State Prison.
Q. What are your general responsibilities as warden?
A. Generally, I oversee all aspects of safety and security, operation of the Indiana State Prison, to include my staff, the incarcerated individuals, safety of the public, as well as state property. Basically all aspects of prison operations.
Q. How long have you been warden of this, that prison?
A. Since September of 2014.
Q. Where do executions take place in Indiana for state executions?
A. They take place here at the Indiana State Prison.

Q. Do you have responsibilities related to executions, carrying out executions in Indiana?
A. Yes. I am responsible for overseeing and supervising executions of condemned persons in Indiana.
Q. What are your -- what are your specific responsibilities related to executions in Indiana?
A. So, I basically serve as the coordinator or person overseeing and supervising all aspects of an execution, which includes putting a team together, an execution team, which is made up of several subteams that allow me to carry out executions in a legal and ethical manner.
Q. Has an execution taken place, a state execution taken place, in the last couple of years?
A. Yes, sir. Our last execution was December of 2014 [sic].
Q. And who --
A. Or 2024, I'm sorry.
Q. And who was the condemned in that case?
A. Joseph Corcoran.
Q. And what were your responsibilities for that execution?
A. The same as I described. I presided over that execution.
Q. Is there another execution scheduled to take place at Indiana State Prison?
A. Yes, sir. Benjamin Ritchie, on May 20th.
Q. What time, approximately, will that take place?

A. It will take place shortly after midnight on May 20th.
Q. And is your role pretty much the same as you described it for that upcoming execution?
A. Yes, sir.
Q. Do you have people helping you with carrying out that operation?
A. I do. As I mentioned, I have a full team that are various subsections of teams. I can describe those, if you would like. I also have an execution director that assists me with executions.
Q. Please describe the teams that help you with carrying out the operation.
A. So basically, I have a security team. The security team handles everything from pick-up of witnesses in the community, transportation of witnesses from the pre-agreed upon pick-up location to the facility, they escort them inside the facility to a waiting room. Security stays with the witnesses and their support staff or their support people while they're waiting to be brought back to the execution chamber.
They play a wide variety of roles, the security folks, because they provide outer security of the execution chamber, the building that it's housed in, they provide security of the inside of the building where the execution chamber is located, to include death watch of the offender once he's taken back to the chamber.

They transport the witnesses from the waiting room through our north gate back through the execution chamber, escort them into the witness rooms, and they stay with them in the witness rooms during the execution process. So that's the security team's primary responsibility.

I also have a -- in addition to that security team, I have perimeter security that's made up of staff that are part of my E-squad, emergency squad, K-9. I also have several correctional police officers, I have numerous correctional parole agents. We also coordinate with Michigan City Police Department, as well as the Indiana State Police to provide perimeter security around the prison itself. So a large group of security staff.

I then have a team that is what we refer to as the IV team. Their primary responsibility is to, when called upon, to come into the chamber and properly apply IVs into the arms of the condemned person. That's oversaw by a physician that we utilize to assist us with executions. So that's their primary responsibility.

I then have a push team or an injection team that is in a separate room behind the condemned. And when called upon to do so in the procedure, we go through a sequential process of pushing drugs into the condemned, per procedure, until the condemned is deceased.

Q. Do --

A. I also --
Q. I was just going to ask, are there any other teams?
A. Well, I have the execution director that assists me just with procedure and odd jobs, some of the radio commands of the teams themselves. There's a group in the Command Center, which is this office, my office, which serves as the Command Center for the executions.
So from the chamber we communicate, I communicate from the chamber to the Command Center, who then communicates with the DOC Command Center and Central Office, who is communicating with the Governor's Office and the Attorney General's Office to make sure that we have authorization to proceed with an execution.
Q. Is DOC the Department of Correction?
A. Yes, sir.
Q. Have you -- are there any other teams?
MR. WEEKS: I am going to --
A. Just --
MR. WEEKS: -- object to relevance here. I feel like we have heard -- we have heard the description of the teams that would handle the witnesses coming into the chamber.
THE COURT: That will be overruled.
BY MR. GARN:
Q. Are there any other teams, sorry?
A. Just the physician. We do hire a physician from the

outside that is in the execution chamber during an execution, who, like I said, assists the IV teams in the proper insertion of the IVs, to make sure that we have good sets, good flow, and he also pronounces death.

Q. Have you and your team and your subteam done anything to prepare for the upcoming execution?

MR. WEEKS: Objection, calls for hearsay.

THE COURT: Really?

MR. GARN: What?

THE COURT: You are proceeding on nothing but declarations, you are not calling a live witness, and you're objecting to their witness on hearsay?

MR. WEEKS: Withdrawn, Your Honor.

THE COURT: Thank you.

BY MR. GARN:

Q. You can answer the question.

A. There are -- we practice roughly once every two weeks. The entire team, all of those subteams that I just mentioned, we go through full rehearsals of carrying out an execution. Every time we practice, we run through an execution process twice for every practice we have. So that's typically once every two weeks.

As we get closer to an execution, after an order is given, that frequency increases to practicing once a week. There were periods many years ago where, you know, we

practiced once a month, once every two months, because we knew that there wasn't an execution close at hand. But typically once every two weeks we practice.

Q. Is it important for the team to have proper training and to practice the operation?

A. Absolutely. This is a very structured process, sequential process, and it needs to flow exactly as we have it prescribed to make sure there's no missteps or mistakes. I also bring in specialized healthcare folks from the outside, from Homeland Security, to provide specialized training to my IV team, sometimes referred to as a stick team. So they get a lot of additional practice.

We also use -- we use dummies so that they can do stick team training. We have various staff who volunteer and allow them to practice on live bodies. Every time we have a practice we have a volunteer who serves as the condemned. So they're actually inserting IVs into a live body every time we have a practice. So we take practices very seriously because we don't want to make any mistakes.

Q. Are there considerations for the witnesses in your training?

MR. WEEKS: Objection --

A. We --

MR. WEEKS: -- vague.

THE COURT: It will be overruled.

A. We practice bringing witnesses into the facility. Sometimes I will use members of my E-squad, members of my K-9 team, various folks of my special teams for that purpose. But we will actually place them in different locations in the community, have my security team pick them up, bring them in, place them in the waiting area, escort them to the chamber when called upon, place them in the witness room. So, yeah, we -- we -- we go through great lengths to do it just as we would during a real execution.

BY MR. GARN:

Q. Are there different groups of witnesses that you need to keep separate during while the execution is being carried out?

A. Yes, sir. I have the condemned's witnesses, up to five people; and then I have the victim's witnesses, which are up to eight people. We transport them separately. We keep them in different rooms, different waiting rooms. They're transported to the chamber separately.

We go to great lengths to keep them from bumping into one another or interacting with one another. We even post security in the witness rooms so that they wouldn't enter a shared bathroom at the same time. So, yes, we go to great lengths to keep them apart.

Q. Are there also -- are there confidentiality rules or laws that you need to keep in mind for the execution, while carrying out the execution?

A. Yeah. I mean, you have to keep in mind that all of these teams that I just described, these are state employees, with the exception of the physician, that are asked to be a part of an execution team, a special detail, we call it.

So we ask people that we believe have the maturity, competence, proven track record of work that could carry out such a duty. We put them through mental health screening with our Director of Mental Health for the Department of Correction. We also do interviews with every member on the team. So they're selected, asked, put through a screening process before we even accept them to be a part of the team.

