**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

THE ASSOCIATED PRESS, STATES NEWSROOM d/b/a Indiana Capital Chronicle, USA TODAY CO., INC., CIRCLE CITY BROADCASTING I, LLC, and TEGNA INC.,

*Plaintiffs*,

v.

RON NEAL, *in his official capacity as the Superintendent of Indiana State Prison*, and LLOYD ARNOLD, *in his official capacity as the Commissioner of the Indiana Department of Correction*,

*Defendants*.

Case No. 1:25-cv-872-MPB-MJD

**STATEWIDE RELIEF SOUGHT**

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B) and Local Rule 7-1(c)(2), Plaintiffs respectfully submit this amended complaint and allege as follows:

**INTRODUCTION**

1. This complaint challenges the constitutionality of Indiana Code § 35-38-6-6(a) ("Section 6(a)") and the Indiana Department of Correction's ("IDOC") Indiana State Prison Facility Directive, ISP 06-26: Execution of Death Sentence, Sec. C (June 17, 2024) ("ISP 06-26") (attached hereto as **Exhibit A**).

2. Defendants' enforcement of Section 6(a) and ISP 06-26 unconstitutionally restricts Plaintiffs—news organizations that seek to serve as "surrogates for the public"—from observing executions carried out by the State of Indiana. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion).

3. Section 6(a) and ISP 06-26 also pose an unconstitutional burden on Plaintiffs' right to gather and disseminate news and information about executions carried out by the State of Indiana in a manner that is not narrowly tailored to achieve a compelling government interest.

4. Accordingly, Plaintiffs seek declaratory and prospective injunctive relief under 42 U.S.C. § 1983 to prevent Defendants from depriving Plaintiffs of their First Amendment right to attend and observe executions carried out by the State of Indiana.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over Plaintiffs' section 1983 claims pursuant to 28 U.S.C. §§ 1331 and 1343.

6. Venue is proper in the Southern District of Indiana under 28 U.S.C. § 1391(b) because all Defendants are residents of Indiana and Defendant Lloyd Arnold resides in this District in his official capacity as the Commissioner of the Indiana Department of Correction.

## PARTIES

7. Plaintiff The Associated Press is an independent not-for-profit global news organization. The AP is one of the world's most trusted news sources, reaching four billion people per day, including with its coverage of executions carried out across the United States. The AP is incorporated under the laws of New York with its headquarters and principal place of business in New York.

8. Plaintiff States Newsroom d/b/a Indiana Capital Chronicle (the "Capital Chronicle") is a nonprofit news outlet focusing on state policy. Its Creative Commons license allows all media in Indiana and nationwide to republish its content for free. Newspapers, television and radio outlets run Capital Chronicle content hundreds of times per month. The Capital

Chronicle employs one editor and three reporters full-time, including reporters who gather news about executions taking place in Indiana.

9. Plaintiff USA Today Co., Inc. ("USA Today") is the largest local newspaper company in the United States. It has more than 200 local daily brands in 43 states. In Indiana, USA Today owns and operates through its subsidiaries, including, among others, The Indianapolis Star, the Lafayette Journal & Courier, The Herald-Times in Bloomington, and the South Bend Tribune. These publications employ full-time reporters who gather news on matters of public concern, including news about executions taking place in Indiana.

10. Plaintiff Circle City Broadcasting I, LLC ("WISH-TV") is Indiana's only locally owned and operated broadcast and digital news media network. WISH-TV is a statewide television news network offering 80 hours per week of local news and programming and provides around-the-clock information on digital platforms. Circle City Broadcasting I, LLC is a certified Minority Business Enterprise and Black owned business. It employs full-time reporters who gather news on matters of public concern, including news about executions taking place in Indiana.

11. Plaintiff TEGNA Inc. ("TEGNA") owns or services (through shared service agreements or other similar agreements) 64 television stations in 52 markets. In Indiana, TEGNA owns and operates WTHR-13, a television station in Indianapolis, Indiana. TEGNA employs full-time reporters who gather news on matters of public concern, including news about executions taking place in Indiana.

12. Defendant Ron Neal is the Superintendent of Indiana State Prison. As Superintendent, Defendant Neal is required under Indiana law to execute death warrants for condemned prisoners, Ind. Code § 35-38-6-2, and to administer Indiana Code § 35-38-6-6. Defendant Neal is sued in his official capacity.

13. Defendant Lloyd Arnold is the Commissioner of the Indiana Department of Correction ("IDOC"). Under his direction and control, IDOC is authorized to adopt rules and regulations governing execution protocols, Ind. Code § 35-38-6-1(d), and for witness access, Ind. Code § 35-38-6-6(b)–(c). Defendant Arnold is sued in his official capacity.

## FACTUAL ALLEGATIONS

### *A. Defendants administer executions pursuant to statute, protocol, and the Eighth Amendment.*

14. IDOC is required to conduct its executions in a manner that complies with the Eighth Amendment to the United States Constitution, which "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). Indiana cannot constitutionally enforce a law that imposes—and Defendants are not constitutionally permitted to carry out—a punishment, including a method of execution, that does not meet that Eighth Amendment standard "in the light of contemporary human knowledge." *See Robinson v. California*, 370 U.S. 660, 666 (1962).

15. The death sentence in Indiana is carried out pursuant to Indiana Code §§ 35-38-6-1 through 10.

16. IDOC is permitted to adopt rules and policies to govern its administration of executions. Ind. Code § 35-38-6-1(d). Its current implementing policy is ISP 06-26.

17. The statutorily required method of execution is currently lethal injection. Ind. Code § 35-38-6-1(a). IDOC's rulemaking authority includes selecting which lethal injection drugs to administer and the amount and order in which to administer those drugs.

18. After the death sentence is imposed in a criminal case, the sentencing court is required to issue a warrant ordering Defendant Neal to execute the convicted person at a specific time and date in the state prison. Ind. Code § 35-38-6-2.

19. When Indiana's Supreme Court stays the execution of a death sentence during the pendency of an appeal, it is responsible for setting a new date for the execution upon resolution of the appeal, which it does through published order. Ind. Code § 35-50-2-9(h); *see, e.g.*, *Ritchie v. State*, 254 N.E.3d 1064, 1065 (Ind. 2025); Order, *Ward v. State*, Nos. 74S00-0907-PD-320, 25S-SD-167 (Ind. July 7, 2025), *available at* https://www.in.gov/courts/files/order-other-2025-25S-SD-167.pdf.

20. The Governor of Indiana has the authority under Indiana Constitution Article 5, Section 17, to grant reprieves, commutations, and pardons.

21. Applications for clemency from individuals who have been sentenced to death are made to a parole board, which submits its recommendation to the Governor. Ind. Code § 11-9-2-2. Applications for clemency cannot be made by inmates on death row until "there is an execution date set that has not been stayed by a court." 220 Ind. Admin. Code 1.1-4-1(d).

22. There is no constitutional or statutory time limit on when the Governor may decide whether to grant clemency prior to an execution. The Governor may adjudicate a death row inmate's application for clemency up until that person is executed.

23. On the day of an execution, Defendant Neal or a designee assigns staff to monitor dedicated phone lines to the Governor's office and residence and to the Indiana Supreme Court. Ex. A at 3, 8.

24. Upon information and belief, IDOC "record[s] the steps taken during the execution process and log[s] the times." *Id.* at 8.

25. Prior to IDOC's execution team administering the lethal injection drugs, Defendant Neal or his designee reads the execution order to the condemned individual. *Id.* at 9. Defendant Neal or his designee then asks the condemned individual if he has any last words. *Id.* at 10.

Following the administration of lethal injection drugs, a physician pronounces the time of death. *Id.*

26. Executions are required by statute to take place inside a purpose-built room on the property of the state prison. Ind. Code § 35-38-6-5.

27. Executions are required by statute to take place "before the hour of sunrise" on a date fixed by court order. Ind. Code § 35-38-6-1(b).

28. Upon information and belief, IDOC currently conducts executions in the Support Services building on the grounds of the Indiana State prison.

29. Upon information and belief, IDOC is currently constructing or has constructed a new execution chamber, on the grounds of Westville Correctional Facility, in which it intends to conduct executions once operational.

30. Upon information and belief, the new facility is equipped to accommodate both lethal injection and firing squad executions.

***B. Section 6(a) and ISP 06-26 restrict who may observe executions in Indiana.***

31. Section 6(a), reproduced in relevant part herein, provides that only certain, limited categories of witnesses may attend executions in the state:

> Only the following persons may be present at the execution:
>
> (1) The warden of the state prison.
>
> (2) The person designated by the warden of the state prison and any assistants who are necessary to assist in the execution.
>
> (3) The prison physician.
>
> (4) One (1) other physician.
>
> (5) The spiritual advisor of the convicted person.
>
> (6) The prison chaplain.

> (7) Not more than five (5) friends or relatives of the convicted person who are invited by the convicted person to attend.
>
> (8) Except as provided in subsection (b), not more than eight (8) of the following members of the victim's immediate family who are at least eighteen (18) years of age:
>
> > (A) The victim's spouse.
> >
> > (B) One (1) or more of the victim's children.
> >
> > (C) One (1) or more of the victim's parents.
> >
> > (D) One (1) or more of the victim's grandparents.
> >
> > (E) One (1) or more of the victim's siblings.

Ind. Code § 35-38-6-6(a).

32. Section 6(a) was added to the Indiana Code in 1983. 1983 Ind. Acts 1885. A predecessor provision was codified in 1889. 1889 Ind. Acts 193.

33. In 2006, Section 6(a) was amended to decrease the number of "friends or relatives of the convicted person" from ten to five, and to provide for the attendance of eight members of the victim's immediate family. 2006 Ind. Acts 1384–85.

34. Defendants' implementing policy, ISP 06-26, reproduced in relevant part herein, states that the press "shall not be permitted to witness the execution or to be in the Execution Chamber":

> C. NEWS MEDIA:
>
> 1. The Commissioner or their designee shall designate a Central Office staff person to assist the State Prison in the coordination of media communications. The designated Central Office staff person shall be present at the State Prison to assist with the media during the period preceding the execution. Additionally, the Warden shall designate a staff person to assist with coordinating media activities.
>
> 2. Authorized and properly identified representatives of the news media shall be permitted access to a designated area. Media personnel must remain in the designated area until the execution has

> been completed. The Warden or designee shall assign a staff person to remain with the media personnel at all times.
>
> 3. Media personnel shall not be permitted to witness the execution or to be in the Execution Chamber. The only exception to this rule is if the offender requests, in writing, that a member or members of the media be present. The name of the individual(s) must then be included on the list of five (5) persons who are invited by the offender to witness the execution.
>
> 4. Under no circumstances will cameras or recorders not under the control of the Department of Correction be permitted in the execution area.

Ex. A at 3.

35. On December 18, 2024, Indiana executed Joseph Corcoran and the observers at Corcoran's execution were limited by Defendants' enforcement of Section 6(a) and ISP 06-26.

36. On May 20, 2025, Indiana executed Benjamin Ritchie and the observers at Ritchie's execution were limited by Defendants' enforcement of Section 6(a) and ISP 06-26.

37. On October 10, 2025, Indiana executed Roy Lee Ward and the observers at Ward's execution were limited by Defendants' enforcement of Section 6(a) and ISP 06-26.