Q. Have you or any of your members of the team related to the carrying out the execution, have any of them been -- are you aware of whether any of them have been threatened or received communication from the public related to executions?

A. Yes. I really didn't finish answering your last question. One of the big things that we assure the team members is that we will protect their confidentiality, that, you know, they will not -- their names will not be made public to the community, for that very reason that you just mentioned, that several of us have been -- have received threats from the public or those folks that may be opposed to the death penalty to the point where, you know, dummies have been thrown in our yards, protests held outside our residences.

So, you know, they know that I am a part of the team and what my responsibility is, and that's not a secret. But for the team members, we try to keep their identities confidential for that reason because we don't want them to be harassed, targeted in any way, shape, or form. If they were, I simply wouldn't be able to put a team together because these folks wouldn't volunteer to do so, to be a part of the team.

Q. Where did the executions take place on the Indiana State Prison property?

A. It's inside the walled facility in the northwest corner of the property. It's in a building we call the Support Services Building, but it's in the very back right-hand corner of that building. In the front of that, directly in front of the chamber is the custody supervisor, the lead captain, the shelter captain. So there's some offices in a conference room in front of the chamber, but it's in the Support Services Building.

Q. Are there observation rooms for where the execution takes place?

A. Yes. There's two observation rooms for both sets of witnesses that we talked about. There's an observation room for the doctor that assists and watches the execution from start to finish, and then the push team is in their own room where they can see the body as well from their location.

Q. Can any of the other witnesses see, observe anything

that happens in the push room? Is that what you call it? If that's what you call it?

A. The injection room or push room, no one can see what's happening inside that room, no, sir.

Q. So I think you said there's a victim's witness room. Are there chairs in that room?

A. Yes, sir. There's -- in the victim's witness room, there's eight chairs. Those chairs are bolted to a platform that is set up as risers. So the second row is elevated approximately a foot taller than the back row, just for viewing purposes. And both rooms are set up the same way. They're bolted to the floor on those risers at two different levels.

Q. And for the condemned person's room, are there also chairs in that room?

A. Yes, sir. Five --

Q. And they are bolted to the --

A. Five chairs bolted to those risers, yes, sir.

Q. For the victim's room, do you know how big the window is for that room?

A. Yes. It's in my declaration, but it's --

Q. If I said it's 42 inches by 43 inches, would that be correct?

A. Yes, sir. Yeah.

Q. Okay. And then is there -- there is a window in the

condemned person's witness room as well?
A. Yes. And it's, I think, one inch smaller than the -- the other witness room.
Q. And do you have security around those rooms during the execution operation?
A. Yeah. There's security all over the place. Like I said, there's security inside each witness room, there's security inside with the physician, there's a security person on every door inside the chamber. So there's the security staff that opens the door leading into the chamber, there's security staff that opens the door to the holding cell where the condemned is waiting and kept. So as you walk through that building, there's security staff on every single door until you get back to the chamber.
Q. Does Indiana -- does Indiana law govern how many people are permitted to be in both of those rooms?
MR. WEEKS: Objection, calls for a legal conclusion.
THE COURT: That will be overruled. If he knows.
A. Yes, sir. My understanding is that Indiana Code calls for what I have described: Five for the condemned's witnesses, up to five people, and for the victim's witnesses up to eight people.
BY MR. GARN:
Q. Will you be doing any more -- strike that.
Has the execution team trained for adding witnesses,

other people to -- that might attend only a few days before the execution is supposed to take place?

A. No. We have never been posed with anything quite like adding additional folks at the last minute. So, no, we don't train for that possibility.

Q. Would adding people cause you to have to change the processes?

A. Possibly. It just depends on what we had to add, where we had to add them, what level of access we had to give them. So, yes, it could significantly alter processes, yes.

Q. Is the general public allowed to observe the execution?

A. They are not, no. Not unless they're listed as one of the witnesses.

Q. Going back to the execution of Joseph Corcoran, did a media member attend -- do you know whether a media representative attended that execution and witnessed it?

A. Yes, sir. There was a media representative, and I believe from the Indianapolis Chronicle, that was listed as a witness and did witness the execution of Joseph Corcoran.

Q. Do you know how that reporter was permitted to observe the execution?

A. She was listed as a witness by Joseph Corcoran and his attorneys as one of his allotted witnesses, and she sat in one of the allotted chairs with the other witnesses and watched the same thing that they did.

Q. And does Indiana -- does -- do Department of Correction policy rules or Indiana State Prison directives permit that, for a media member to attend if designated by the condemned person as a witness?

A. Yes. If they're listed as a witness, yes, that's permitted.

MR. GARN: Thank you, Mr. Neal. I don't have any more questions.

THE COURT: Cross exam?

**CROSS EXAMINATION**

BY MR. WEEKS:

Q. Good morning, Mr. Neal. Can you see and hear me?

A. I can. Good morning.

Q. Good morning.

You said you've been warden at ISP since 2014, correct?

A. Since September of 2014, yes.

Q. And you have presided over one execution during that time, correct?

A. I have presided over one execution. I was a part of another execution prior to the one that I presided over, but yes, that's correct.

Q. Which execution were you a part of prior to the one that you presided over?

A. I was a part of the execution team in 2009 for Eric

Wrinkles as a deputy warden.
Q. Did you write Indiana State Prison Policy 06-26?
A. I did not.
Q. And did you write -- did you approve Indiana State Prison Policy 06-26?
A. I did approve and sign off on it, yes, sir.
Q. And did you approve the portion of ISP 06-26 that controls the persons that can be present at the execution?
A. I approved it as it's written, yes, sir.
Q. When you say "as it's written," you say that because it's -- that portion of the policy is part of the Indiana Code, correct?
A. Yes.
Q. So you didn't choose that policy that doesn't provide for access for the public, correct?
A. Correct. That policy was written by a collaboration of several folks from central office, chief of staff, deputy commissioner, attorneys, and myself.
Q. But speaking specifically about the portion of the policy that controls who can be in the witness chamber, that portion was not written at all; that was taken from the Indiana Code, correct?
A. Yes.
Q. And so your decision to have the policy follow the statute really has nothing to do with how easy or difficult it

is to carry out an execution, correct?

A. Well, it did follow statute, but this building was designed based on what is written in that procedure, and it's basically a replica of the chamber at Terre Haute Bureau of Prisons for the federal system.

So I say that simply to say when we say there's five chairs in one witness room and eight chairs in another witness room, the size of those rooms were built for that purpose to accommodate that many chairs or people.

Q. Mr. Neal, do you know whether Terre Haute permits members of the public and the press to witness executions?

MR. GARN: Objection, beyond the scope.

A. I --

THE COURT: I'm sorry?

MR. GARN: Beyond the scope of direct.

THE COURT: That will be overruled. If he knows.

A. I do not know whether they do or not.

BY MR. WEEKS:

Q. Okay. Returning to ISP 06-26, the portion of that policy that controls who can be in that room isn't based on your own professional judgment about what's best for ISP, correct?