38. Upon information and belief, four other individuals are currently awaiting execution in Indiana. Ind. Dep't of Corr., State of Indiana Offenders Sentenced to Death (Nov. 21, 2019) (attached hereto as **Exhibit B**) (noting that a fifth individual on death row is not presently competent for execution); Casey Smith, *Indiana's death row dwindles to five—and future executions remain uncertain*, Ind. Cap. Chron. (Oct. 20, 2025), https://indianacapitalchronicle.com/2025/10/20/indianas-death-row-dwindles-to-five-and-future-executions-remain-uncertain/.

39. Defendants' enforcement of Section 6(a) and ISP 06-26 will limit observers at Indiana's future executions of individuals sentenced to death in the state.

40. In the event that ISP 06-26 is modified or revoked, Defendants' enforcement of Section 6(a) will still limit the people permitted to observe future executions in Indiana.

41. In the event that executions are conducted at Westville Correctional facility, Defendants' enforcement of Section 6(a) will still limit the people permitted to observe future executions in Indiana.

***C. Plaintiffs are news media entities that employ reporters to cover executions.***

42. Plaintiffs are organizations that gather and publish the news and represent the interests of journalists and news organizations working in Indiana.

43. Plaintiffs' journalists routinely document the manner in which law enforcement officers, the criminal justice system, and correctional institutions perform official duties, including by directly observing the operations of those institutions and reporting on their proceedings.

44. Plaintiffs are in the business of publishing newsworthy information and all employ journalists assigned to cover activities of Indiana's law enforcement, criminal justice system, and correctional institutions on a regular basis. *See, e.g.*, Casey Smith, *New Document Shows Indiana Paid $900,000 for Execution Drug, but Other Details Still Sparse*, Ind. Cap. Chron. (Mar. 26, 2025), https://indianacapitalchronicle.com/2025/03/26/new-document-shows-indiana-paid-900000-for-execution-drug-but-other-details-still-sparse/; Kristine Phillips, *Lawless: Legacy of Racist, Brutal Police Culture Still Plagues City of Elkhart*, The Indianapolis Star (Apr. 29, 2025), https://www.indystar.com/story/news/investigations/2025/04/29/lawless-racist-brutal-cops-wolverines-elkhart-indiana/81925291007/; *see generally* Crime, WTHR-13, https://www.wthr.com/crime (last visited Aug. 14, 2026); Crime Watch 8, WISH-TV, https://www.wishtv.com/crime-watch-8/ (last visited Aug. 14, 2026).

45. For instance, USA Today, through its subsidiary The Indianapolis Star, and TEGNA, through its subsidiary WTHR-13, covered the crime, prosecution, and sentencing of

Benjamin Ritchie. *See, e.g.*, Joe Fahy & Terry Horne, *Beech Grove Policeman Slain*, The Indianapolis Star, Sept. 30, 2000, at 01A; Vic Ryckaert, *Suspect May Face Death Penalty; Prosecutor Puts Process in Motion to Seek Lethal Injection for Man Accused of Killing Police Officer*, The Indianapolis Star, Nov. 2, 2002, at 01B; Steve Jefferson, *Convicted Cop Killer Tells His Story*, WTHR-13 (Aug. 15, 2002), https://www.wthr.com/article/news/convicted-cop-killer-tells-his-story/531-db2acea2-9bc8-4d19-8df9-08c867808ac2; Vic Ryckaert, *Ritchie Gets Death for Murder of Officer; Killer, 22, Laughed as Verdict Was Read; Jury Deliberated for About 3 ½ Hours*, The Indianapolis Star, Aug. 15, 2002, at 01A; Steve Jefferson, *Convicted Cop Killer Gets Death Row*, WTHR-13 (Oct. 15, 2002), https://www.wthr.com/article/news/convicted-cop-killer-gets-death-row/531-8edb2075-3c56-4cd8-8855-b64147db12f8.

46. Similarly, WISH-TV, the Capital Chronicle, and The AP covered final legal challenges filed by Corcoran, Ritchie, and Ward before their executions. *See, e.g.*, Tim Spears, *Corcoran's Defense Discusses Latest Attempt to Stay Execution,* WISH-TV (Dec. 15, 2024), https://www.wishtv.com/news/i-team/corcorans-defense-discusses-latest-attempt-to-stay-execution/; Casey Smith, *Roy Ward Drops Final Legal Challenges, Clearing Way for Indiana's Second Execution This Year*, Ind. Cap. Chron. (Oct. 8, 2025), https://indianacapitalchronicle.com/2025/10/08/roy-ward-drops-final-legal-challenges-clearing-way-for-indianas-second-execution-this-year/; Jay Adkins, *Indiana Attorney General Seeking Second Execution Date for Convicted Murderer*, WISH-TV (Sept. 27, 2024), https://www.wishtv.com/ news/politics/indiana-attorney-general-seeking-second-execution-date-for-convicted-murderer/; Brady Gibson, *Killer of Beech Grove Police Officer Cites Fetal Alcohol Syndrome to Avoid Execution*, WISH-TV (Dec. 3, 2024), https://www.wishtv.com/news/crime-watch-8/killer-of-beech-grove-police-officer-cites-

fetal-alcohol-syndrome-to-avoid-execution/; Todd Richmond, *Indiana Supreme Court Sets May Execution for Man Convicted of Killing Police Officer*, AP News (Apr. 15, 2025), https://apnews.com/article/indiana-execution-date-benjamin-ritchie-murder-c743857b0111b0cece3cfdfc07be8136; Casey Smith, *Clemency Hearings Scheduled for Indiana Death Row Inmate Benjamin Ritchie*, Ind. Cap. Chron. (Apr. 28, 2025), https://indianacapitalchronicle.com/2025/04/28/clemency-hearings-scheduled-for-indiana-death-row-inmate-benjamin-ritchie/.

47. Upon learning of Corcoran's scheduled execution, The AP contacted IDOC and requested information about how to attend the execution. The AP intended to send a reporter to witness the execution so that it could publish reporting on the proceeding. The Chief Communications Officer for IDOC stated that The AP could not attend, citing Indiana Code § 35-38-6-6(a).

48. Similarly, upon learning of Corcoran's scheduled execution, USA Today began covering the story in earnest using court filings, written statements from the Indiana state government, and interviews with Corcoran's attorneys. Due to Indiana Code § 35-38-6-6(a), USA Today did not formally request to attend Corcoran's execution, but it did send reporter Joseph Dits to cover the proceeding from the parking lot of the Indiana State Prison in Michigan City.

49. Similarly, upon learning of Corcoran's scheduled execution, WISH-TV enlisted a team of journalists, led by Tim Spears, to cover all aspects of the appeals and pre-execution process, including the State's acquisition of the drug pentobarbital. In the days before the execution, Mr. Spears interviewed then-Governor Eric Holcomb and Corcoran attorney Joanna Green regarding Corcoran's execution. Mr. Spears made multiple requests to interview Corcoran before his execution, but Mr. Spears was not granted an interview. Mr. Spears covered the

execution from the parking lot outside of Indiana State Prison in Michigan City with two other WISH-TV journalists, but they were not permitted to enter the facility.

50. Similarly, TEGNA, through WTHR-13, was unable to enter the facility to observe the execution of Corcoran, despite its coverage in the days and weeks prior. *See, e.g.*, Rich Nye, *Indiana's First Execution in 15 Years Now 1 Week Away*, WTHR-13 (Dec. 11, 2024), https://www.wthr.com/article/news/crime/indiana-first-execution-in-15-years-now-1-week-away-joseph-corcoran/531-1708882d-b7ac-4ef7-a27f-33cfd6eb9d13.

51. A journalist working for the Capital Chronicle, Casey Smith, was permitted to attend Corcoran's execution because Corcoran designated Smith as one of his "five (5) friends or relatives of the convicted person who are invited by the convicted person to attend." Ind. Code § 35-38-6-6(a)(7); *see also* Ex. A at 3.

52. In an article published by the Capital Chronicle, Smith reported that "Department of Correction officials said in a statement that 'the execution process started shortly after' 12 a.m. Central Time," and that witnesses were not allowed into the execution room until 12:32 a.m. Casey Smith, *Death Row Inmate Joseph Corcoran Executed for Quadruple Murder*, Ind. Cap. Chron. (Dec. 18, 2024), https://indianacapitalchronicle.com/2024/12/18/death-row-inmate-jospeh-corcoran-executed-for-quadruple-murder/.

53. Further, Smith reported that "[t]he execution was the first in which Indiana used" only pentobarbital, and that it was "not clear when exactly the execution drug . . . was administered into Corcoran's left arm, via an IV line that protruded from the execution chamber's wall." *Id.*

54. Further, Smith reported that "[b]linds for a one-way window with limited visibility into the execution chamber were raised at 12:34 a.m. Corcoran appeared awake with his eyes blinking, but otherwise still and silent, at that time. After a brief movement of his left hand and

fingers at about 12:37 a.m., Corcoran did not move again. Blinds to the witness room were closed by the prison warden at 12:40 a.m." *Id.*

55. Further, Smith reported that "[w]itnesses were unable to hear voices inside the execution chamber; DOC officials said Corcoran's last words were, 'Not really. Let's get this over with.'" *Id.*

56. Further, Smith reported that although IDOC had originally denied a request from Corcoran to permit his spiritual advisor inside the execution chamber, after a lawsuit by Corcoran, "Rev. David Leitzel, Corcoran's Wesleyan minister, was allowed within the execution chamber as Corcoran died." Smith reported that Leitzel said of Corcoran, "his greatest fear was that it would not be peaceful. From my perspective, it was very, very peaceful." *Id.*

57. Further, Smith reported that a "DOC statement was issued at 12:59 a.m., in the minutes following the conclusion of Corcoran's execution, indicating his time of death and last words." *Id.*

58. Smith's reporting "filled in key gaps" in the government's statements about Corcoran's execution proceeding. Liliana Segura, *Indiana's Midnight Executions Are a Relic of Another Age*, The Intercept (Dec. 22, 2024), https://theintercept.com/2024/12/22/indiana-execution-joseph-corcoran-death-penalty/.

59. By statute, the only people permitted to visit a person sentenced to death are that person's attorney, physician, relatives, friends, and spiritual advisor. Ind. Code § 35-38-6-4; *see also* 210 Ind. Admin. Code 1-8-10.

60. Plaintiffs were unable to send reporters to the executions of Benjamin Ritchie on May 20, 2025, or of Roy Lee Ward on October 10, 2025, because of Defendants' enforcement of Section 6(a) and ISP 06-26.

61. Upon information and belief, the State of Indiana intends to schedule further executions.

62. Plaintiffs each intend to cover future executions scheduled in Indiana, including by sending their reporters to directly observe proceedings in the execution chamber. Plaintiffs intend to publish the observations of their reporters who witness those in-person proceedings.

63. Plaintiffs' proposed course of conduct will be prevented by Defendants' enforcement of Indiana Code § 35-38-6-6(a) and ISP 06-26.

***D. Section 6(a) and ISP 06-26 burden newsgathering.***

64. ISP 06-26 states, "[m]edia personnel shall not be permitted to witness the execution or to be in the Execution Chamber," unless invited by the condemned inmate. Ex. A at 3.