A. Well, I did agree with what's written there based on Indiana Code and the room that I have available.

Q. Well, did you write the portion of Indiana Code that

controls the policy?
A. I did not.
Q. So the statute also doesn't reflect your judgment about what's best for ISP, correct?
A. That would be correct.
Q. Okay. The training regimen for the execution team that you mentioned, part of that training regimen involves moving witnesses from place to place, correct?
A. Correct.
Q. And you said if that provision were to change, the training regimen might need to change as well, correct?
A. Correct.
Q. So I understand that you have given some testimony here about the upcoming execution, but for executions following May 20th, you could change the training regimen to address any change to the law, correct?
A. If the actual physical space would allow us to do so, possibly, yes.
Q. Did the execution team undergo the same training regimen for Corcoran's execution as they have been undergoing for Ritchie's?
A. Yes, sir. Same practice, yes, sir.
Q. Okay. And the execution team conducted the same type of walkthroughs for Corcoran's execution as they have been doing for Ritchie's?

A. Yes, basically our practices are replicas of one another each and every time we do them. The only difference with an actual execution is that we do do a full dress rehearsal prior to an actual execution, which is above and beyond our normal practice schedule, but it is the same as we did for Joseph Corcoran.

Q. How -- how long in advance of the execution does that dress rehearsal take place?

A. I didn't catch that last part. How long in advance what?

Q. How far in advance of the execution does the dress rehearsal take place?

A. The day before, usually.

Q. Okay. And so a journalist attended Corcoran's execution, as you mentioned, correct?

A. Yes.

Q. When did you learn that Ms. Smith was on the list of people that would attend Corcoran's execution?

A. I can't remember exactly, but at least a couple of weeks prior to the execution.

Q. So the execution then for Corcoran's execution had trained for a journalist to attend, correct?

A. She was one of the witnesses in the witness room, so she was -- the team trained that she was one of the five witnesses. There was no special precautions taken for that.

She was allowed to do nothing other than the other witnesses were allowed to do, other than view the execution.

Q. There was no special precaution taken for the attendance of a journalist at the execution, is that your testimony?

A. That is my testimony.

Q. So your execution team has, in fact, trained for a witness to attend executions -- for a journalist to attend executions, correct?

MR. GARN: Objection, misstates the testimony.

THE COURT: I think it's been asked and answered.

MR. WEEKS: Fair enough, Your Honor.

THE COURT: The answer is what it is.

MR. WEEKS: Fair enough.

BY MR. WEEKS:

Q. The rooms for the condemned witnesses and the victim witness room are the -- sorry, excuse me.

The room for the condemned individual's witnesses is, your declaration said, 10 by 10 feet; is that correct?

A. The size I listed on my declaration was accurate, yes.

Q. And currently that room holds five witnesses, correct?

A. Five seated witnesses and one security staff that stands in the room, yes.

Q. The room for the victim's witnesses holds -- is -- let's see. Is it 16 feet by 10; is that correct?

A. I believe -- that sounds correct. It's whatever

specifications I listed in the declaration, but that sounds correct. And it seats eight people.

Q. There's space for additional people in those rooms, correct?

A. Those are very tight-spaced rooms. Like I said, they were constructed based on the number of people that were allowed in those rooms, so I can put a security officer in the back of the witnesses. They're there, obviously, to make sure that the two different witness groups do not mistakenly run into each other in a bathroom that they share. But there's very limited space in addition to the chairs that are in those rooms.

Q. Are the victim witnesses escorted through security and into the viewing chamber as a group?

A. The victim's witnesses, all witnesses are brought into the facility, as I said, separately because we keep them apart. They go through our full entrance procedures as far as shakedown, running through the body scanner, pat searching before they're placed in their holding areas or their waiting rooms. And then those that are pre-approved as witnesses are taken out of those rooms when called for and taken back to the chamber. So they all go through full security procedures.

Q. So just to -- just to reiterate my question, the group of victim witnesses and the group of condemned individual witnesses are brought into the facility together as one group,

correct? Separately -- separately those two groups, but each group not -- they don't enter the prison person by person?
A. They are brought into the prison in two different groups, and they go through security individually, and they're placed in their waiting rooms, yes, sir.
Q. So we have one group of eight at the max and one group of five at the max?
A. Along with whatever support people that they have listed to come with them. So for example, some have listed a mother, a father, a sister, it's usually someone in the family. But they can choose a support person to come into the facility with them and stay with them in the waiting room, the waiting area, prior to going back to the chamber to actually witness the execution. So those folks who come as support people never leave the waiting room until the execution is done.
Q. But suffice to say that your security team is trained to handle groups larger than five, correct?
A. We pick up no more than what we can fit in our passenger vans. So I have two staff in that van. The larger group in this case, the victim's witnesses that are up to eight, they're allowed no more than 13 people to come in the prison because that's what we can transport in a van.
Q. Does your training account for the possibility that people don't show up to witness as they planned?
A. I mean, that's always a possibility, that folks don't

show up. And we just adjust accordingly to that.
Q. So, in fact, the execution team and the security team don't know the precise number of people that will be witnessing the execution beforehand, correct?
A. They know exactly who is coming, what their names are, and in what capacity they're serving, witness or support person that will stay in the waiting room.
Q. But if you could answer my question, they're trained to have some flexibility to handle a different number of people, correct?
A. The only change to them would be if someone did not show up, but they're given a list of the names of the individuals and what role they serve in.
Q. I am going to read you a sentence here from ISP 06-26. This sentence says, "Media personnel shall not be permitted to witness the execution or to be in the Execution Chamber." New sentence, "The only exception to this rule is if the offender requests, in writing, that a member or member" [sic} "of the media be present" -- "a member or members of the media be present."
So the condemned individual gets five friends or relatives, correct?
A. They can list five people. And as we discussed, in the Corcoran case one of those five people was the reporter.
Q. But under your policy, more than one person could be a

reporter, correct?

A. Yes.

Q. The execution team needs to be able to handle up to five reporters, correct?

A. Up to five witnesses for that room.

MR. WEEKS: If I could confer.

Thank you, Mr. Neal.

THE COURT: All right. Redirect?

MR. GARN: Thank you, Mr. Neal. I don't have any other questions.

THE COURT: All right. Thank you, sir. You can disconnect now. Thank you for your testimony.

THE WITNESS: Yes, sir, thank you.

*(Witness excused.)*

THE COURT: Okay. Mr. Garn, any further witnesses?

MR. GARN: No, Your Honor, thank you.

THE COURT: Okay. The -- I'm sorry? Oh, that's...

COURTROOM DEPUTY: Judge, can I --

THE COURT: Yeah, you can go ahead.

Okay. I said I would allow the parties 30 minutes argument -- or 20 minutes, but I will make that 30 minutes, give you all ample opportunity to argue your points.

We will start, Mr. Weeks, you may begin, and then we will hear from Mr. Garn.

MR. WEEKS: Thank you, Your Honor.

Plaintiffs seek a preliminary injunction requiring defendants to permit plaintiffs and other members of the press to attend and observe the execution of Benjamin Ritchie, which is set to take place shortly after midnight on May 20th. Plaintiffs also seek access to any additional executions that take place during the pendency of this case.

In order to effectuate that relief, the Court will also need to bar defendants temporarily from enforcing Indiana Code Title 35, Article 38 -- excuse me -- Title 35, Article 38, Chapter 6, Section 6(a), and portions of Indiana State Prison Policy 06-26 against plaintiffs and other similarly-situated members of the press.