65. The intent of Indiana's statutory restriction on general public observers at executions is "to prevent the newspapers from sending representatives to describe the executions, and therefore no press representatives will be admitted." *A Day With Lawmakers*, Indianapolis J., Feb. 7, 1889, at 5 (discussing bill that was enacted as 1889 Ind. Acts 193, withdrawing statutory protection from general public observers in 1852 Ind. Acts (Vol. II) 379).

66. Plaintiffs' goal, in seeking to observe executions, is to gather information, including by acting as their own primary source of information, in order to report to the general public about Indiana's executions and other criminal justice proceedings.

67. Upon information and belief, Section 6(a) and ISP 06-26 are intended, among other things, to prevent members of the press from "gather[ing] information to report on Indiana executions." Oral Argument at 15:05, *Associated Press v. Neal*, No. 25-2025 (7th Cir. Feb. 18, 2026) (statement of Megan Smith, appellate counsel for the State).

68. Upon information and belief, Section 6(a) and ISP 06-26 are intended, among other things, to prevent members of the press from "be[ing] their own primary source of the information" about executions. *Id.* at 25:45.

69. There is no statutory requirement that Defendants disclose what occurred during an execution to the public.

70. Upon information and belief, ISP 06-26 contains no requirement that any observer of executions in Indiana describe what occurred during an execution to the public.

71. ISP 06-26 states, "[a]fter the body has been removed from the facility, a representative of the facility or Department of Correction shall make a statement to the news media." Ex. A at 12. Upon information and belief, through this statement Defendants provide only the time the execution commenced, the time the condemned person was pronounced dead, and IDOC's description of the condemned's last words.

72. ISP 06-26 states that "[a]uthorized and properly identified representatives of the news media shall be permitted access to a designated area" during executions. Ex. A at 3. Upon information and belief, the designated area is the parking lot of Indiana State Prison.

73. Upon information and belief, no legitimate penological goal is advanced through Defendants' enforcement of Section 6(a) and ISP 06-26 against Plaintiffs.

74. Members of the press, including Plaintiffs' reporters, have experience converting first-hand observation of an event into a detailed, accurate, and fulsome account of that event in a manner that can be published for the edification of members of the general public.

75. Members of the press that observe executions conduct background research, interviews, and information gathering in advance of the execution they are observing in order to best provide detailed, accurate, and fulsome information to the public.

76. Members of the press that observe executions acquire familiarity with the execution proceedings, which helps them provide detailed, accurate, and fulsome information to the public.

77. Having multiple members of the press observe an execution facilitates the reporting of detailed, accurate, and fulsome information to the public, and increases the likelihood that the corpus of information available to the public is detailed, accurate, and fulsome.

***E. The tradition of public observers at executions at the ratification of the Bill of Rights.***

78. Section 6(a) and ISP 06-26 depart from the tradition of permitting public observers, including press observers, to attend executions that dates to well before the founding.

79. "In early America, as in England, public hangings were the most common method of execution." Sheherezade C. Malik & D. Paul Holdsworth, *A Survey of the History of the Death Penalty in the United States*, 49 U. Rich. L. Rev. 693, 696 (2015).

80. All or most hangings at English common law were conducted in full public view and members of the general public were permitted to observe.

81. All or most hangings in colonial America were conducted in full public view and members of the general public were permitted to observe.

82. All or most hangings in early America, both before and after ratification of the Bill of Rights, were conducted in full public view and members of the public were permitted to observe.

***F. The tradition of public observers at executions at the ratification of the Fourteenth Amendment.***

83. The tradition of public hangings continued well after the founding and framing. As of 1868 the following states and territories had no law governing where executions were to take place, meaning that any executions they carried out typically occurred in full public view at the town or county gallows: Arkansas, Connecticut, Iowa, Kentucky, Louisiana, Maryland, Minnesota, Missouri, Nebraska, Nevada, New Jersey, Oregon, South Carolina, Tennessee, Texas,

West Virginia, Wisconsin, and the Territories of Arizona, Dakota, Idaho, New Mexico, Oklahoma, Utah, Washington, and Wyoming.

84. Other state legislatures passed laws governing where executions were to take place. Most of these laws either purported to require or explicitly codified a statutory preference for executions to take place at or near local or county jails or jail yards.

85. As is evident from legislative history, contemporaneous news accounts, and other sources, the purpose of such laws during this period was not to limit transparency or forfeit the public's ability to understand what happened at executions.

86. Although the laws governing the fora of executions that were enacted during this era often required certain witnesses to attend, they did not limit how many other people could attend jail or jail yard executions. *See, e.g.*, 1868 Fla. Laws 110–11; 1849 Del. Laws 367; 1858 Cal. Laws 192–93; 1855–56 Va. Acts 36–37; 1840 Ala. Laws 150; 1839 Miss. Laws 110.

87. For example, large crowds, including members of the press, continued to access executions conducted at Florida jail yards after the passage of its 1868 law. *See, e.g.*, *Bill Westmoreland's End*, Fla. Times-Union, Aug. 16, 1889, at 5 (reporting "[a]t 9:30 o'clock a representative of the Times-Union knocked at the door [of the jail, and] was admitted" to the jail yard, which became "filled" with a "crowd" of observers to the hanging); *Double Hanging at Crestview of Two Murderers*, Tampa Morning Trib., Sept. 24, 1921, at 1 ("A crowd estimated at 1,000 persons had gathered to witness the hanging, which was a public one.").

88. Large crowds, including members of the press, also continued to access executions conducted in Delaware jail yards in the years following the passage of its 1849 law and for well into the twentieth century. *See, e.g.*, *Execution of Armstrong, the Wife Murderer!*, Del. Trib., Feb. 14, 1867 at 4 (between "twelve hundred and thirteen hundred people" admitted to 1867 execution);

*Gordy Hanged Today*, Evening J., June 11, 1897, at 1 ("The small jailyard was crowded to its utmost capacity and every point of vantage outside was occupied" for 1897 execution); Norman MacLeod, *Hanging Over, Georgetown is Back to Normal*, Wilmington Daily Com., Feb. 27, 1926, at 16 ("about 100 persons being permitted in the jail yard" at 1926 execution, including "newspaper men, official witnesses, guests of the sheriff and the jury").

89. In Alabama, sheriffs maintained discretion to conduct executions in full public view, and large crowds continued to attend public executions. *See, e.g.*, *Noon Telegrams*, Montgomery Daily Advertiser, Mar. 24, 1878, at 1 (noting 1878 triple-hanging was conducted "in the presence of about 10,000 people").

90. And crowds of general public observers at executions conducted in Mississippi were commonplace. *See, e.g.*, *Hanging of Bovard and Three Negroes*, Vicksburg Daily Whig, June 28, 1856, at 3 ("The crowd in attendance was immense. Never so many people assembled here before."); *Hanging at Starkville*, Jackson Daily News, Aug. 8, 1915, at 5 (reporting a "crowd numbered in the neighborhood of 5,000" at "public double hanging").

91. As state legislatures passed statutes governing where executions were to be held, an overwhelming majority also adopted provisions protecting the public's right of access by, at minimum, requiring the government official in charge of the execution to invite members of the general public to observe the proceeding:

| **State Statute** | **Observer Requirements** |
|---|---|
| 1833–34 Pa. Laws 235 | Required sheriff to invite 12 reputable citizens |
| 1835 N.Y. Laws 299 | Required sheriff to invite 12 reputable citizens |
| 1836 N.H. Laws 241–42 | Required sheriff to invite up to 12 reputable citizens |
| 1843 Ohio Laws 71 | Permitted sheriff to invite 6 citizens |
| 1846 Mich. Rev. Stat. tit. XXXI, ch. 168, § 12 | Required sheriff to invite 12 respectable citizens |

| | |
|---|---|
| 1849 Del. Laws 367 | Required sheriff to summon 12 good and lawful men as a jury |
| 1852 Ind. Acts (Vol. II) 379 | Required sheriff to invite 12 reputable citizens |
| 1855–56 Va. Acts 37 | Required court officer to invite 12 respectable citizens |
| 1858 Kan. Terr. Laws 190 | Required sheriff to invite 12 reputable citizens |
| 1858 Cal. Laws 192 | Required sheriff to invite 12 respectable citizens or more |
| 1859 Ill. Laws 17 | Required sheriff to invite 12 reputable citizens |
| 1864 Mont. Terr. Laws 250 | Required sheriff to invite 12 reputable citizens |
| 1868 N.C. Sess. Laws (Spec. Sess.) 34 | Required sheriff to invite 18–36 respectable citizens |
| 1868 Fla. Laws 110–11 | Required sheriff to invite 12 reputable citizens |

92. Even where a state law did purport to limit how many people could observe executions, "the tradition of public execution was tenacious," with "[m]any localities and sheriffs decid[ing] either to ignore private execution laws or to adhere to them in the most perfunctory fashion." Michael A. Trotti, *The Scaffold's Revival: Race and Public Execution in the South*, 45 J. Soc. Hist. 195, 202 (2011).

93. For example, in Indiana, which codified a requirement that the sheriff invite "twelve reputable citizens" to attend executions at the same time it mandated that executions take place in the jail yard, *see* 1852 Ind. Acts (Vol. II) 379, executions continued to be attended by large crowds until the late nineteenth century. In one account of an 1879 jailhouse execution in Marion County, for example, a newspaper described the crowd: "[a]bout 250 tickets of invitation had been issued, and every one was represented" in the jailhouse yard—including "members of the press"—and that "at least 5,000 people throng[ed] the court yard and adjacent streets" who had not been issued tickets to witness the execution from within the jailhouse yard itself. *The Law Executed*, The Indianapolis News, Sept. 19, 1879.

94. From 1790 to 1937, federal law designated hanging as "the manner of inflicting the punishment of death" for federal crimes. *See* An Act for the Punishment of Certain Crimes Against the United States, § 33, 1 Stat. 112, 119 (1790). Although federal law did not specify the number of witnesses that could attend, throughout the 1800's, federal executions were often conducted before large crowds. *See Execution for Piracy*, Richmond Enquirer, Dec. 24, 1812, at 4 (describing federal execution in Boston and noting "spectators were estimated at upwards of 10,000"); *The Execution at Fort Klamath*, Daily Oregonian, Oct. 9, 1873, at 4 (noting "large number of citizens" were present at federal hanging in Oregon).

95. Executions conducted in Montana throughout the nineteenth and into the twentieth century also continued to be attended by large crowds. *See, e.g.*, *The Gallows! Execution of Wheatley for the Murder of Warl*, Helena Daily Herald, Aug. 13, 1875, at 3 (reporting that 1875 hanging "was virtually a public affair," because "more than a thousand people" crowded into the "houses and sheds in the immediate vicinity of the jail yard"); *Lu Sing Is Dead*, The Republican-Courier, Apr. 20, 1906, at 1 (reporting 1906 hanging was "witnessed by about 150 men and two women," including "representatives of the two local papers, quite a number of the city and county officials and about 100 others"); *George Hoffman Hanged at Choteau Tuesday Morning*, The Big Timber Pioneer, Aug. 31, 1933, at A1 (reporting "[m]ore than 175 Teton county residents including 12 official witnesses" had attended the 1933 hanging).