This relief is appropriate, first and foremost, because ISP 06-26 and Section 6(a) are unconstitutional. This is true for two reasons. These are the only two counts of plaintiffs' complaint. First, Section 6(a) and ISP 06-26 are unconstitutional because the closure of executions to all disinterested public observers, including the press, violates plaintiffs' qualified First Amendment of right of access to attend criminal proceedings without the adequate justification.

And, second, these are unconstitutional because they violate the press clause because they infringe the freedom of the press but carve out exceptions for non-press groups in a manner that doesn't meet strict scrutiny.

THE COURT: Is there a difference between an

execution, a punishment, versus a criminal proceeding?

MR. WEEKS: Executions in Indiana are a proceeding. They are ordered by the Indiana Supreme Court. They are carried out pursuant to regulation, put in place by an administrative body. There's recordkeeping. This is a -- this is a proceeding that takes place in a limited time, they're rare, and it's not the day-to-day operations like a -- like a prison sentence. This is a different animal.

The Supreme Court in the line of cases that begin with *Richmond Newspapers*, continued through *Globe Newspaper*, *Press-Enterprise I* and *Press-Enterprise II* stressed that the purpose of the test that the Supreme Court set forth in *Press-Enterprise II* was to ensure the flow of information about government affairs to the public.

So the test is in place in order for the courts to make a determination as to whether a particular proceeding qualifies under that experience and logic prongs in *Press-Enterprise II*. So I can give -- I can give an example.

THE COURT: But government affairs is too broad, right? I mean, certainly the press doesn't have unfettered access to all government affairs, right?

MR. WEEKS: Correct, Your Honor. Not -- not all government affairs, correct, but --

THE COURT: So what they talk about are court proceedings, right?

MR. WEEKS: Not -- not exclusively court proceedings. So I think we have -- we have put examples in our brief regarding guardianship proceedings, which I suppose are before a court, but there are also examples from other courts. Obviously, the Ninth Circuit has the cases about the execution access. And we have seen cases in other courts involving -- cases in other jurisdictions involving administrative proceedings as well.

I think -- I think the key issue -- so to give an example, right, defendants brought up the grand jury proceedings in their papers, right? So these are -- these are -- if you apply the *Press-Enterprise* test to grand jury proceedings, grand jury proceedings would still remain private, right? The test is not a rubber stamp. The test allows for some proceedings to remain private while others are presumptively public.

The reason for that is that there's -- if I take the grand jury example, that there's a history of secrecy in grand jury proceedings that simply isn't present for something like executions. Similarly, there's a logic to keeping grand jury proceedings private in order to maintain -- you know, in order to not have witness tampering, in order to make sure that an individual before a grand jury who isn't indicted doesn't have his reputation tarnished, right? There are logical reasons to keep the grand jury proceeding closed. Those reasons don't

exist in the context of executions.

THE COURT: But, again, grand jury proceedings are -- the grand jury is impaneled by the Court. It's a court -- it fundamentally is a court proceeding.

MR. WEEKS: It's a -- I would suppose it's a quasi-court, quasi-prosecutorial proceeding, Your Honor. But I think here we have seen the test applied more broadly than that, specifically in the cases that we have cited regarding executions.

THE COURT: Anyplace other than the Ninth Circuit cases?

MR. WEEKS: The Middle District of Pennsylvania did the same. And in the Oklahoma case, the District Court in that Oklahoma case applied the *Press-Enterprise II* test but found ultimately that executions were not public. I think that the Court in that case erred for a different reason. It looked only at the history of executions in Oklahoma rather than the broader history in the United States. But I do think that's -- that they applied that test in that case as well.

So I think -- I think the divergence in the interpretation of law comes from defendants' misreading of *Pell v. Procunier.* And that's a case where journalists were seeking access to a prison during day-to-day operations. This was not a specific time-limited, court-ordered proceeding that was happening in the prison. These were journalists that were

asking to enter the prison during day-to-day operations to interview inmates.

Another notable difference between *Pell* and this case is that in *Pell*, journalists already had extensive access to enter the prison. So they were asking for additional access to interview specific inmates when and where they wanted. Here, journalists have no access to execution proceedings unless they're put on this friends and family list. And I'll just --

THE COURT: Was nobody -- there are no journalists on Mr. Ritchie's witness list; is that accurate?

MR. WEEKS: To the best of our knowledge, correct.

THE COURT: Okay. Have any of your clients asked to be on Mr. Ritchie's?

MR. WEEKS: They have, Your Honor.

THE COURT: And were they told no?

MR. WEEKS: They were, Your Honor.

THE COURT: Okay.

MR. WEEKS: So there are four factors for the Court that --

THE COURT: I'm sorry, one more follow-up. I apologize for interrupting. Was that through Mr. Ritchie's counsel, his criminal counsel?

MR. WEEKS: I believe so, Your Honor.

THE COURT: Okay.

MR. WEEKS: I believe these are in the -- I would say the -- they're in several of our declarations. And I can find the cites for those.

THE COURT: Okay, thank you.

MR. WEEKS: There are four factors for the Court to consider in deciding whether to grant a preliminary injunction, so I will focus -- and we have been focusing on the merits here, but I do want to also say that a violation of First Amendment rights, the case law in the Seventh Circuit says that that violation is always irreparable and that vindication of First Amendment rights is going to always be within the public interest.

So defendant, I think, has focused their argument primarily on the balancing of the equities, bringing up the timing of this case. And so I just want to address that quickly. Defendants -- although defendants, I think incorrectly, imply in their papers that we're somehow seeking to delay Mr. Ritchie's execution, we are not seeking that. We don't seek that relief.

1983 cases have various -- very strenuous standing requirements. And so in order to mount a case that met those standing requirements, we needed to collect significant evidence, a good group of plaintiffs, and make sure that when we put the case before your Court that the first thing we heard from defendant wasn't, you know, a motion to dismiss on

lack of ripeness, for instance.

THE COURT: But practically, if the Court were to grant an injunction May 16th -- we're on May 16th -- it would probably delay the execution, right? I mean, how would they -- how would it --

MR. WEEKS: Well, I think it's notable, Your Honor, that defendants' witness said that it may -- it did not say that it would delay the execution. Defendants' papers don't say that it would delay the execution. I don't think we have anything in the record indicating that Your Honor's preliminary injunction would delay the execution. In fact, I think defendants' witness said that the dress rehearsal, they called it, is held the day before the execution.

I will say this case in some ways looks a lot like the one advanced by The Associated Press in 2012 in Idaho. This was *Associated Press v. Otter*. And we have cited that case in our brief. But for today's purposes, I pulled the preliminary injunction motion.

This is a case that went up and back to the Ninth Circuit, and this preliminary injunction came in -- let's see. It came in on June 11th, the day before the scheduled execution of Richard Leavitt on June 12th. So I can hand this up.

Similarly, in the Middle District of Pennsylvania case, the preliminary injunction came on November 6th, 2012,

two days before the scheduled execution of Hubert Michael on November 8th, 2012. And I'll hand this up as well.

THE COURT: How did the Idaho statute compare with Indiana's statute as far as witnesses?

MR. WEEKS: The Idaho statute -- the Idaho statute is more permissive than the Indiana statute. The Indiana statute is unique with Wyoming, uniquely restrictive to public witnesses and the press. So in the Idaho case, the press was seeking access to additional parts of the proceeding.

THE COURT: All right.