96. In North Carolina, "[p]ublic hangings were common . . . until the state took over administration of the death penalty in 1910." *History of Capital Punishment in North Carolina*, N.C. Dep't of Adult Corr., https://www.dac.nc.gov/divisions-and-sections/institutions/death-penalty/history-capital-punishment-north-carolina (last visited Aug. 14, 2026).

97. Crowds also continued to attend executions in New York jail yards. *See, e.g.*, *Three Executions Yesterday*, N.Y. Daily Herald, Mar. 2, 1867, at 10 (account of executions noting "two to three hundred spectators" at hanging in New York, and "over two hundred people" at hanging in Elmira).

98. Further, the press was always or virtually always among the public observers permitted to attend executions under these laws. Stuart Banner, The Death Penalty 162 (2002) ("Journalists were always allowed a place at jail-yard hangings.").

99. For example, members of the press continued to attend Pennsylvania executions conducted in jail yards after its 1833 law was passed. *Execution of Matthias Skupinski*, Public Ledger, Aug. 7, 1852, at 1 (reporting "one [r]eporter for the press; and the jury of twelve men" were admitted as witnesses to 1852 hanging); *Hanlon Hung*, The Evening Tel., Feb. 1, 1871, at 1 (reporting "non-official gentleman were sworn in as the 'Sheriff's Deputies,'" and, in addition to jury of twelve witnesses, "there were the special reporter of The Evening Telegraph and ten other representatives of the city press" at 1871 hanging).

100. Members of the press also continued to observe executions in New York's jails and jail yards after enactment of its 1835 law. *See, e.g.*, *Mary Runkle*, Rome Sentinel, Nov. 19, 1847, at 1 (noting "one of the Editors" of Oneida Morning Herald was present for 1847 hanging); *Hanged for Murder*, Daily Sentinel, Feb. 9, 1888, at 2 ("The Sentinel, the Utica Herald, Press Observer, Sunday Tribune, Syracuse Herald and the United and State Press associations were represented" at hanging).

101. Members of the press also continued to observe executions in the jails and jail yards of the Kansas Territory after enactment of its 1835 law. *See, e.g., Execution of Carl Horne!*, The

Daily Conservative, Feb. 14, 1863, at 3 (reporting that at Kansas's "first legal execution by hanging" after statehood, "reporters, and those persons who had invitations" were witnesses).

102. Reporters were "a constant presence" at executions conducted in California jail yards following the enactment of its 1858 law. *Cal. First Amend. Coal. v. Calderon*, 150 F.3d 976, 978 (9th Cir. 1998); *see also Exit Wheeler*, The Daily Exam'r, Jan. 24, 1884, at 2 (noting "the reporters [were] located in the reserved space, just opposite the cell" at 1884 execution).

103. Representatives of the press continued to observe executions conducted in Illinois jail yards following the passage of its 1859 and throughout the nineteenth century. *It Is Done*, Chi. Daily Trib., Mar. 15, 1873, at 5 (reporting crowd at 1873 hanging was "seventy-five strong, counting bailiffs, deputies, reporters, and loafers"); *The Hempen Remedy*, Newton Press, Nov. 16, 1887, at 6 (reporting "representatives of the press" were admitted before other ticket holders at 1887 execution); *Expiate Crimes on the Gallows*, Urbana Daily Courier, Apr. 23, 1904, at 1 ("newspapers were represented" among the witnesses to a 1904 triple-execution by hanging in Chicago).

104. Meanwhile, other states abolished the death penalty or conducted no executions at all. For example, Michigan abolished the death penalty in 1847, and Wisconsin in 1853. No executions occurred in those states after those dates. Rhode Island conducted no executions after 1845, although it abolished the death penalty in 1852, reinstated it in 1873, and abolished it again in 1984.

### *G. The tradition of public observers at executions under statutes passed 1868–1968.*

105. In the years following the ratification of the Fourteenth Amendment, state legislatures passed additional laws governing where executions were to take place.

106. From 1868 through the first years of the twentieth century, many states that had not done so previously passed laws requiring that executions take place at or near a local or county jail or jail yard.

107. As in the pre-1868 era, most states enacting such statutes also adopted provisions explicitly protecting the general public's ability to observe executions, including:

| State Statute | Observer Requirements |
|---|---|
| 1874 Or. Laws 116 | Required sheriff to select 12 electors to witness |
| 1876 Wyo. Terr. Laws 161 | Permitted sheriff to invite 12 citizens |
| 1877 Dakota Terr. Rev. Stat. Tit. IX, ch. II, § 469 | Required sheriff to invite 12 reputable citizens |
| 1878 Iowa Laws 152 | Required sheriff to invite 12 respectable citizens |
| 1879 Ky. Laws 60–61 | Required court and sheriff to designate up to 50 witnesses |
| 1882 Md. Laws 630–31 | Required sheriff to appoint up to 20 witnesses |
| 1883 Tenn. Acts 139–40 | Permitted sheriff to invite 6 citizens |
| 1884 La. Acts 102 | Required sheriff to admit 4–15 witnesses |
| 1887 Mo. Laws 169 | Required officer to invite 12 reputable citizens |
| 1887 Ark. Acts 29 | Permitted sheriff to admit 25 witnesses |
| 1887 Ariz. Terr. Sess. Laws 807 | Required sheriff to invite 12 reputable citizens |
| 1890 Okla. Terr. Sess. Laws 1014–15 | Required sheriff to invite 12 reputable citizens |

108. Under these statutes, large crowds of observers in some states continued to attend executions conducted in jails and jail yards until well into the twentieth century.

109. For example, large crowds attended executions in the Arizona territory following the passage of its 1887 law. *See, e.g.*, *The Death of Ortiz*, Ariz. Republic, Nov. 19, 1900, at 1 (estimating 1900 hanging in Arizona was attended by "200 spectators"); *Paid the Penalty*, Graham Guardian, July 12, 1907, at 1 (reporting "[a]bout 200 people witnessed" 1907 hanging, including "officers, newspaper men and others" in Arizona).

110. The press was always or virtually always among the public observers permitted to attend executions under these post-1868 jail yard laws. Banner, *supra*, at 158.

111. For instance, representatives of the press continued to access executions conducted in Maryland in the decades following the passage of its 1882 law. *Monahan Hanged*, Balt. Sun, Aug. 14, 1897, at 7 (reporting that "[a]t least seventy-five persons were present, including newspaper men" for 1897 hanging); *Confesses; Is Hanged*, Balt. Sun, Jan. 4, 1913, at 5 (reporting "[a]bout 50 persons were present at the hanging, besides the newspaper men").

112. Representatives of the press also continued to access executions conducted in Iowa following the passage of its 1878 law. *Hanged*, The Courier, Dec. 21, 1887, at 5 (noting "[t]he reporters, note books in hand, clustered around as the ebbing life beats were counted" during 1887 hanging); *The Law Vindicated!*, The Courier, Jan. 18, 1888, at 2 (noting 1888 "execution was witnessed by Judge Hatch, who presided over the trial, and by the jury, as required by law, and of the court, county attorney, and a few visiting sheriffs and reporters").

113. Representatives of the press also continued to access executions conducted in Missouri following the passage of its 1887 law. *See, e.g.*, *Turlington Is No More*, Kansas City Star, Mar. 6, 1891, at 6 ("There was but a small crowd of witnesses besides the jury and the newspaper men[.]"); *Yeager and Lowry Hanged at 6:19 A.M.*, St. Louis Star, Feb. 1, 1929, at 8

(reporting "some fifty witnesses, reporters, deputies, doctors and officials" witnessed 1929 hangings).

114. Even where a state law of this era did not explicitly protect the public's ability to observe jail yard executions, members of the press were still permitted to attend as surrogates for the general public.

115. For example, Georgia law granted judicial discretion to hold public hangings until 1893. *Compare* 1859 Ga. Laws 63, *with* 1893 Ga. Laws 42. Even after passage of Georgia's 1893 law, representatives of the press were routinely permitted to attend executions conducted in Georgia throughout the 1900s. *Robinson Dies on the Gallows*, Marietta J., Sept. 6, 1900, at 1 (describing "several newspaper men" in "the party within the enclosure" at 1900 hanging); *Bullard Hanged; No Mercy Shown*, Atlanta Georgian (and News), Mar. 2, 1907, at 1 (describing condemned asking "newspaper men present to step closer so they could hear him" at 1907 hanging).

116. Representatives of the press also observed executions conducted in Mississippi. *See, e.g.*, *Trap Is Sprung At 2:12 and Both Necks Break; Meet Death Stoically*, Hattiesburg Am., July 25, 1924, at 1 (reporting "newspapermen . . . were among the witnesses"); Charles P. Nutter, *Electrocution*, Hattiesburg Am., Oct. 11, 1940, at 1 ("Four official witnesses, two newspaper men and about 10 other persons watched the inauguration of the portable chair.").

117. After Alabama's legislature enacted a law in 1878 requiring executions to take place in the jail yard, reporters continued to access executions. *See, e.g.*, *John West's Execution*, Montgomery Weekly Advertiser, Mar. 17, 1885, at 1 (noting group of witnesses included "reporters"); *Dead! Dead! Dead!*, Russell Reg., June 26, 1886, at 3 (noting condemned "shook hands cordially with the reporter and several others" as he walked through the jail yard to be

hanged); *Day of Death Draws Near*, Birmingham News, July 22, 1902, at 3 (noting "newspaper men" among those "legally entitled to" and expected to attend hanging).

118. Representatives of the press were also permitted access to jail yard executions conducted in Utah. *See, e.g.*, *The Last of Hopt*, Deseret News, Aug. 11, 1887, at 2 (describing 1887 execution and noting "representatives of the press" were among the "Fifty Spectators Admitted").