MR. WEEKS: So we have discussed -- we have discussed the *Press-Enterprise II* test, and I have explained why I think that it applies, that the major purpose of the *Press-Enterprise II* test is to protect the flow of information about government affairs.

And I think you can look, Your Honor can look at the concurrence, the Brennan concurrence in the *Richmond Newspapers* case, as well as the concurrence of Justice Stevens in *Press-Enterprise II.* Justice Brennan in *Richmond Newspapers* says -- excuse me. I had my -- sorry.

Justice Stevens in *Press-Enterprise I* says, "The distinction between trials and other official proceedings is not necessarily dispositive, or even important, in evaluating the First Amendment issues," right? Instead, the question focuses on the First Amendment values, the protection of the

free discussion of government affairs.

So looking at those experience and logic prongs in *Press-Enterprise II*, in present day, as I mentioned, Indiana is uniquely restrictive of press and public access -- disinterested public access to executions.

In Terre Haute, as I asked Warden Neal, there is a federal regulation on the books that requires eight members of the public and ten members of the press to be permitted into executions that are conducted in Indiana at Terre Haute, where we now know ISP was designed -- designed after.

But that -- that recent history of the 25 death penalty states carries back quite a way. We have submitted to the Court historical statutes from both Kentucky and Ohio, dating back as far as 1886, indicating that, in the language of the time, three newsmen shall be permitted to attend executions.

And even further back there was a shift in the way that executions were conducted in the mid 1800s. Executions came out of the public square, where public hangings were conducted and the public was gathered to witness the execution, and they shifted behind prison walls. But the public access continued through that shift.

And we have cited primarily the Ninth Circuit case, *CFAC v. Woodford*, which collects historical sources, demonstrating that that -- when that shift occurred that the

public was still permitted to attend.

On the logic side of things, I think we have pointed to three reasons that logic supports public access to executions. First, public access to execution proceedings ensures that executions are competently and humanely administered.

The press has an important function in ensuring that any missteps or discrepancies in the execution procedure are publicly reported. And this is important for other prisoners on death row to exercise their Eighth Amendment rights. It's also important for other members of the public to engage in informed public debate about the statutes that control the death penalty procedure itself, right?

There's a variety of different death penalty procedures that are in place in different states throughout the country, and there's a vigorous public debate about both the humaneness and the efficacy of those different methods.

Third, there is a -- the courts call it a prophylactic or a cathartic function for public and press access in executions. Both the Ninth Circuit in *Woodford,* as well as in the *Richmond Newspapers* case, the plurality opinion in that case, which was Justice Burger, mentioned that there's an importance to the public seeing justice done. And allowing the public to see justice carried out is important so that extra legal measures aren't taken, so that the public doesn't

take matters into their own hands. If they're able to see what is done, they can better trust that the -- that appropriate criminal processes have happened.

Because we believe there's a qualified right of access, the question -- one question for the Court is what standard to hold the government to in order to maintain closure over those proceedings.

We have argued in our brief that we think that the standard set forth in *Press-Enterprise I*, which would be a compelling government interest that's narrowly tailored in support of that interest is the correct -- the correct standard to hold the government -- that the government must meet in order to maintain closure. And we don't think that that standard has been met in this case.

Through the testimony of Warden Neal today, we did not hear that the prison would not be able to handle journalists. In fact, what we heard is the prison has trained to allow journalists in. We heard that the prison -- we have heard that the prison -- that the prison has some flexibility for the number of people that could attend.

We have heard that the -- that people come in, in groups and that one group is eight people and one group is five people, conceivably leaving room for additional people in one of the groups. And we haven't heard a single word about why the specific -- why the specific distribution of people,

eight witnesses for the victim and five witnesses for the condemned individual, is narrowly tailored or meets a compelling government interest.

If we -- you know, just using back-of-the-envelope math, if we took a quarter of those, you know, 13 attendees and gave that over to members of the press, we have heard no reason -- we have heard no penological interest that would prevent that sort of shift.

So we don't think defendants have asserted any interest here, let alone a compelling one. And we can see through the Smith declaration, and as well the Runevitch declaration -- both of those individuals attended proceedings. Jennie Runevitch attended in 2005 through the provision for friends and family -- that when a member of the press is permitted to attend an execution, nothing changes. The execution goes as planned. The state is able to carry out its responsibility just as they always do.

We also heard from Warden Neal that this is not a policy that's been put in place under his decision-making. It doesn't reflect his institutional knowledge about what's needed to run a prison. It doesn't -- he said himself that this is something that we put in our policy because it is state law. He didn't write the state law. It doesn't reflect his interest.

So to the extent that Your Honor is looking at the

*Turner* factors, all of those factors stem from a question about whether the policy has been put in place to protect a legitimate penological interest. And I think we heard from Warden Neal that the answer to that is no.

Finally --

THE COURT: The -- oh, go ahead.

MR. WEEKS: I will move on to our second count in the complaint, unless Your Honor had questions about the first.

THE COURT: Well, go ahead. I will ask my question.

MR. WEEKS: Okay. As Your Honor knows, there is a special place for the press. The framers chose a special place for the press in the Bill of Rights, alongside religious organizations, the right of assembly.

In the *Minnesota Star Tribune* case, the Supreme Court held that a law that is not generally applicable, that disfavorably singles out the press, the law in that case was a tax on ink and paper that -- use tax that extremely burdened the press in Minnesota at that time.

So if that -- if there is not -- if the law is not generally applicable, and it burdens a freedom of the press, then the correct standard to apply is strict scrutiny. Now, in past years, in the past five years, specifically in 2001, the Supreme Court in a couple of cases, specifically *Fulton* and *Tandon v. Newsom*, has explained in the context of free exercise cases what it means for a law to be neutral and

generally applicable.

And what the Supreme Court has said in *Tandon* and in *Fulton v. City of Philadelphia* is that if there is a law that burdens the free exercise of religion but carves out exceptions for secular groups, it doesn't matter what the intent of that law is. It doesn't matter whether -- whether some religious organizations are allowed or are exempted. If the law singles out religious organizations from practicing but carves out an exception for secular groups, that law is not generally applicable and, therefore, strict scrutiny applies.

So right -- the example the Supreme Court relied on in those two cases, the one it drew from was this *Lukumi Babalu Aye* case, which was a case in which there was a regulation involving the disposal of animal carcasses and it was applied to a group of individuals practicing Santería but it wasn't applied to hunters, right? So hunters disposed of animal carcasses, same practices of Santería also.

So in the 2021 cases, the Supreme Court said that law that the Court had interpreted in *Lukumi Babalu Aye*, that law was not generally applicable under the standard that it announced in those two cases.

And you can see the parallel to the law in Indiana, right? Here we have a law that infringes a core freedom of the press: Reporting on the most severe sanction available to

the state in the criminal justice process and makes exceptions for non-press groups. We have the clergy, we have the victim witnesses, we have the witnesses for the condemned. Therefore, under the Supreme Court's recent explanation of the generally applicable law test, strict scrutiny should be applied to this First Amendment -- to the law burdening this First Amendment freedom for freedom of the press.

And, again, for the same reasons that defendant can't overcome -- defendants can't overcome -- can't show a compelling reason for their restriction, they can't show that it's narrowly tailored, again here under strict scrutiny they would fail.