119. In the early- to mid-twentieth century, many state legislatures passed laws requiring that executions take place in their state prison or penitentiary. The majority of states enacting these statutes adopted or kept provisions that explicitly protected the general public's ability to observe executions, including:

| **State Statute** | **Observer Requirements** |
|---|---|
| 1885 Ohio Laws 169 | Permitted presence of reporters for two newspapers |
| 1891 Cal. Laws 274 | Required warden to invite at least 12 reputable citizens |
| 1893 Conn. Pub. Acts 282 | Permitted presence of representatives of 5 newspapers from county where crime was committed and one reporter from each Hartford newspaper |
| 1894 Iowa Laws 93 | Required presence of 12 citizens of the state |
| 1898 W. Va. Laws 13 | Required warden to invite 12 respectable citizens and members of the press |
| 1901 Neb. Laws 506 | Permitted warden to designate 6 witnesses |
| 1901 Nev. Laws 68 | Required warden to invite 12 reputable citizens |
| 1903 N.D. Laws 120 | Required warden to invite representatives of local and Bismark newspapers |
| 1903 Or. Laws 67 | Required superintendent to invite 12 reputable citizens |
| 1906 N.J. Laws 114 | Required state prison official to invite 12 reputable citizens |

| | |
|---|---|
| 1909 Ariz. Laws 96 | Required superintendent to invite at least 12 reputable citizens |
| 1909 N.C. Sess. Laws 760 | Required presence of 12 respectable citizens |
| 1910 Ky. Laws 112 | Required warden to permit one representative from each newspaper published in the county the crime was committed and every state daily newspaper |
| 1912 S.C. Laws 703 | Required executioner to designate 12–24 respectable citizens |
| 1913 Pa. Laws 529 | Required presence of 6 reputable citizens and six accredited representatives of daily newspapers |
| 1913 Okla. Laws 209 | Required warden to invite at least 12 reputable citizens |
| 1922 Md. Laws 1024 | Required presence of 6–12 respectable citizens |
| 1923 Fla. Laws 176 | Required presence of jury of 12 respectable citizens |
| 1923 Ala. Laws 760 | Required warden to permit newspaper reporters |
| 1927 Ill. Laws 401 | Permitted sheriff to invite 12 reputable citizens |
| 1929 N.M. Laws 101 | Required warden to select at least 12 reputable citizens |
| 1935 Kan. Laws 235 | Permitted warden to invite 6 witnesses |
| 1937 Mo. Laws 223 | Required warden to invite 12 reputable citizens |
| 1939 S.D. Laws 169 | Required warden to invite 10 reputable citizens |
| 1939 Fla. Laws 1373–74 | Required superintendent to permit press to attend |
| 1951 Okla. Laws 64 | Required warden to admit reporters from newspapers, press and wire services, and radio |
| 1954 Miss. Laws 246 | Required sheriff to secure presence of up to 8 members of the press |
| 1957 La. Acts (Extraordinary Sess. 1956) 31 | Required warden to invite 5–7 witnesses |

120. Under these statutes, crowds of observers continued to attend executions conducted in at least some state prisons. *E.g.*, *With Steps That Did Not Falter; With Smiling Lips, But Devoid Of Bravado, Condemned Men Enter Eternity*, Daily Ardmoreite, Feb. 25, 1921, at 2 (reporting

witnesses to double electrocution in Oklahoma included "75 persons . . . most of them state employees and newspaper men"); *Sands and Siler Keep Up Nerve to Final Second*, Seminole Producer, June 11, 1937, at 1 (reporting there were "250 witnesses" to double electrocution).

121. Kentucky, in addition to its 1910 law protecting the general public's ability to observe executions through its surrogates in the press, re-established public hangings "for the crime of rape," in 1920, 1920 Ky. Laws 694, and continued to conduct public hangings pursuant to that law as late as 1936, *see 20,000 See Bethea Die on Scaffold as Ex-Louisville Cop Springs Trap*, Owensboro Inquirer, Aug. 14, 1936, at 1. Kentucky re-required all executions to take place in its state penitentiary in 1938, 1938 Ky. Laws 640–41, subject to its previously enacted protections for representatives of the press to attend as witnesses.

122. The press, as surrogates for the general public, was always or virtually always permitted to observe executions conducted in the penitentiaries of the overwhelming majority of states under these statutes.

123. For example, representatives of the press continued to observe executions conducted in Missouri after passage of its 1937 law. *Their Last Walk*, Kansas City Star, Dec. 18, 1953, at 18 (noting reporters from The Star and the Associated Press were among witnesses); Don Kremer, *Tucker Dies at 12:10 a.m.*, The Jackson Pioneer, July 26, 1963, at 1.

124. Representatives of the press continued to access executions conducted in Kansas following the passage of its 1935 law. *See, e.g.*, Bill Brown, *Hickock, Smith Pay Extreme Penalty*, Garden City Tel., Apr. 14, 1965, at 1 (reporters' first-hand account of 1965 hanging).

125. Representatives of the press maintained a right of access to executions conducted in Illinois following the passage of its 1927 law. *See, e.g.*, Kent A. Hunter, *3 Die in Chair in First Electrocution in Illinois*, Belleville Daily News-Democrat, Dec. 15, 1928, at 12 ("three

newspapermen, representing press services" among thirty-five witnesses to triple-electrocution); *Slayer Ciucci Executed*, Chi. Daily Trib., Mar. 23, 1962, at 1 (describing execution and noting reporters were invited to inmate's cell an hour before execution began).

126. Representatives of the press continued to observe executions conducted in Maryland following the passage of its 1922 law. *See, e.g.*, Max Johnson, *Slayer Prays as He Dies on Md. Gallows*, The Afro-Am., July 18, 1942, at 12 (noting "AFRO representative" was among witnesses at 1942 hanging); Louis R. Rukeyser, *First Gas-Chamber Victim In State Dies Slowly*, The Evening Sun, June 29, 1957, at 20 (noting at least "two reporters" were among witnesses to 1957 lethal gas execution).

127. Representatives of the press continued to access executions conducted in Florida after the passage of its 1923 law. *Negro Murderer Dies in Electric* Chair, Fla. Times-Union, Oct. 8, 1924, at 1 ("The execution was witnessed by the twelve official witnesses required by law, several newspaper men, state officials, and officers of the law."); *Zangara to Die in Death Chair at Prison Today*, Palm Beach Post, Mar. 20, 1933, at 1 ("three newspaper reporters" among those permitted to be present at execution, in addition to "12 citizen witnesses").

128. Representatives of the press maintained a right to access executions conducted in South Carolina following the passage of its 1912 law. *See, e.g.*, *Five Negroes Executed at State Penitentiary; Murder Was the Charge*, Columbia Rec., Sept. 29, 1915, at 1, 11 (reporting "150 persons" witnessed executions "in relays," but "certain newspapermen," along with "certain county officers" were permitted to "remain for all the executions"); *Johnson and Coleman Executed at State Penitentiary Tuesday for Killing Drayton Mill Clerk*, Gaffney Ledger, June 26, 1930, at 1, 4 (describing execution and noting that "more than fifty spectators" attended, and that one of the condemned men "looked straight into the eyes of a reporter sitting immediately in front

of the chair" during 1930 execution); Jack C. Orr, *Young, Thorne Pay Supreme Penalty*, Columbia Rec., Apr. 20, 1962, at 3 (noting "10 newsmen" were present "along with more than 30 spectators" at 1962 execution).

129. Representatives of the press accessed executions conducted in Arizona following the passage of its 1909 law. Craig Pottinger, *Ten Nogales Men Among 49 Witnessing Execution of Slayer of Lon Blankenship*, Nogales Int'l, July 14, 1934, at 1 (reporting "a big percentage" of the 49 witnesses to 1934 execution "were newspapermen and news photographers").

130. Representatives of the press were regularly admitted to executions conducted in Oregon after passage of its 1903 law. *See, e.g.*, *Two More Go to Their Death by the Noose*, Daily Or. Statesman, Nov. 1, 1913, at 1 (noting "newspapermen entered the death chamber" with witnesses to execution); *Cody Meets Death with Cool Nerve*, Or. J., Apr. 16, 1926, at 1 (noting "newspaper men" were included in "party of 20 men" witnessing execution).

131. Representatives of the press also maintained a right of access to executions conducted in Nevada following the passage of its 1901 law. *See, e.g.*, *Chinese First To Be Slain By Lethal Gas*, Santa Fe New Mexican, Feb. 8, 1924, at 1 (reporting "[n]ewspaper men acted as official witnesses" to 1924 execution).

132. Representatives of the press were routinely permitted to observe executions conducted in Nebraska following the passage of its 1901 law. *Crime's Debt Paid on Gallows at Pen*, Lincoln Evening News, May 19, 1911, at 1 (noting there were "forty in the party" of witnesses, including "newspaper men"); *Frank Carter, Unperturbed as Usual, Saunters to his Death in Electric Chair*, Norfolk Daily News, June 24, 1927, at 1 (noting reporters were admitted to see condemned immediately prior to execution); *Starkweather Dies Today; Writ Denied*, The

Lincoln Star, May 22, 1959, at 1 (noting "[f]ifteen newsmen," along with "6 official witnesses," witnessed execution).

133. Representatives of the press accessed executions conducted in West Virginia following the passage of its 1898 law. *See, e.g.*, Carl P. Leatherwood, *Murderers Executed at Prison*, Wheeling Intelligencer, Apr. 5, 1913, at 1 (estimating "eighty persons" were present for 1913 double-hanging, "newspaper representatives" were separated); *Hanging of Powers*, Indep.-Herald, Mar. 24, 1932, at 1 (noting condemned "gazed at the audience of newspaper men, officials and physicians" at hanging); *Electric Chair Claims First Two Victims*, Hinton Daily News, Mar. 27, 1951, at 1 (first electric chair executions were "witnessed by 17 persons, including seven newspapermen"); *Resigned to Fate, Fudge Dies in Chair*, Hinton Daily News, July 2, 1958, at 1 ("25 witnesses to the electrocution, including eight newsmen").

134. Representatives of the press continued to observe executions conducted in Iowa after passage of its 1894 law. *See, e.g.*, *The First Judicial Hanging in the State in Six Years*, Mount Pleasant Weekly News, Nov. 7, 1894, at 6 (reporting "the representatives of a score of newspapers and as many sheriffs, together with a dozen privileged persons, were admitted" to witness 1894 hanging); Warren T. Francke, *Brown Walks To Gallows With Steady Stride*, Council Bluffs Nonpareil, July 24, 1962, at 1 (reporting "[o]fficial witnesses from Council Bluffs, law officers and newsmen" were among witnesses to 1962 execution).

135. Representatives of the press continued to be "a constant presence" at executions conducted in California throughout the twentieth century after the passage of its 1891 law. *Calderon*, 150 F.3d at 978; *see also* Gale Cook, *Santo Murder Trio Executed; Delays Torture Barbara*, S.F. Exam'r, June 4, 1955, at 2 (reporting "sixteen newsmen" among witnesses to 1955 execution); E.E. Nichols, *What Reporters Saw at State's First Gas Executions: Cannon Scorns*

*Death, Kessel Prays and Prays*, The Sacramento Union, Dec. 3, 1938, at 1–2 (describing experience as witness to 1938 execution).

136. The press also continued to act as surrogates for the general public at executions that took place in state prisons and penitentiaries even in states that did not initially pass laws explicitly confirming their ability to do so.

137. For example, the press continued to attend executions carried out in New York. *See, e.g.*, *Far Worse than Hanging*, N.Y. Times, Aug. 7, 1890, at 1 (noting "Frank W. Mack of the Associated Press" witnessed execution); *Executed!*, Buffalo Evening News, Feb. 8, 1892, at 1 ("The presence of six newspaper representatives within the prison made it certain that a detailed story of the execution would be sent out[.]"); Associated Press, *Four Gunmen Executed for Murder*, Buffalo Evening News, Apr. 13, 1914, at 1 (noting "over-crowding of newspaper reporters" required "shifting of witnesses for each execution" during quadruple execution); Martin Kivel & James Desmond, *Lonely Hearts Killers Go Stoically to Doom*, Daily News, Mar. 9, 1951, at 48 ("[a]ll the witnesses but two were reporters, representing 29 newspapers" at executions).

138. Representatives of the press maintained consistent access to executions conducted in Texas's state penitentiary. *See, e.g.*, Associated Press, *Five Negroes Went to Death In Electric Chair Last Night*, Tyler Daily Courier-Times, Feb. 8, 1924, at 1 (noting at first executions by electric chair, "newspaper men" were "to witness"); W. Boyd Gatewood, *Witnesses Agree Chair Better Than Gallows but Sicken at Death Orgy: Record Man Compares it to Shooting*, Fort Worth Rec., Feb. 11, 1924, at 3 (detailed account by press witness of first execution by electric chair); *Amarillo Man Executed for Attack on Girl, 9*, Fort Worth Star-Telegram, Mar. 21, 1953, at 1 (noting Huntsville newspaperman was among witnesses to 1953 execution).