THE COURT: Mr. Weeks, the defendants make an equities argument and basically referring to the timing of the, not only the complaint but the PI motion, sort of raised it again here this morning, noting that the plaintiffs were proceeding on declarations alone, called no live witnesses who could be cross-examined or further teased out as to what their testimony would be.

Do you want to respond to that argument at all?

MR. WEEKS: Yes, Your Honor.

On the point about the declarations, what I would say first and foremost is that the Seventh Circuit has been very clear that on a preliminary injunction posture informal evidence such as declarations and hearsay evidence is

permissible. I have -- I have two cases here.

THE COURT: I guess what I'm saying is, should I -- should the Court take into account the fact that this is sort of -- it seems to be intentionally placed on a really tight time frame.

MR. WEEKS: I think -- I think what I will say -- so what I will say is the Supreme Court of Indiana issued the warrant for Mr. Ritchie's execution on April 15th. It denied rehearing on April 30th. Our complaint was filed May 5th. I can assure Your Honor that we have been working day and night to put the record before the Court that it needs to decide this motion specifically.

THE COURT: Any reason why it took days to file the motion after the complaint was filed? I mean, we frequently -- the Court frequently sees PI motions that are filed contemporaneously with the complaint.

MR. WEEKS: We corrected a procedural defect with the Southern District that Judge Magnus-Stinson noted with our complaint. Otherwise, we were -- we were continuing to gather the declarations that we needed to demonstrate standing and to put the best showing possible before the Court as to why the logic prong as well as the -- if the Court chooses to address the *Turner* factors, why those won't be met by defendant.

THE COURT: All right, thank you.

MR. WEEKS: Thank you.

THE COURT: Anything else?

MR. WEEKS: No, Your Honor. We would ask that the Court grant the preliminary injunction.

THE COURT: All right. Thank you, Mr. Weeks.

MR. WEEKS: Thank you.

THE COURT: Yeah. Mr. Garn?

MR. GARN: Your Honor, if I promise to talk loudly, can I -- would it be all right if I stood here --

THE COURT: Yeah, that's fine.

MR. GARN: -- within striking distance of my co-counsel if I mess anything up?

THE COURT: Yes.

MR. GARN: Thank you. The Court should deny the motion for preliminary injunction basically for two reasons. We've put all of this in the brief, so I don't want to belabor anything. But, again, the delay is reason enough to deny this. What they're talking about now is about an execution that's happening in a couple -- it's scheduled to happen in a couple of days.

They say they're asking for future executions. We are fine to talk about that on a different schedule. But in terms of what we're talking about for relief, we're mostly going to be focused on the execution that is scheduled for Benjamin Ritchie. It is -- we have had barely any time to develop a case to -- to bring together witnesses, to come down

here. The Courts have repeatedly explained why motions like this should be denied when they're brought at the last minute. The second reason is there's -- there's simply no right to witness an execution. And I will go into both of those factors.

But before that, when the Court asked about what evidence the Court needs to make a decision on it, there is a relaxed standard on a preliminary injunction. I understand that. But the Courts have been clear that if there is a dispute, if there is a factual dispute, if there are facts that need to be developed, then testimony is appropriate and that is what should decide.

Bring forth the case on a District Court in Illinois in the Northern District made this clear, citing two Seventh Circuit cases. And that's -- the cite for that is 2012 West Law 357031, *Instant Tech LLC v. DeFazio*. They go through some of the cases that show when a declaration just isn't enough. And it's not enough here.

THE COURT: Are there things that you would have liked to have heard from a live witness, maybe from one of the plaintiffs today that --

MR. GARN: Yes, why -- why there was a delay. And any communi- -- why there was delay in filing this case, if they knew -- when they knew about the Indiana state law, what they planned to do if they even have standing. It's -- what

they're asking for -- because it's really not clear what precisely they're asking for, for this upcoming execution.

They say they want it for similarly-situated people. This is not a class action lawsuit. So I don't know how many people they want to come in. I don't know what they want to see, if they only want to see what the witnesses see or if there's something more. It's very nebulous, very vague about what they're asking for, for this upcoming execution.

So those are the kind of things that we would explore through discovery. But the main thing is when did they know about how Indiana law is structured for permitting witnesses and what they have done to try to be a witness. I would also explore communications between the reporters and Mr. Ritchie's attorneys to see what happened with that. There were some changes with the witnesses for the -- so that would be something we would explore.

The Indiana Supreme Court ordered Benjamin Ritchie to be executed by May 20th. As Mr. Neal testified, that's going to be -- that's going to occur very early that day, so essentially Monday night, Tuesday morning. Before that, the State of Indiana had requested an execution date in September of 2024. So they knew this execution was going to be scheduled. So they could have filed something then. The Indiana Supreme Court set the date on April 15th of this year.

And more important than that, and also with all of

that, is the plaintiffs knew what the law is in Indiana. They've testified -- they stated in their declarations that they had wanted to go to see executions before the -- before there was the 15-year pause on executions. So they knew about it. They knew that they were -- there wasn't a designated slot for reporters to witness the execution, that it's very strictly described who can attend to witness the execution.

So as I mentioned, there are several cases that say that when a last minute claim comes that could forestall an execution, that's something the courts should not countenance, and that is for when the prisoner, when the condemned individual brings a lawsuit at the last minute.

So the difference between saying you waited too long and that we're going to carry out the -- you can carry out the execution versus just witnessing the execution, those are -- those are very different requests for relief. And the Court said for executions, even for executions, those can go forward if they're brought too late. And that's what we have here. We have a case that was brought too late with respect to the execution scheduled for Tuesday.

THE COURT: Do you know -- Mr. Garn, do you know the timing on the condemned's witness list, when that has to be provided to the --

MR. GARN: I don't know, but I would -- it fits with what Mr. Neal said, that they had received the list a couple

-- at least a couple of weeks ago for the reporter who attended Mr. Corcoran's execution. I do know that there is some people who -- who wait, who are permitted to be added to the list. I think that plays out a lot with the victim's side. But I don't have any specific information.

And my understanding is that it's not in addition, like today on there wouldn't be more people added, especially on the condemned side of things because that's going to -- but the -- my understanding is that that had been -- they have gotten that at least a week ago, but I don't have specific information about that right now.

THE COURT: Okay. Thank you.

MR. GARN: And as Mr. Neal testified, this is a -- this is a highly coordinated operation. There are a lot of people, a lot of teams together, working together, practicing this. They have practiced for years, even before the execution was scheduled. It's a highly coordinated effort by prison officials down to the very minute of where to get people so there's no overlap. The chairs are literally bolted to the floor to say exactly where people should be during this time. So to ask the department to add this last minute, to change that procedure, that request should be denied.

The next reason that the plaintiffs' motion should be denied is because they're unlikely to succeed on the merits, keeping in mind the context for all of this is this is a very

complicated issue legally speaking. There is -- there are disputes across the country. Courts have come out one way -- they're relying almost entirely on the Ninth Circuit decision. There are conflicting decisions in other places in the country. There are different laws. And they're asking this Court to make a decision on that essentially in a couple of days before an execution. And that is not the way that litigation should work for something this complex and this complicated.

But the bottom line is that Indiana Code and the policies do not violate the First Amendment. Press has a qualified right to witness criminal adjudicative processes, but an execution is not that. When Your Honor asked the plaintiffs' attorney about the difference between a proceeding and an execution, I don't know what that means. I -- I did not understand the response because it is something very different, what Mr. Neal described, versus all of the adjudicative proceedings that the courts have talked about in these cases dealing with this issue or adjudicative proceedings. They are adjudicative proceedings. That's what these courts are talking about when they're talking about access to the press.