139. Representatives of the press were also invited to executions conducted by electrocution in Massachusetts between 1901 and 1947, the year when the state conducted its last execution. *Storti Executed at 12:30 this Morning*, Bos. Post, Dec. 17, 1901, at 7 (noting "press representative" was among witnesses to electrocution); *Sacco, Vanzetti and Madeiros Executed; Dramatic Farewell Speeches Made by Radicals*, Virginian-Pilot, Aug. 23, 1927, at 1 ("W.E. Playfair, of the Associated Press," among witnesses to triple-electrocution); *Swift Death Comes to Gertson and Bellino in Electric Chair*, Holyoke Daily Transcript, May 9, 1947, at 12 ("group of newspaper representatives" were among witnesses to electrocution).

140. "Media witnesses have been present for all but one Idaho execution since 1901 and published detailed accounts of them." Betsy Z. Russell, *News Media Witnesses at Executions an Idaho Tradition*, Spokesman-Rev. (June 4, 2012), https://www.spokesman.com/stories/2012/jun/04/news-media-witnesses-executions-idaho-tradition/; *see also* Rebecca Boone, *4 Media Witnesses View Execution*, Idaho Statesman, June 13, 2012, at A12.

141. Representatives of the press continued to access executions in Utah. *Omer Woods Dies Bravely*, Ogden Standard-Exam'r, Jan. 18, 1924, at 1 (describing execution and noting "newspapermen" were admitted into the prison yard, while "[a]bout 50 persons" were allowed to watch from afar); Hugh A. Wilson, *Slayer of Ogden Girl Executed by Firing Squad*, Sunday Herald, Sept. 30, 1951, at 1 (describing execution and noting "[a]n orderly crowd of about 50 officers . . . and newsmen witnessed the execution").

142. In the late 1800's and early 1900's, federal executions continued to be conducted before crowds, and representatives of the public and press were regularly admitted.

143. For example, at a federal hanging that took place at Marion County jail in Indiana in 1936, a newspaper article reported that "an estimated 50 to 75 persons including government

officials, state and city police and newspapermen," were admitted as witnesses. *U.S. Hangs First Criminal Since Pioneer Times*, Evansville J., Mar. 24, 1936, at 3.

144. Members of the press were among the public observers at federal executions conducted in other states at the turn of the century. *See, e.g.*, *Trap Sprung*, The Harper Sentinel, Nov. 29, 1888, at 1 (noting "spectators thus numbered about 80, including officials from this and neighboring counties, doctors, representatives of the press" at federal execution conducted in Kansas); *Two Pay Death Penalty*, S. McAlester Cap., July 23, 1903, at 1 (describing how "physicians, officers and members of the press" were admitted in advance, and later, "several jurors who sat at the trial[]" to execution conducted in Oklahoma).

145. In 1937, Congress passed a law requiring that "[t]he manner of inflicting the punishment of death shall be the manner prescribed by the laws of the State within which the sentence is imposed," to be executed by the United States marshals using "available State or local facilities." Pub. L. No. 156, 50 Stat. 304 (1937).

146. Representatives of the press were permitted to attend federal executions conducted in the various states following the passage of this law. *See, e.g.*, *Federal Prisoner to Die August 14*, Nashville Tennessean, July 10, 1943, at 46 (reporting "representatives of the three leading press associations will be admitted" to anticipated federal execution in Tennessee); *Henry Ruhl Dies for Katmo Death*, Scottsbluff Star-Herald, Apr. 27, 1945, at 3 (reporting "three newspapermen" were permitted at federal execution in Wyoming); *Rosenbergs Are First Civilians Executed by U.S. as Traitors*, News J., June 20, 1953, at 4 (noting three news service representatives witnessed federal execution for espionage in New York).

147. The United States Army also invited eight representatives of the press to attend executions conducted at Nuremberg of Nazi leaders following World War Two. *Eyewitness Describes Execution of 10 Nazi War Lords*, Ottawa J., Oct. 16, 1946, at 1, 17 (collecting coverage).

148. Meanwhile, other states abolished the death penalty altogether. For example, Alaska and Hawaii both abolished the death penalty prior to their statehood and neither state has conducted executions after joining the union. Maine abolished the death penalty in 1887, Minnesota in 1911, West Virginia and Iowa in 1965, and no executions have been conducted in those states subsequent to those dates.

149. There were no executions conducted in any state between 1968 and 1976 due in part to litigation that culminated with *Furman v. Georgia*, 408 U.S. 238 (1972).

***H. The tradition of public observers at executions from Gregg v. Georgia to present.***

150. In addition to the states that abolished the death penalty prior to 1972, further states have abolished, struck down, or otherwise determined not to carry out the death penalty over the last fifty years including New Hampshire, New Jersey, New York, Massachusetts, North Dakota, Rhode Island, and Vermont.

151. In states that reinstated the death penalty following *Gregg v. Georgia*, 428 U.S. 153 (1976), which ended the nationwide moratorium on executions, the historical tradition of general public observers at executions, including their surrogates in the press, has continued into present day.

152. Of the twenty-seven states that maintain the death penalty today, fourteen provide specifically for press access by statute—either in addition to or as surrogates for general public observers. Ala. Code § 15-18-83; Ky. Rev. Stat. Ann. § 431.250; Fla. Stat. Ann. § 922.11; Miss. Code Ann. § 99-19-55; Mont. Code Ann. § 46-19-103; Neb. Rev. Stat. Ann. § 83-970; Ohio Rev. Code Ann. § 2949.25; Okla. Stat. tit. 22, § 1015; Or. Rev. Stat. Ann. § 137.473; 61 Pa. Stat. and

Cons. Stat. Ann. § 4305; S.C. Code Ann. § 24-3-550; S.D. Codified Laws § 23A-27A-34; Tenn. Code Ann. § 40-23-116; Utah Code Ann. § 77-19-11.

153. Four other states—Texas, Georgia, North Carolina, and Idaho—have promulgated policies or rules allowing press access, either in addition to or as surrogates for general public observers. 37 Tex. Admin. Code § 152.51(d)(7) (2024); *For Media – Access for Scheduled Executions*, Ga. Dep't of Corr., https://perma.cc/P75U-HG69 (last visited July 10, 2025); N.C. Dep't of Adult Corr., Execution Procedure Manual § IV.B.2 (Oct. 24, 2013); Idaho Dep't of Corr., Execution Procedures, at 12 (adopted May 18, 1998) (last amended June 8, 2026).

154. Seven other states maintain statutory protection for representatives of the general public to observe executions. Ariz. Rev. Stat. Ann. § 13-758; Ark. Code Ann. § 16-90-502(e)(1)(D); Cal. Penal Code § 3605(a); Kan. Stat. Ann. § 22-4003(a); La. Stat. Ann. § 15:570(A)(6); Mo. Ann. Stat. § 546.740; Nev. Rev. Stat. Ann. § 176.355(2)(e).

155. These modern statutes and/or rules are a continuance of the long-standing traditions of press and general public observers at executions.

156. For example, reporters have had continued and ongoing access to executions in California. Melissa Bauman, *The Final Hours*, The Californian, Apr. 22, 1992, at 14 ("All 18 media witnesses to the execution . . . were taken into the execution observation room"); Tim Eberly, *The Final Minutes*, The Fresno Bee, Jan. 18, 2006, at A12 ("At 11:55 p.m., prison officers let the 17 media witnesses into the death chamber."); State of Cal., San Quentin Operational Procedure Number 0-770 § V.J.4.a (May 15, 2007) (allowing 17 media witnesses to attend).

157. Reporters have had continued and ongoing access to executions in Maryland. Michael Ollove & Sandy Banisky, *Thanos Died Quietly After a Life of Fury*, Balt. Sun, May 18, 1994, at 10A (noting "six reporters and six volunteers" were witnesses); Stephen Manning, *Baker*

*Executed for 1991 Baltimore County Murder*, Star-Democrat, Dec. 7, 2005, at A6 (noting witness gallery "included five reporters").

158. Reporters have had continued and ongoing access to executions in Arizona. *Witnesses to Death—What Was It Like?*, Ariz. Republic, Jan. 22, 1998, at 13 (describing reporters' experiences witnessing executions in Arizona from 1992–1998).

159. Reporters have had continued and ongoing access to executions in Georgia. Associated Press, *State Uses Lethal Injection*, Ledger-Enquirer, Oct. 26, 2001, at 3 ("There were seven state witnesses, five media witnesses and seven witnesses for [the condemned]" at 2001 execution by lethal injection); Jeffry Scott, *'Calm' Alderman Put to Death by Lethal Injection*, Atlanta J.-Const., Sept. 17, 2008, at C7 (describing media witness account of 2008 execution).

160. Consistent with its historical practice, Idaho adopted an execution protocol in 1998 that permits "up to four news media representatives" to witness executions. Idaho Dep't of Corr., Execution Procedures, *supra*, at 12; *see also* Rebecca Boone, *4 Media Witnesses View Execution*, Idaho Statesman, June 13, 2012, at A12.

161. Reporters have had continued and ongoing access to executions in Nebraska. Leslie Boellstorff Reed, *Victim's Spouse May Get to See Execution*, Omaha World-Herald, Nov. 26, 1997, at 15 (listing five reporters among anticipated official witnesses to then-upcoming execution).

162. Reporters have had continued and ongoing access to executions in South Carolina. Brian Duncan, *Shaw Dies In Electric Chair*, Columbia Rec., Jan. 11, 1985, at 7 (reporting "[t]wo members of the news media" were present at 1985 execution). In 1990, South Carolina codified its longstanding practice of permitting press to attend executions by enacting a law that permitted

"five representatives of the South Carolina media" to attend as witnesses, in addition to "two respectable citizens of the State." 1990 S.C. Laws 2146.

163. Reporters have had continued and ongoing access to executions in Texas. Michael A. Lutz, *Family Denied Last Look Before Brooks' Execution*, San Antonio Light, Dec. 7, 1982, at 11A ("four media representatives and Brooks' girlfriend witnessed" 1982 execution by lethal injection); Michael Graczyk, *Convicted Killer Given Lethal Dose After Delay*, Fort Worth Star-Telegram, Apr. 24, 1992, at A24 ("[R]eporters filed in to watch" 1992 execution by lethal injection). Since at least 1996, Texas has maintained regulations that authorize media representatives to attend executions as witnesses. *Compare* Proposed Rule, 20 Tex. Reg. 9836 (Nov. 24, 1995), *adopted*, 21 Tex. Reg. 602 (Jan. 23, 1996), *with* 37 Tex. Admin. Code § 152.51(d)(7) (2024).

164. Reporters have had continued and ongoing access to executions in Nevada. *State Adopts Rules for Execution by Injection*, Nev. State J., Sept. 2, 1983, at 27 (reporting Nevada's first-adopted lethal injection protocol allowed "between six and nine 'reputable citizens' to be witnesses," along with "a 'reasonable number' of in-state reporters," and a pool of out-of-state reporters); Frank Mullen, *Execution Is Final Chapter of Grisly Story*, Reno Gazette-J., Apr. 6, 1999, at 4 (describing reporter's experience as witness to 1999 execution).