They relied on *Press-Enterprise*, which -- for the principle that they should be able to see, witness this execution, but it's -- that case was about getting a

transcript for a preliminary hearing, which is something very different than witnessing an execution, demanding a Court to order that they be given special access to this highly coordinated, highly-regimented operation in a prison a couple of hours -- a couple of days before it's supposed to take place. That's a huge difference between those.

If you look at the definitions of proceedings, Merriam-Webster describes it as a legal proceeding or a judicial process, and then the example they give is a divorce proceeding. I think it was telling that the example given for what a proceeding is was a guardianship proceeding. They're all about what happens in a court or what happens when you're before a grand jury or -- even that is something different. But it's all about evidence, an adjudicative process, which is very different than something that's happening at a prison when you are carrying out an execution or the sentence of a Court.

Yes, the Courts have been very clear. Seventh Circuit has recognized a qualified right only for judicial proceedings. It does not go beyond that. And the framework for analyzing restrictions on a press's right to access court proceedings and documents, that's what this is all about. That was in the Seventh Circuit in 2018, *Courthouse News Services v. Brown*.

So what they're relying on is, again, the Ninth

Circuit case, where there was barely any analysis of why this is a criminal -- why this is a proceeding. I think it's also important to keep in mind what the -- what the state law says if there -- how it's framed as a -- as more of a public proceeding versus a private proceeding or an operation because the plaintiffs have said that Indiana is an outlier because of how -- of it being restrictive on listing out who exactly can attend.

That -- that cuts both ways because it says that Indiana -- it's correct Mr. Neal did not make that decision on who can attend. That was the people of Indiana, the representatives who made that decision. And that -- there are also -- there's support for that in the cases that -- that it's important to keep in mind the injury to the state by their laws that are carried out. Because they're asking this Court, again, in a couple of days, to find a state statute unconstitutional.

And as I mentioned, the -- there are cases -- there is a conflict on how to analyze these cases. There's the case in Oklahoma, *Oklahoma Observer v. Patton*, that rejected the *Press-Enterprise* conclusion or a conclusion that *Press-Enterprise* would mandate the press to do certain things around an execution. There was also the *BH Media Group* in Virginia, federal court in Virginia.

The plaintiffs have no more right to observe the

imposition of a sentence of death than the access of inmates serving a sentence of incarceration. That is the analysis that the Court should work from instead of the *Press-Enterprise* analysis of the experience or in the logic element. But even if the Court looked to that, the *Press-Enterprise* experience, logic analysis, the conclusion would be the same. They do not have a right to observe the execution.

There was a long time of public executions. We're beyond that. There are -- there are lots of books, scholarly books, analyses of the change that has taken place to go from public executions in the square to what we have now. There are different penological reasons for that. So citing public executions that took place centuries ago should not be persuasive as to the experience of this.

Instead, we have moved to it happening inside the prison walls, which again would bring it back to the analysis of this is not a proceeding, this is an operation, this is carrying out a sentence just like it would be for carrying out the sentence of an incarcerated person.

The logic element also fails. The plaintiffs talk about the -- some kind of oversight that the press would take. But there are also considerations that weigh against moving the executions to the public. As Mr. Neal testified about, there are confidentiality concerns here with keeping

confidential the people who carry out the sentence and so that it's strictly regulated who can attend these executions.

And also it's about the dignity of the individual being executed. As Justice Brennan stated, "No longer does our society countenance the spectacle of public executions, once thought desirable as a deterrent to criminal behavior by others. Today we reject public executions as debasing and brutalizing to us all." So the logic behind the public executions does not come forward to our -- to today, to justify allowing the press to observe. And how many want to observe, that's still unclear.

Indiana Code treats members of the press the same as members of the public. Plaintiffs' attorney wanted to -- Mr. Neal was very clear that it's a witness, if the witness is a reporter, treated the same as every other witness. There's no special treatment for reporters. There is no prohibition of reporters, just the person needs to be listed on the condemned individual's list, and then that person can come in. Just like for Mr. Corcoran's execution.

And the First Amendment doesn't guarantee members of the press greater access or special access. And that's really what the plaintiffs are asking for here. They are saying, like, well, we could fit more people in. And the reason why we're struggling, the defendants are struggling in saying what kind of injury this would be is because it's really not clear

what the plaintiffs are specifically asking for in their declarations. They're like it would be ideal if we saw this, it would be nice if we saw this. Best practice is this. The more people, the better.

So -- so -- but they're -- depending on what happens, it will be an absolute necess- -- it would necessitate delaying the execution and -- depending on what they're asking for, and we just don't know what they're really asking for. But one way or another, there's no right for special access for the press to an execution.

And given the delay, the plaintiffs should not be able to benefit from that delay to say that we needed time to make this the best possible case for the Court while denying the defendants an adequate time to respond to that complaint and the PI motion.

Just a -- just a few things on what Mr. -- what the plaintiffs talked about just now. I think it's important to be clear what Mr. Neal talked about when he was talking about Terre Haute. It is the execution room, it's the chamber that was designed after Terre Haute. He wasn't talking about the witness rooms. There's just no room for the number of witnesses that are allowed in federal -- in a federal penitentiary. When he was talking about the modeling of it, the ISP, that's different than talking about the witness rooms and everything else. So I don't think we can extrapolate that

that many people could view the execution at ISP.

And then as far as these Idaho decisions go, I think it's important to look at the first line of the Court's order. This isn't like the Court came a couple of -- there was -- this went up to the Ninth Circuit and then was remanded down and then -- but the most important thing of all, of the Ninth Circuit analysis, is that they're working from the same case that there is a -- there is a deep conflict across the country on how to analyze this question of press access to executions. So this -- what happened in Idaho should not be considered.

That's all, Your Honor. Thank you.

THE COURT: Thank you, Mr. Garn.

Mr. Weeks, let me ask you. I will give you a minute to rebut, but also, Mr. Garn raises a good issue. What is the relief that's -- what's the prayer for relief here in the injunction? The conclusion to your brief says enjoin the defendants, that being Warden Neal and the DOC Commissioner, from enforcing the Indiana Code statute and require Warden Neal and the DOC Commissioner to permit the plaintiffs, that being the Associated Press, the States Newsroom, Capital Chronicle, Gannett, et cetera, and similarly-situated members of the press to attend executions for the duration of the case. I mean, what exactly -- what exactly are you envisioning if I granted an injunction? What would it say?

MR. WEEKS: The type of thing we envision, Your

Honor, is that you would order that a quarter of the observers, whether that's in addition to the observers or whether that's a portion of the observers that are already permitted to attend, be members of the press.

And the reason that we framed our relief request that way is that the press is -- Your Honor, the press pools have been in the news recently. The press is quite adept at determining among itself who will use limited space within a proceeding like that. This is exactly what the Court said in *Richmond Newspaper.* Often the press is provided a specific number of seats and they determine amongst themselves who will attend.

THE COURT: The press determines it?

MR. WEEKS: The press pool, exactly.

THE COURT: And it would be three or four witnesses? Because 13 doesn't go evenly into --

MR. WEEKS: Well, we would ask for four. But -- but, Your Honor, I think to the extent that the department can add additional people, a quarter could be as much as -- could be as much as four if the department were to add additional people.