165. In 1983, when Montana passed a law requiring executions take place at the state prison, it protected the public's right of access by requiring the warden to "allow the execution to be observed by 12 witnesses, 3 of whom may be designated by the person to be executed." 1983 Mont. Laws 915. Representatives of the press continued to access executions conducted in Montana following the passage of the law. *See, e.g.*, David Fenner, *Duncan McKenzie Executed*, Mont. Standard, May 10, 1995, at 1 (noting reporters were among witnesses to 1995 execution);

Zach Dundas, *Killing by the Numbers*, Missoula Indep., Feb. 26, 1998, at 12 (picturing four reporters admitted to 1998 execution); Daniel Roberts, *Last Minute Witness Confronts Fear, Survives*, Missoula Indep., Feb. 26, 1998, at 13 (describing lottery system for selecting media witnesses as of 1998). In 1999, Montana codified its practice of permitting press to attend executions, enacting a statute that provided that "witnesses must, to the extent possible, include three persons from the news media." 1999 Mont. Laws 1440. That law remains in effect in Montana today. Mont. Code Ann. § 46-19-103(6)(b).

166. Reporters have had continued and ongoing access to executions in Oregon. Bryan Smith, *Wright's Final Minutes: Clean, Calm and Quiet*, Oregonian, Sept. 7, 1996, at 1 (noting staff writer for the Oregonian was "one of 10 witnesses" to execution).

167. Missouri's practice of permitting press at executions has continued into the modern era. *See, e.g.*, Rick Montgomery & Greg Kuhl, *Quiet Tension Accompanied Execution*, Kansas City Star, Jan. 6, 1989, at 1 (noting eight reporters witnessed 1989 execution); Lee Hill Kavanaugh, *Viewing Execution Helps One Family Ease Burden*, Kansas City Star, May 1, 2001, at A6 (noting four media representatives were present at 2001 execution).

168. Consistent with its longstanding practice of permitting press observers at federal executions, in 1993, the Department of Justice adopted regulations permitting up to "ten representatives of the press" at federal executions. 28 C.F.R. § 26.4(c)(4)(ii); *see also* Implementation of Death Sentences in Federal Cases, 58 Fed. Reg. 4898-01, 4902 (Jan. 19, 1993).

169. Also in 1993, the United States government designated the United States Penitentiary in Terre Haute, Indiana, as the site of federal executions. U.S. Dep't of Justice, Restoring and Strengthening the Federal Death Penalty 44 (Apr. 24, 2026), https://www.justice.gov/ag/media/1437806/dl?inline.

170. Accordingly, representatives of the press have been present for the 16 executions conducted at Terre Haute between 2001 and 2021.

171. The same tradition of public access was present in states that carried out executions in the post *Gregg v. Georgia* era, but later abolished, repealed, or struck down the death penalty.

172. For example, prior to its judicial repeal of the death penalty, Delaware enacted a statute requiring executions be conducted by lethal injection in 1986 that empowered trial courts to determine "the place, the number of witnesses and conditions of privacy" on executions conducted thereafter. 1985–86 Del. Laws 538. Consistent with Delaware's historical tradition, representatives of the press have maintained a right of access to Delaware executions conducted in the modern era. *See, e.g.*, Ted Caddell, '*Before I understood . . . He Was Dead'*, News J., Mar. 15, 1992, at 1 (account from reporter who witnessed 1992 execution); Ted Caddell, *Witness to a Hanging*, News J., Jan. 26, 1996, at 1 (account from reporter who witnessed 1996 execution); *see also* Del. Dep't of Corr., Policy No. 2.7: Execution (effective Aug. 31, 2007), Attach. 6 (providing for "[s]even representatives of the news media" to attend as witnesses).

173. Prior to Illinois's repeal of the death penalty in 2011, representatives of the press continued to access executions conducted in Illinois throughout the twentieth century and into the modern era. Rob Karwath & William Grady, *Walker Becomes 1st Execution in 28 Years*, Chi. Trib., Sept. 12, 1990, at 1, 12 (describing media witness accounts); Rob Karwath & Susan Kuczka, *Gacy Execution Delay Blamed on Clogged IV Tube*, Chi. Trib., May 11, 1994, at 8 ("12 media witnesses at the execution").

174. Connecticut provided statutory protection for representatives of the press to access executions until 2012, when it eliminated the death penalty. Conn. Gen. Stat. Ann. § 54-100(b) (providing for attendance of nine members of the news media, while providing commissioner

discretion to "authorize a greater number of such representatives or, for specified reasons of space or security, [to] reduce such number of representatives"); *see* An Act Revising the Penalty for Capital Felonies*,* Pub. Act No. 12-5 (Conn. 2012) (substitute Senate Bill No. 280, prospectively eliminating death penalty in Connecticut).

175. New Jersey provided statutory protection for representatives of the public and of the press to attend executions until it eliminated the death penalty in 2007. *See, e.g.*, N.J.S.A. 2C:49-7 (2006) (providing for the attendance of "six adult citizens" along with "four representatives of the news media to be present at the execution, for the purpose of giving their respective newspapers and associations accounts of the execution").

***I. The role of public observers at executions.***

176. General public observers, including the press, foster more accurate fact finding about executions and promote the public perception of fairness and transparency surrounding them in a way that state officials, the condemned's attorneys, friends and family, or the family members of victims, cannot.

177. For example, at a press conference following the execution of Joseph Wood in Arizona in 2014, an Arizona Department of Corrections representative stated: "Inmate Joseph Wood was pronounced dead today at 3:49 Arizona time, at the Arizona State Prison complex in Florence. The execution procedure began at 1:52 this afternoon and, as I said, it was concluded at 3:49." Fox10 Phoenix, *Raw Video: Press Conference Following Controversial Execution*, at 0:01–1:30 (YouTube, July 23, 2014), https://www.youtube.com/watch?v=UWxuDfvXld8. That representative went on to describe Wood's last meal and to read Wood's last words. *Id.* He did not mention any difficulties with the execution itself. *Id.*

178. By contrast, a press witness described how Wood had "gasped for more than an hour and a half," after the administration of the lethal injection drugs, over 600 times. *Id.* at 3:30, 6:45. Another press witness likened it to "if you catch a fish, and you throw it on the shore, the way a fish opens and closes its mouth." *Id.* at 7:10.

179. The victim's family members provided an altogether different account, stating "I don't believe he was gasping for air, I don't believe he was suffering, it sounded to me as though he was snoring." *Id*. at 11:05.

180. As another example, at a press conference following the execution of Gregory Resnover in Indiana in 1994, an IDOC representative "had difficulty gaining composure to read [a] brief statement" that gave the time the execution commenced and Resnover's time of death. Matthew S. Galbraith, *Inmate Put to Death Against Will*, South Bend Trib., Dec. 8, 1994, at 1. A spokesperson for Indiana State Prison stated that the execution went well, with no problems, and that "[t]he equipment functioned properly." Nancy Armour, *Resnover's Body Taken to Family*, J. & Courier, Dec. 9, 1994, at 1.

181. In contrast, Lynn Ford, a reporter for the Indianapolis Star, who had been invited to attend the execution by Resnover, through his attorney, described how "a fiery orange halo of sparks and light gray smoke appeared atop Gregory Resnover's head for what seemed like several minutes, the smoke creating a surreal haze. His body slumped in the chair, then jumped." Lynn Ford, *Resigned to a Final Excruciating Moment*, Indianapolis Star, Dec. 9, 1994, at 12. At "about 12:10 a.m. . . . a thick musty scent filled the viewing room, it was the scent of burning flesh—sort of like burning hair." *Id.*

182. Ford described Resnover's family members and other observers in attendance as stunned. "His son sobbed. Several minutes ticked by. 'Why is this *taking* so long?' a woman asked. 'Does this mean he hasn't passed yet?'" *Id.*

183. General public observers, in turn, contribute to the positive functioning of execution proceedings by providing the public with the information necessary to exercise meaningful democratic oversight over executions to ensure that they are conducted humanely, efficiently, and consistently, and with due dignity and solemnity.

184. General public observers contribute to ensuring that the public and its elected and appointed representatives in government have the "contemporary human knowledge," *Robinson v. California*, 370 U.S. 660, 666 (1962), necessary to meet the "evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

185. For example, following Resnover's execution, the Indiana General Assembly passed a bill, which was signed into law by the governor, changing the method of capital punishment in the state from the electric chair to lethal injection. 1995 Ind. Laws 4145–46. "[T]he measure's author, Sen. Richard Thompson, R-North Salem . . . said he was moved to offer the proposal after seeing graphic media accounts detailing the electrocution last December of convicted killer Gregory Resnover." Richard D. Walton, *Senate OKs Use of Lethal Injections*, Indianapolis Star, Feb. 17, 1995, at 1.

186. As another example, the Arizona legislature passed a ballot initiative in 1992 that switched the state's method of execution from gas to lethal injection after the execution of triple murderer Donald Eugene Harding in the gas chamber at the state prison in Florence, during which "Harding wasn't pronounced dead until 10 minutes after two cyanide pellets were dropped into a bowl of sulfuric acid beneath his chair." Associated Press, *House Votes, 41-7, to Switch to Lethal*

*Injection*, Tucson Citizen, Apr. 25, 1992, at 9A. In the minutes prior to the pronouncement of death, "[w]itnesses described a gruesome scene of Harding gasping, shuddering and desperately making obscene gestures." *Id.* Members of the Arizona legislature were reportedly "disturbed by graphic accounts of the slow death of the first man executed in the state's gas chamber in 29 years." *Id.* Arizona voters approved the ballot measure.

187. General public observers at executions also foster more accurate fact finding and provide a check on the activities of judges and litigants in judicial proceedings that involve executions, including underlying criminal and post-conviction proceedings for condemned persons.

188. Until the conclusion of execution proceedings, criminal proceedings are subject to being reopened based on new facts.

189. For example, in 1930, two men who had previously been convicted of murder received a reprieve from the governor of Kentucky after their co-defendant "absolved [them] from guilt in a statement made . . . shortly before he went to the electric chair." *Governor Gives Reason for His Reprieve of Men*, State J., June 14, 1930, at 1. The governor stayed and later commuted the co-defendants' death sentences, which were to have been carried out the same morning, to life imprisonment. C.W. Bailey, *Miller Is Pardoned in Raid Killing*, Courier-J., Dec. 25, 1930, at 1 (noting Grigsby and Keller were among four whose death sentences were commuted).