THE COURT: And who -- who would you contemplate loses their seats as a result of that, the condemned's witnesses or the victim's witnesses?

MR. WEEKS: Well, I think the ideal situation would

be adding additional people to the room, but I...

THE COURT: So is the prayer to add additional people?

MR. WEEKS: The prayer is for a quarter of observers, whether that means adding additional people or whether, based on Warden Neal's testimony, Your Honor determines that additional people can't be added.

THE COURT: Okay. And obviously the timeline here is -- in light of Mr. Ritchie's execution date, your prayer would -- is not exclusive to Mr. Ritchie's execution?

MR. WEEKS: Our prayer extends throughout the pendency of this case. If additional executions are scheduled beyond the 20th, we would ask that the same relief be provided for executions until the case is decided on the merits.

THE COURT: And is there authority for the -- what's your authority for the -- or what would be the Court's authority, I guess, for the other similarly-situated members of the press?

MR. WEEKS: The members of the press here launch or have mounted an as-applied challenge. Their challenge is coming in as -- in their role as surrogates of the public. So what we have asserted here is a First Amendment right of access which the public has. But the press is sort of the surrogate for the public. That's language directly from *Richmond Newspapers*.

THE COURT: Okay, thank you. Anything else that you wanted to rebut?

MR. WEEKS: I just wanted to touch --

THE COURT: Mr. Garn, I will give you an opportunity to surrebut on that because we haven't talked about that issue until just now.

MR. WEEKS: Briefly, Your Honor, just on the timing issue, I do think it's important to note that there was a 15-year hiatus in executions in Indiana between 2009 and 2024. Between 2009 and 2024, based on the declarations that we have submitted, specifically the declaration of Jennie Runevitch and that of Thomas Coyne, the procedure seems to have changed somewhat from -- not unsurprisingly -- from 2009 to 2024. And so gathering some facts as to how the ISP and the Department of Corrections conducts its execution I think is important to this to -- to providing the Court with full information it needs to determine this case.

I also think that defendants made an important concession during their argument here, which was that they don't see any issue going forward with executions, with press access and executions after the May 20th --

THE COURT: I didn't hear them say that, but --

MR. WEEKS: Well, I could be wrong, Your Honor, but I think -- I think what I heard is that they said their issue is with May 20th and after that they're willing to discuss.

Well, they can't discuss because --

THE COURT: I think they're willing to litigate, but I'm not sure they're willing to discuss.

MR. WEEKS: Well, maybe --

THE COURT: Maybe I -- we will give Mr. Garn an opportunity to clarify that, but I don't think I heard that the same as you did.

MR. WEEKS: I also wanted to respond to Your Honor's earlier question about the role of *Press-Enterprise* outside of adjudicative proceedings. First of all, that phrase, "adjudicative proceeding," is not found in the Supreme Court case law. That's a conclusion that defendants have drawn, I think, themselves.

If you look at the Court -- if the Court looks at the decision in the Pennsylvania case, *Philadelphia Inquirer v. Wetzel*, you will see that there are -- the *Press-Enterprise II* analysis is applied in some jurisdictions to administrative proceedings, including those ordered by the executive. But I think a better way to frame this analysis is the purpose of the *Press-Enterprise* test.

The Supreme Court has never limited the *Press-Enterprise* test to adjudicative proceedings. It just happens that the cases that it had during that line of cases started with the criminal trial, proceeded through voir dire and pretrial hearings. I think the Supreme Court was very

clear in *Press-Enterprise II* that this is a general test to be applied across government proceedings. And I do think that's what we have here because --

THE COURT: But are there other cases out there that speak to the press's access to prisons in general?

MR. WEEKS: Prisons in general, yes. That would be the *Pell* line of cases. And I think because *Pell* was decided before *Richmond Newspapers* and its progeny, we can look at what the Court said about *Pell* in *Richmond Newspapers*. Justice Brennan said, if read carefully and with full context, the decisions in *Pell* and *Houchins* are better understood to first have the Court make the determination as to whether a First Amendment right attaches and, second, adjust the burden that the government needs to meet accordingly based on the specific situation.

So that's how you get the Ninth Circuit applying the *Turner* factors. Now, we disagree that the *Turner* factors should apply here, but that's now the Ninth Circuit gets to that conclusion.

So I think one note, opposing counsel here has attempted to clean up some of its witness's testimony about Terre Haute. I don't think the Court should consider the attorney argument of counsel over the testimony of Warden Neal regarding Terre Haute. It is -- it is quite remarkable --

THE COURT: It's in the record, though, that the BOP

procedures are far more witnesses than --

MR. WEEKS: Correct. And the BOP provides even -- for instance, at the execution of Timothy McVeigh, I think BOP provided access even beyond letting those people in the room, closed-circuit television for witnesses of the affected people and members of the press.

I think there are -- there are additional procedures that BOP puts in place. And I think what the Court -- the takeaway from that is not that this is an outlier but that this is what every other -- the reason that there haven't been a lot of these challenges where there's no access and we're challenging on the grounds that there should be access is because every other state, except for Wyoming, provides some measure of access to the public and the press for executions. Thank you.

THE COURT: All right. Thank you, Mr. Weeks.

Mr. Garn, I said I would let you surrebut, particularly on that issue that we were discussing, but you can also, if you would like to clarify the state's position or the defendants' position with regard to post-Ritchie scheduled proceedings.

MR. GARN: Thank you, Your Honor. Thank you, Your Honor.

So they're asking for, it sounds like, four witnesses or up to four, and it's not clear what room they would be in.

If it did come to that, I would ask that Mr. Neal testify about that because there are concerns about which room reporters would be in. So if there's -- if the reporters would go into the victim's room, there would be a lot of concerns with that. Because one way or another, Mr. Neal has testified that there are only two rooms for witnesses.

And so it would be either with the victim's family, victim's witnesses, or the condemned individual witnesses. So if it were to be about going into the victim's room, that would be very concerning.

And Your Honor is correct. We would litigate this case further. That would be -- we would be fine with that. It's the timing of the execution coming up in a couple of days that is deeply concerning. With that said, I am always happy to discuss cases. If we have a settlement conference with Magistrate Judge Dinsmore, that we would discuss it in that context, too. But I wasn't suggesting that we are going -- that we had room to discuss about the -- any upcoming executions after Mr. Ritchie.

And then opposing counsel mentioned the Pennsylvania case. I think it's important to look at that because there it was determinative that an execution did not take place at a prison facility. So that's all I have, if the Court doesn't have any more questions.

THE COURT: Okay. Okay. Thank you, gentlemen --

lady and gentlemen for your arguments, for your presentations this morning. The Court will take the pending motion under advisement. We will strive to issue a timely ruling. And if there's nothing further from the parties, we will be adjourned. Thank you.

MR. GARN: Thank you, Your Honor.

MR. WEEKS: Thank you, Your Honor.

COURTROOM DEPUTY: All rise.

*(Adjourned at 11:50 a.m.)*

***************************

CERTIFICATE OF COURT REPORTER

I, Amy L. Hooten, RDR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/s Amy L. Hooten May 16, 2025

AMY L. HOOTEN, RDR, CRR
Official Court Reporter
Southern District of Indiana
Evansville Division