190. Eighth Amendment challenges can and do take place while executions are ongoing.

191. For example, during the 2014 execution of Joseph Wood in Arizona, described *supra* paras. 177–79, Wood's attorneys filed an emergency motion for stay of execution, claiming his then-in-progress execution violated the Eighth Amendment. Mot. for Emergency Stay of Execution, *Wood v. Ryan*, No. 2:14-cv-01447 (D. Ariz. July 23, 2014), ECF No. 26. In a

telephonic hearing held in the U.S. District Court for the District of Arizona, at approximately 3:33pm, Wood's attorney represented to the court that Wood had "been gasping and snorting for over an hour." Tr. of Telephonic Hr'g at 6:17, *Wood v. Ryan*, No. 2:14-cv-01447 (July 23, 2014), ECF No. 31. Based on those factual developments, Wood's attorney requested "that the Court stop the execution." *Id.* at 6:18–19. In response, counsel for the Department of Corrections represented that the gasping was an "involuntary reaction," but that "Wood [was] effectively brain dead." *Id*. at 7:24–25. The court requested that the Department obtain more information from its Director, *id.* at 12:9–11, and following a brief pause in the court proceeding, the Department represented that it was impossible to "change course at this point," because "Wood [had] no respiration right now and his heart rate [was] 20 and falling" and was "apparently comatose." *Id*. at 13:20–14:3. The court declined to intervene, noting that based on the Department's summary, as of 3:51 P.M., there was "no serious risk of pain being experienced at [that] time," and that intervening could "create even more risk of pain." *Id.* at 15:17–16:9. Moments later, the Department represented that "the IV team leader ha[d] confirmed Mr. Wood's death," mooting the emergency motion. *Id.* at 16:19–20.

192. As another example, in May 2026, the Tennessee Department of Correction attempted, unsuccessfully, to execute a condemned inmate named Tony Carruthers. State executioners reportedly "spent more than an hour trying to successfully insert the secondary IV line—according to protocol—including attempts on his left arm, feet, hand and jugular vein before attempting a central line in his upper chest" and, finally, "his right shoulder." Mikeie Honda Reiland et al., *Tony Carruthers' Execution Delayed After Doctor Unable to Administer IV*, Nashville Banner (May 21, 2026), https://nashvillebanner.com/2026/05/21/tony-carruthers-execution-lethal-injection-issues/. Meanwhile, Carruthers's attorneys filed an emergency motion

in the Tennessee Supreme Court seeking a stay of his execution, representing that TDOC's "[r]epeated attempts to obtain access at alternative IV sights ha[d] been unsuccessful." Emergency Mot. for Stay of Execution, *State v. Carruthers*, No. W1997-00097-SC-DDT-DD (Tenn. May 21, 2026). The governor then issued a one-year reprieve, *see* Notice, *State v. Carruthers*, No. W1997-00097-SC-DDT-DD (Tenn. May 21, 2026), representing that the execution was "called off" because the execution team "could not find another suitable vein" required for a backup IV line as required by its lethal injection protocol. Press Release, Tenn. Off. of the Governor, *Gov. Lee Grants Temporary Reprieve for Tony Von Carruthers* (May 21, 2026), https://www.tn.gov/governor/news/2026/5/21/gov--lee-grants-temporary-reprieve-for-tony-von-carruthers.html.

193. By contrast, Indiana's statutory prohibition on providing access to news reporters at its executions has limited the public's understanding of these proceedings. For example, in 1985, Indiana executed William Vandiver by electrocution. Contemporaneous news reporting relied on the account of a prison doctor, who stated that after an initial administration of 2,300 volts, "[t]he current was applied three more times before [Vandiver] was pronounced dead 17 minutes later." *Man Who Murdered His Father-in-Law Executed in Indiana*, N.Y. Times (Oct. 17, 1985), https://www.nytimes.com/1985/10/17/us/man-who-murdered-his-father-in-law-executed-in-indiana.html. Vandiver's attorney, who witnessed the execution, called the proceeding "outrageous," and a spokesperson for the Department of Correction said the execution "did not go according to plan," but few other details were made available to the public. *Id.*

194. Similarly, in 1996, Indiana executed Tommy Smith by lethal injection. Contemporaneous reporting relied on the account of an Indiana State Prison spokesperson who conveyed that "the primary procedure of putting a catheter in two of the prisoner's extremities could not be completed, so a catheter had to be put in Smith's foot. [The spokesperson] said the

procedure caused a 35-minute delay." *Indiana Executes Cop Killer*, United Press Int'l (July 18, 1996), https://www.upi.com/Archives/1996/07/18/Indiana-executes-cop-killer/1496837662400/. Again, few other details were publicly reported.

195. Public observers at executions also contribute to both of the "two principal social purposes" of the death penalty: "retribution and deterrence of capital crimes by prospective offenders." *See Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (plurality opinion).

196. For example, by increasing their salience, public access to execution proceedings contributes to their intended deterrent effect. *See* Cass R. Sunstein & Adrian Vermeule, *Is Capital Punishment Morally Required? Acts, Omissions, and Life-Life Tradeoffs*, 58 Stan. L. Rev. 703, 711–16 (2005). ("If executions are highly salient and cognitively available, some prospective murderers will overestimate their likelihood, and will be deterred as a result[.]").

197. "[P]ublic observation of executions fosters the same sense of catharsis that public observation of criminal trials fosters." *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 877 (9th Cir. 2002).

198. For example, permitting public observers to witness execution proceedings has also historically contributed to their orderly functioning and served to prevent vigilante justice. *See id.* ("Although this may reflect the dark side of human nature, the Supreme Court has recognized that the public must be permitted to see justice done, lest it vent its frustration in extralegal ways." (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 571–72 (1980) (plurality opinion))).

## <u>COUNT I</u>
## Deprivation of the Qualified First Amendment Right to Attend and Observe Executions as Surrogates for the General Public (As Applied)

199. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Amended Complaint.

200. Public observers at executions are necessary to "give meaning to those explicit guarantees" in the First Amendment, for freedom of speech and of press, in the Fifth Amendment, for due process, and in the Eighth Amendment, against cruel and unusual punishment because those rights would "lose much meaning if access to observe" execution proceedings could "be foreclosed arbitrarily." *Richmond Newspapers*, 448 U.S. at 575–77 (plurality opinion).

201. Public observers at executions play a "structural role . . . in securing and fostering our republican system of self-government." *Id.* at 587 (Brennan, J., concurring).

202. Plaintiffs are "surrogates for the public." *Id.* at 573 (plurality opinion). "While media representatives enjoy the same right of access as the public, they often are provided special seating and priority of entry so that they may report what people in attendance have seen and heard. This 'contribute[s] to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system[.]'" *Id.* (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring in judgment)).

203. Executions have historically been open to observers in the general public and their surrogates in the press throughout the United States. *See El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150 (1993) (the relevant history to consider is not "the particular practice of any one jurisdiction, but instead . . . the experience in that *type* or *kind* of hearing throughout the United States" (citation and internal quotation marks omitted)).

204. Permitting members of the general public and their surrogates in the press to observe executions significantly contributes to the positive functioning of those proceedings.

205. Upon information and belief, Indiana cannot demonstrate that public observers serve a negative role in the functioning of executions.

206. The balance of the positive role of public observers at executions against any negative role of public observers at executions is still significantly positive.

207. The First Amendment, made applicable to the states through the Fourteenth Amendment, prevents Defendants from closing their executions to all members of the general public, including their surrogates in the press, without demonstrating a constitutionally adequate and narrowly tailored justification for doing so.

208. Upon information and belief, Defendants cannot make the demonstration necessary to constitutionally close all executions to all members of the general public, including their surrogates in the press.

209. In order to close an execution or portion of an execution, Defendants must make a particularized factual showing that there is a compelling governmental interest in closure or partial closure, and that any closure is narrowly tailored.

210. Defendants, through their enforcement of Section 6(a) and ISP 06-26, will deprive Plaintiffs of their First Amendment right to access upcoming executions.

211. Accordingly, Plaintiffs seek declaratory and injunctive relief under 42 U.S.C. § 1983 to prevent Defendants from depriving Plaintiffs of their First Amendment right to attend and observe executions carried out by the State of Indiana.

## COUNT II
**Unconstitutional Burden on the First Amendment Protections for Gathering and Disseminating News (As Applied)**

212. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Amended Complaint.

213. Defendants, through their enforcement and implementation of Section 6(a) and ISP 06-26, impose a greater than incidental burden on Plaintiffs' right to gather and disseminate news about Indiana's executions.

214. Defendants, through their enforcement of Section 6(a) and ISP 06-26, treat non-media witnesses more favorably than members of the press.

215. Plaintiffs' presence at an execution will not threaten or undermine the solemnity of the occasion in a manner not implicated by other attendees.

216. Upon information and belief, Plaintiffs' presence at an execution will not threaten or undermine the dignity of the person being executed in a manner not implicated by other attendees.

217. Upon information and belief, Defendants cannot show that Plaintiffs' presence threatens or offends the dignity of the person being executed or the solemnity of the occasion in a manner that is not implicated by other attendees.

218. Upon information and belief, Plaintiffs' presence at an execution does not implicate any government interest that is not also equally implicated by other observers permitted to attend executions in Indiana.

219. Section 6(a) and ISP 06-26 are not generally applicable laws.

220. In the alternative, even if they are generally applicable laws, Section 6(a) and ISP 06-26 nonetheless unconstitutionally burden Plaintiffs' rights under the First Amendment.

221. Defendants, through their enforcement and implementation of Section 6(a) and ISP 06-26 single out the press, including Plaintiffs, for differential treatment.

222. Section 6(a) and ISP 06-26 treat the press, including Plaintiffs, differently because of the press' newsgathering function.

223. Section 6(a) and ISP 06-26 are intended to regulate the content of content or viewpoint of speech, including that of Plaintiffs.

224. Defendants' enforcement and implementation of Section 6(a) and ISP 06-26 reflect their aversion to or disagreement with certain speech, including that of Plaintiffs.

225. Section 6(a) and ISP 06-26 produce a net decrease in the amount of available speech about Indiana's executions.

226. Through their intended observation of executions, Plaintiffs would be engaged in the process of creating speech that would differ systematically in its message from the groups who are presently permitted to observe executions.

227. Upon information and belief, Defendants cannot demonstrate that Section 6(a) and ISP 06-26 are narrowly tailored in pursuit of a compelling governmental interest.

228. Accordingly, Plaintiffs seek declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 to prevent Defendants from depriving Plaintiffs of their rights under the First Amendment, made applicable to the states through the Fourteenth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request from this Court:

A. A declaratory judgment that Indiana Code § 35-38-6-6(a) and ISP 06-26 violate the First Amendment of the Constitution as applied to Plaintiffs;

B. An injunction restraining Defendants from enforcing Indiana Code § 35-38-6-6(a) and ISP 06-26 against Plaintiffs, and requiring that one quarter of the total observers at future executions be selected by Plaintiffs from a press pool administered by Plaintiffs;

C. An award of attorney's fees pursuant to 42 U.S.C. § 1988;

D. Costs of suit; and

E. Such other and further relief as the Court may deem just and proper.

Dated: August 17, 2026

*/s/ Kristopher L. Cundiff*
Kristopher L. Cundiff
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
PO Box 150
Fishers, IN 46038
Tel: (463) 271-4676
Fax: (202) 795-9310
kcundiff@rcfp.org

Lin Weeks, *admitted pro hac vice*
Elizabeth J. Soja, *admitted pro hac vice*
Allyson Veile, *admitted pro hac vice*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Tel: (202) 795-9300
Fax: (202) 795-9310
lweeks@rcfp.org
esoja@rcfp.org
aveile@rcfp.org

*Counsel for Plaintiffs*