**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

THE ASSOCIATED PRESS, STATES NEWSROOM d/b/a Indiana Capital Chronicle, USA TODAY CO., INC., CIRCLE CITY BROADCASTING I, LLC, and TEGNA INC.,

*Plaintiffs*,

v.

RON NEAL, and LLOYD ARNOLD, *in their official capacities*,

*Defendants*.

Case No. 1:25-cv-872-MPB-MJD

# PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Kristopher L. Cundiff
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
PO Box 150
Fishers, IN 46038
Tel: (463) 271-4676
Fax: (202) 795-9310
kcundiff@rcfp.org

Lin Weeks, *admitted pro hac vice*
Elizabeth J. Soja, *admitted pro hac vice*
Allyson Veile, *admitted pro hac vice*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Tel: (202) 795-9300
Fax: (202) 795-9310
lweeks@rcfp.org
esoja@rcfp.org
aveile@rcfp.org

*Counsel for Plaintiffs*

## TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 2

LEGAL STANDARD ........ 3

ARGUMENT ........ 3

I. Count I of Plaintiffs' Amended Complaint states a claim upon which relief can be granted. ........ 3

- A. The law of the case doctrine does not control the resolution of Count I. ........ 4
- B. Under *Press-Enterprise II*, Defendants cannot enforce Section 6(a) and ISP 06-26 unless Indiana demonstrates a sufficient interest and appropriate tailoring. ........ 6
- C. Plaintiffs have plausibly alleged a sustained historical tradition of public observers at executions, including their surrogates in the press. ........ 12
- D. Plaintiffs have plausibly alleged that general public observers, including their surrogates in the press, play a significant positive role in executions. ........ 20
- E. Even setting aside the *Press-Enterprise II* considerations, Plaintiffs have stated a claim for relief requiring a fact-based determination as to whether Defendants' continued enforcement of Section 6(a) and ISP 06-26 passes constitutional muster. ........ 23

II. Count II of Plaintiffs' Amended Complaint states a claim upon which relief can be granted. ........ 25

- A. Plaintiffs have plausibly alleged that Section 6(a) and ISP 06-26 burden the press' ability to gather and disseminate news and information about executions in a manner that requires balancing against the purported government interest in causing that burden. ........ 25
- B. Plaintiffs have also alleged that Section 6(a) and ISP 06-26 are not generally applicable laws. ........ 30

CONCLUSION ........ 30

## TABLE OF AUTHORITIES

**Cases**


*ACLU of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ........ 25, 28

*AnchorBank, FSB v. Hofer*, 649 F.3d 610 (7th Cir. 2011) ........ 3

*Associated Press v. Neal*, 177 F.4th 862 (7th Cir. 2026) ........ *passim*

*Associated Press v. Neal*, 788 F. Supp. 3d 959 (S.D. Ind. 2025) ........ *passim*

*Associated Press v. Nelsen*, No. 25-1513-III (Tenn. Chancery Ct., Davidson County, Jan. 16, 2026) ........ 11

*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012) ........ 11

*Bilek v. Fed. Ins. Co.*, 8 F.4th 581 (7th Cir. 2021) ........ 3, 24

*Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868 (9th Cir. 2002) ........ 10

*Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002) ........ 7, 16

*Doe v. Univ. of S. Indiana*, 43 F.4th 784 (7th Cir. 2022) ........ 5, 15

*First Amend. Coal. of Ariz., Inc. v. Ryan*, 938 F.3d 1069 (9th Cir. 2019) ........ 11

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) ........ 30

*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979) ........ 17

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596 (1982) ........ 8, 17

*Gregg v. Georgia*, 428 U.S. 153 (1976) ........ 16, 22

*Hunter v. Atchison, T. & S. F. Ry. Co.*, 188 F.2d 294 (7th Cir. 1951) ........ 4

*Leigh v. Salazar*, 677 F.3d 892 (9th Cir. 2012) ........ 7

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue,* 460 U.S. 575 (1983) ........ 28

*N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002) ........ 7, 16

*N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286 (2d Cir. 2012) ........ 7, 16, 19

*Pell v. Procunier*, 417 U.S. 817 (1974). ........ 29

*Philadelphia Inquirer v. Wetzel*, 906 F. Supp. 2d 362 (M.D. Pa. 2012) ........ 4, 11

*Press-Enter. Co. v. Superior Court*, 478 U.S. 1 (1986) ........ *passim*

*Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*, 464 U.S. 501 (1984) .................. 8

*Protect Our Parks, Inc. v. Buttigieg*, 97 F.4th 1077 (7th Cir. 2024) ............................................ 6

*Ramos v. Louisiana*, 590 U.S. 83 (2020) ........................................................................... 8

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ........................................... *passim*

*Robinson v. California*, 370 U.S. 660 (1962) ..................................................................... 23

*Roy Lee Ward v. Indiana*,
Nos. 74S00-0907-PD-320, 25S-SD-167, 2025 WL 2459317 (Ind. Aug. 27, 2025).................. 2

*Seattle Times Co. v. U.S. Dist. Ct. for W.D. Wash.*, 845 F.2d 1513 (9th Cir. 1988) .................... 20

*Tandon v. Newsom*, 593 U.S. 61 (2021) ............................................................................ 30

*Texas Trib. v. Caldwell Cnty., Texas*, 121 F.4th 520 (5th Cir. 2024) .......................................... 17

*Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277 (7th Cir. 1998)........................................ 5

*Tully v. Okeson*, 78 F.4th 377 (7th Cir. 2023) ...................................................................... 4, 5

*Turner Broadcasting System, Inc. v. F.C.C.*,
512 U.S. 622 (1994)........................................................................................................ 25, 28

*United States v. Chagra*, 701 F.2d 354 (5th Cir. 1983) ........................................................... 20

*United States v. Simone*, 14 F.3d 833 (3d Cir. 1994)................................................................ 20

*United States v. Suarez*, 880 F.2d 626 (2d Cir. 1989) ............................................................. 20

*Wolford v. Lopez*, 146 S. Ct. 2032 (2026) ......................................................................... 17, 18

**Statutes**

1852 Ind. Acts (Vol. II) 379.................................................................................................. 13

1889 Ind. Acts 193 .............................................................................................................. 26

1995 Ind. Acts 4145 ............................................................................................................ 21

Indiana Code § 35-38-6-6(a)................................................................................................ *passim*

**Other Authorities**

*A Day With Lawmakers*, Indianapolis J., Feb. 7, 1889 ............................................................ 26

*AP Changes Writing Style to Capitalize 'B' in Black*, Associated Press (June 19, 2020)........... 19

Bryan A. Garner, et al., The Law of Judicial Precedent (2016) .................................................... 8

Hope Yen, *US Stopping Use of Term 'Negro' for Census Surveys*,
Associated Press (Feb. 25, 2013) .......................................................................................... 19

Indiana Constitution Article 5, Section 17 .................................................................................. 9

Indiana State Prison Facility Directive,
ISP 06-26: Execution of Death Sentence (June 17, 2024) ................................................ *passim*

Max Radin, *The Right to a Public Trial*, 6 Temp. L. Q. 381 (1932) ........................................... 17

Michael A. Trotti, *The Scaffold's Revival: Race and Public Execution in the South*,
45 J. Soc. Hist. 195 (2011) .................................................................................................... 18

Richard D. Walton, *Senate OKs Use of Lethal Injections*, Indianapolis Star, Feb. 17, 1995 ....... 21

## INTRODUCTION

Ron Neal and Lloyd Arnold's (collectively "Defendants'" or "Indiana's") motion to dismiss advances a spectacularly broad legal theory. Defendants contend from the first page of their memorandum ("Defendants' Brief," ECF 84) to the last that there is simply ***no*** constitutional limitation on Indiana's ability to close its executions to whatever degree it sees fit.

Under Indiana's theory, there are no First Amendment limits on its ability to conduct executions in secret, Defs.' Br. 1, 4; no inquiry need be made into its reasons for closing executions to the general public or its surrogates in the press, *id.* at 15; the Court need not consider whether public observers at executions were historically present and play a positive role, *id.* at 7–8; and no facts can plausibly support Plaintiffs' claims that Defendants' enforcement of Indiana Code § 35-38-6-6(a) ("Section 6(a)") and Indiana State Prison Facility Directive, ISP 06-26: Execution of Death Sentence (June 17, 2024) ("ISP 06-26") infringe their constitutional rights, as applied, *id.* at 9–13, 16. So long as Indiana's enforcement of Section 6(a) and ISP 06-26 "[does] not treat the press less favorably than the general public," Defendants believe, those restrictions are *ipso facto* constitutional. *Id.* at 4, 13–14.

That is not the law, and it is not what this Court or the Seventh Circuit previously decided. If Indiana's motion to dismiss is to be believed, the First Amendment provides no barrier to it executing a prisoner in complete secrecy and not telling a single member of the public what occurred; there is no limiting principal between the legal theory in Indiana's motion and a total blackout on information about executions in the state, instituted for any reason Defendants choose.

There are pivotal issues of fact that must be assessed to determine whether Indiana's enforcement of Section 6(a) and ISP 06-26 is constitutional. For the reasons set forth below, Defendants' motion to dismiss should be denied.

## BACKGROUND

On April 15, 2025, the Indiana Supreme Court scheduled the execution of Benjamin Ritchie for May 20, 2025. Compl. ¶ 44, ECF 1. Ritchie's execution came on the heels of the execution of Joseph Corcoran in December 2024, which ended a fifteen-year hiatus on executions in the state. Less than a month later, to avoid an irreparable deprivation of access to Ritchie's then-fast-approaching execution—and to executions Plaintiffs believed were likely to be scheduled during the pendency of this case by the State of Indiana—Plaintiffs filed this lawsuit, ECF 1 & 9, and soon thereafter moved for a preliminary injunction. ECF 19. Through that motion, Plaintiffs sought a stop-gap order ensuring the press access to executions while the merits of this case were litigated. *Id.* at 3–4. The parties appeared before this Court on May 16 for an expedited hearing, ECF 35, and this Court denied Plaintiffs' motion the same day. *Associated Press v. Neal*, 788 F. Supp. 3d 959 (S.D. Ind. 2025) (the "Preliminary Injunction Order," ECF 36).

Plaintiffs appealed. ECF 42. On Plaintiffs' unopposed motion, ECF 47, proceedings in this Court were stayed pending resolution of the appeal. ECF 51. Plaintiffs' appeal was fully briefed on September 17, 2025. Appellants' Reply Br., *Associated Press v. Neal*, 177 F.4th 862 (7th Cir. 2026) (No. 25-2025), Dkt. No. 29. In the meantime, the Indiana Supreme Court scheduled the execution of Roy Lee Ward for October 10, 2025. *See* Order, *Roy Lee Ward v. Indiana*, Nos. 74S00-0907-PD-320, 25S-SD-167, 2025 WL 2459317, at *3 (Ind. Aug. 27, 2025). On October 10, 2025, Ward was executed, Am. Compl. ¶ 37, ECF 78.

On June 5, 2026, the Seventh Circuit affirmed the denial of Plaintiffs' motion for preliminary injunction. *Associated Press v. Neal*, 177 F.4th 862 (7th Cir. 2026). The case returned to this Court, and the unopposed stay was lifted. ECF 66. Defendants moved to dismiss Plaintiffs' then-operative complaint. ECF 72. Plaintiffs timely filed an Amended Complaint, ECF 78, and Defendants' second motion to dismiss, to which this brief responds, followed, ECF 83, 84.

## LEGAL STANDARD

In evaluating a motion to dismiss, courts view the complaint "in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). While plaintiffs are required to "provide some specific facts to support the legal claims asserted in the complaint," *Bilek v. Fed. Ins. Co*., 8 F.4th 581, 586 (7th Cir. 2021) (cleaned up), a plaintiff "need not prove [their] claims at the pleading stage." *Id.* at 588. Accordingly, a court deciding a motion to dismiss need only determine whether the complaint "alleges a plausible claim for relief." *Id.* In so doing, the primary inquiry is whether the plaintiff has "allege[d] enough details about the subject-matter of the case to present a story that holds together." *Id.* at 586 (internal quotations omitted).

## ARGUMENT

### I. Count I of Plaintiffs' Amended Complaint states a claim upon which relief can be granted.

Count I of Plaintiffs' Amended Complaint is an as-applied claim alleging that Defendants' enforcement of Section 6(a) and ISP 06-26 infringes the public's qualified right to observe executions. *See generally* Am. Compl. ¶¶ 199–211. To that end, Count I alleges that the First Amendment forbids Defendants' enforcement of Section 6(a) and ISP 06-26, as applied to Plaintiffs, unless Defendants can make a specific, factual showing that their enforcement is appropriately tailored and conducted in furtherance of a sufficiently compelling interest. *Id.*

As set forth below, Plaintiffs have plausibly alleged that the complimentary considerations of experience and logic set forth in *Press-Enter. Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*") are met. In the alternative, Plaintiffs have set forth allegations sufficient to meet either pre-*Press-Enterprise II* framework for determining the same question. Plaintiffs maintain

that *Press-Enterprise II* controls the determination of Count I, *see infra*, Section I.B. But whether or not the Court agrees, Plaintiffs have plausibly alleged that Defendants carry the burden of showing appropriate tailoring and a sufficient interest in their enforcement of Section 6(a) and ISP 06-26, which Defendants cannot satisfy at this stage in the case. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580–81 (1980) (plurality opinion) (reversing closure order where "the trial judge made no findings to support closure; no inquiry was made as to whether alternative solutions would have met the need to ensure fairness"); *see, e.g.*, *Philadelphia Inquirer v. Wetzel*, 906 F. Supp. 2d 362, 372 (M.D. Pa. 2012) (due to the qualified First Amendment limitation on the closure of executions, the "focus now shifts to whether Defendants have produced specific, on the record findings that indicate obstructing certain phases of the execution process is 'necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest'").

**A. The law of the case doctrine does not control the resolution of Count I.**

As Defendants acknowledge, "legal and factual rulings made as part of a preliminary-injunction analysis are not binding upon [courts] when they later consider the matter on the merits." *Tully v. Okeson*, 78 F.4th 377, 381 (7th Cir. 2023) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)); *see also Hunter v. Atchison, T. & S. F. Ry. Co.*, 188 F.2d 294, 299 (7th Cir. 1951) ("[A] decision granting or refusing a preliminary injunction is not conclusive upon either the court or the parties, on the subsequent disposition of the cause by final judgment."). That is because factors such as "a less-than-developed record, a short timeline, and a concomitant truncated legal analysis—usually counsel against invoking the law of the case doctrine in a way that would preclude a full merits determination." *Tully*, 78 F.4th at 381. Those factors were all present when this Court denied Plaintiffs' motion for preliminary injunction, which was briefed, argued, and decided in the few short weeks between the scheduling of Ritchie's execution and the

execution itself. Prelim. Inj. Order 4 n.1 (observing the "tight timeframe in which it [had] to rule on Plaintiffs' Motion").

While a narrow exception may sometimes be invoked for "[a] fully considered appellate ruling on an issue of law made on a preliminary injunction appeal," *see Tully*, 78 F.4th at 381 (stating the exception but proceeding to reconsider an issue of law), the Seventh Circuit's determination here that Plaintiffs were not likely to succeed on the merits of Count I of its initial complaint involved an assessment under a narrower set of allegations than are present in the amended complaint. The Seventh Circuit assumed without deciding that the complementary considerations of experience and logic described by the Supreme Court in *Press-Enterprise II* would govern its analysis. *Associated Press*, 177 F.4th 867. Then, on the limited historical record before it, the court concluded that Plaintiffs were not likely to be able to show a sufficient tradition of public observers at executions, which would have "foreclose[d] any likelihood of success on the merits." *Id.* at 868. The Seventh Circuit did not "reach a firm conclusion" as to whether the allegations in Plaintiffs initial complaint were likely to be substantiated as to find that public observers at executions play a significant positive role in the function of that proceeding. *Id.* at 867–68.

On each point, because the panel was evaluating Plaintiffs' motion for preliminary injunction, and not a Rule 12 motion, it did not "accept [Plaintiffs'] allegations as true," or give Plaintiffs "the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Here, "different standards apply" to Defendants' present motion than were applied at the preliminary injunction stage. *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 292 (7th Cir. 1998) (explaining caution in adopting findings and conclusions from preliminary injunction

stage for purposes of summary judgment is necessary in part because "different standards apply in the two contexts (reasonable likelihood of success on an injunction, and the existence of any genuine issues of material fact on summary judgment)").

Moreover, the record here is not the same as the one assessed by the Seventh Circuit, because Plaintiffs' Amended Complaint contains a different set of allegations. *Cf. Protect Our Parks, Inc. v. Buttigieg*, 97 F.4th 1077, 1091 (7th Cir. 2024), *cert. denied sub nom. Protect Our Parks, Inc. v. Duffy*, 145 S. Ct. 2787 (2025) (noting law of the case applied where the court had previously "consider[ed] the identical record that is now before us, and so there are no new facts we must incorporate"). As set forth in more detail below, Plaintiffs' Amended Complaint contains substantial additional factual allegations that, taken as true, plausibly demonstrate that executions have historically been open to the press and general public, and that public access to executions "plays a significant positive role in [their] functioning." *See Press-Enterprise II*, 478 U.S. at 8. Accordingly, the Seventh Circuit's decision neither requires nor counsels for dismissal of Plaintiffs' amended complaint at the pleading stage.

### B. Under *Press-Enterprise II*, Defendants cannot enforce Section 6(a) and ISP 06-26 unless Indiana demonstrates a sufficient interest and appropriate tailoring.

The complementary considerations of experience and logic set forth in *Press-Enterprise II*, 478 U.S. at 8–9, are determinative of whether Defendants bear the burden of demonstrating the constitutionality of enforcing Section 6(a) and ISP 06-26 against Plaintiffs. While this is not the only doctrine under which Count I of Plaintiffs' Amended Complaint can plausibly succeed, *see infra*, Section I.E, the consistent application of a framework endorsed by a majority of the Supreme Court requires that it be applied in this case. Plaintiffs respectfully request that the Court reconsider its contrary view, which it reached during its expedited decision on Plaintiffs' motion for preliminary injunction. Prelim. Inj. Order at 5–9.

*First*, the distinction between court proceedings and other government processes relied upon by Defendants makes no constitutional difference. Although neither the Supreme Court nor the Seventh Circuit has applied the *Press-Enterprise II* framework outside the context of "court proceedings" and their associated records, *see Associated Press*, 177 F.4th at 865, neither have those courts rejected its application beyond that scope. In fact, the Supreme Court has instructed that "the First Amendment question cannot be resolved solely on the label we give the event, i.e., 'trial' or otherwise." *Press-Enterprise II*, 478 U.S. at 7. If any conclusion can be drawn from the absence of Supreme Court cases defining the scope of the doctrine, it is that litigants have found no error in the raft of appellate cases holding it broadly applicable. *See, e.g.*, *Leigh v. Salazar*, 677 F.3d 892, 898–900 (9th Cir. 2012) (finding experience and logic framework broadly applicable to government proceedings and holding that it would govern whether presumptive right of access attached to horse roundup events); *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 694–95 (6th Cir. 2002) (stating "we believe that there is a limited First Amendment right of access to certain aspects of the executive and legislative branches," and finding a First Amendment right of access to deportation proceedings); *N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 208–09 (3d Cir. 2002) (recognizing that the experience and logic framework is "broadly applicable to issues of access to government proceedings" and using it to conclude that there is no First Amendment right of access to "special interest" deportation proceedings); *see also N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 297–300 (2d Cir. 2012) (applying experience and logic framework to transit authority meetings).

More importantly, the principles that underly the constitutional limit on when the government can enact process upon its constituents with no public oversight are not confined to court proceedings. Instead, the Supreme Court cases beginning with *Richmond Newspapers* and

culminating with *Press-Enterprise II* each emphasize the foundational principle that the people's right of access to government proceedings in a democracy cannot be curtailed arbitrarily.[1] The Supreme Court's reasoning in this line of cases is clear and consistent: "the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper*, 457 U.S. at 604. That the government may not arbitrarily keep its activities a secret from those it governs is the *ratio decidendi*—the reasoning underpinning the Supreme Court's holdings—that "allows [these cases] to have life and effect in the disposition of future cases." *See, e.g.*, *Ramos v. Louisiana*, 590 U.S. 83 (2020) (plurality opinion). Indeed, "courts must . . . deduce legal rules not only from the language of opinions but from their underlying logic as well." Bryan A. Garner, et al., The Law of Judicial Precedent 89 (2016).

*Second*, although no part of the *Press-Enterprise II* framework requires it, Plaintiffs have alleged facts that, taken as true, plausibly demonstrate that executions have characteristics in common with judicial proceedings in ways that this Court suggested might be constitutionally significant in its Preliminary Injunction Order. Prelim. Inj. Order 9; *see also Associated Press*,

---

[1] *See Richmond Newspapers*, 448 U.S. at 575–76 (plurality opinion) ("[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.") (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978); *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 604 (1982) ("Underlying the First Amendment right of access to criminal trials is the common understanding that 'a major purpose of that Amendment was to protect the free discussion of governmental affairs'") (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)); *Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*, 464 U.S. 501, 517 (1984) ("*Press-Enterprise I*") (Stevens, J., concurring) (emphasizing "the underpinning of our holding today is not simply the interest in effective judicial administration; the First Amendment's concerns are much broader. The common core purpose of assuring freedom of communication on matters relating to the functioning of government that underlies the decision of cases of this kind provides protection to all members of the public from abridgment of their rights of access to information about the operation of their government[.]") (cleaned up).

177 F.4th at 865. As Plaintiffs allege, the end of a criminal trial does not signify the conclusion of adjudication regarding when and whether the death sentence will be imposed, either by decisionmakers within the judiciary or outside it. *See generally*, Am. Compl. ¶¶ 18–23. Indiana's Supreme Court can stay an execution at any time during the pendency of an appeal. *Id.* ¶ 19. Moreover, "[t]he Governor of Indiana has the authority under Indiana Constitution Article 5, Section 17, to grant reprieves, commutations, and pardons." *Id.* ¶ 20. Individuals who have been sentenced to death may make applications for clemency to a parole board, "which submits its recommendation to the Governor." *Id.* ¶ 21. There is no constitutional or statutory time limit on when the Governor may decide whether to grant clemency prior to an execution. *Id.* ¶ 22. Instead, the Governor may adjudicate a death row inmate's application for clemency up until that person is executed. *Id.* ¶ 22. Even on the day of an execution, staff are assigned to monitor dedicated phone lines to the Governor's office and residence and to the Indiana Supreme Court in case a stay or application of clemency is granted. *Id.* ¶ 23. In other words, adjudicatory processes continue through and including the minutes before an execution sentence is carried out.

In addition, as Plaintiffs allege, until the conclusion of execution proceedings, criminal proceedings are subject to being reopened based on new facts, *id.* ¶ 188, including those developed at an execution itself. For example, in 1930, two men who had previously been convicted of murder were granted a reprieve from the governor of Kentucky after their co-defendant "absolved [them] from guilt in a statement made . . . shortly before he went to the electric chair" the morning all three were to be executed. *Id.* ¶ 189. Taking these allegations as true and drawing all inferences in Plaintiffs' favor at this stage, Plaintiffs have plausibly pled that executions both occur within and contain an "adjudicative process," where governmental factfinders may still weigh guilt and the appropriateness of the sentence, even after the "factfinder has determined guilt and the trial

court has imposed a sentence and terminated the case." *Contra Associated Press*, 177 F.4th at 865.

Plaintiffs also allege that "more open public scrutiny of an execution 'provide[s] a check on the activities of judges and litigants' or 'foster[s] more accurate fact finding." *Contra Associated Press*, 177 F.4th at 865 (quoting *United States v. Eppinger*, 49 F.3d 1244, 1252–53 (7th Cir. 1995). In particular, Eighth Amendment challenges, often involving court proceedings, can and do take place while executions are ongoing. Am. Compl. ¶ 191. For example, during the 2014 execution of Joseph Wood in Arizona, Wood's attorneys filed an emergency motion for stay of execution, claiming his then-in-progress execution violated the Eighth Amendment. *Id.* ¶ 191. An emergency telephonic hearing was held before the presiding court, during which both parties' counsel represented numerous facts about the ongoing execution itself in an effort to convince the court whether or not to intervene. *Id.* More recently, in May 2026, during the attempted execution of Tony Carruthers in Tennessee, Carruthers's attorneys similarly filed an emergency motion seeking a stay of his execution based on developments at that execution. *Id.* ¶ 192. These examples further show how executions exist within judicial proceedings, and they also illustrate that more open, public scrutiny of an execution would "provide a check on the activities of judges and litigants" and "foster more accurate fact finding." *Contra Associated Press*, 177 F.4th at 865; *see infra*, Section I.D.

It is for these reasons that the Ninth Circuit, its district courts, and the Middle District of Pennsylvania have applied the *Press-Enterprise II* factors to conclude that the First Amendment creates a qualified right of access to executions. *See Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 877 (9th Cir. 2002) (applying the experience and logic considerations to find "a First Amendment right to view executions from the moment the condemned is escorted into the

execution chamber, including those 'initial procedures' that are inextricably intertwined with the process"); *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (applying the same analysis to the execution process in Idaho and reversing the denial of a preliminary injunction to require public access); *First Amend. Coal. of Ariz., Inc. v. Ryan*, 938 F.3d 1069, 1075 (9th Cir. 2019) (applying the *Press-Enterprise II* framework to determine that the public has a constitutional right to hear the entire execution process); *Phila. Inquirer*, 906 F. Supp. 2d at 368 (applying experience and logic framework to find qualified right of access to portions of execution that Pennsylvania corrections department protocol instructed its employees to obstruct). And during the pendency of this case, a Tennessee trial court did the same. *See* Order at 10–14, *Associated Press v. Nelsen*, No. 25-1513-III (Tenn. Chancery Ct., Davidson County, Jan. 16, 2026) (applying *Press-Enterprise II* test to executions to conclude for purposes of temporary injunction that "executions were historically open to the public" and that access "plays a significant role in promoting transparency, accountability, and public confidence in the administration of capital punishment"),[2] *cert. granted*, No. M2026-00150-SC-R10-CV, 2026 WL 982288, at *1 (Tenn. Apr. 8, 2026).

Given the explicit statements from the Supreme Court regarding its reasons for developing the experience and logic framework, the wide-spread use of that framework outside of court proceedings, and the pattern of courts analyzing experience and logic in the execution context, Plaintiffs respectfully maintain that the *Press-Enterprise II* framework should determine whether Defendants hold the burden of demonstrating an adequately compelling and sufficiently-tailored reason for their enforcement of Section 6(a) and ISP 06-26. And while this does require the Court to reconsider its holding at the preliminary injunction stage, the pleadings in the Amended

[2] Filed herewith as ECF 86-1 pursuant to S.D. Ind. R. 7-1(f) and Sec. II.A & Appx. A of this Court's Practices and Procedures.

Complaint regarding the adjudicatory elements of executions in Indiana and elsewhere bolster the case for such a reconsideration.

### C. Plaintiffs have plausibly alleged a sustained historical tradition of public observers at executions, including their surrogates in the press.

The Amended Complaint surveys the long history of general public and press observers at executions from the founding to present day. Taken as true, Plaintiffs' pleadings allege a sufficient tradition of general public observers at executions under controlling Supreme Court law, including under *Press-Enterprise II.*

As Plaintiffs allege, virtually all hangings in early America — both before and after the ratification of the Bill of Rights — were conducted in full public view. Am. Compl. ¶ 82. And this tradition of general public observers at executions continued after the founding and through the ratification of the Fourteenth Amendment, *id.* ¶ 83. Such allegations are sufficient at the pleading stage because the Supreme Court's historical inquiry under the experience prong has typically focused on early American history. *See Richmond Newspapers*, 448 U.S. at 576 (1980) (plurality opinion) ("The First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing courtroom doors which had long been open to the public *at the time that Amendment was adopted*.") (emphasis added); *Press-Enterprise II*, 478 U.S. at 10 (relying on openness of probable-cause hearing for Aaron Burr in 1807).

But even as of 1868, many states had no laws governing where executions were to take place, meaning that they still conducted executions by public hanging in their town or county gallows. Am. Compl. ¶ 83. And although several state legislatures had passed laws prior to 1868 moving executions into local or county jail yards, the purpose of those laws was not to limit transparency or forfeit the public's ability to understand what happened at executions. *Id.* ¶¶ 84–85. This is an inference that must be taken in Plaintiffs' favor at this stage of the case, supported

by Plaintiffs' showings that many of these state statutes did not actually limit the number of witnesses who could attend executions, *id.* at ¶ 86, while others included provisions that explicitly required the government official in charge of the execution to invite members of the public to attend. *Id.* ¶ 91. Indeed, contemporaneously reported accounts of members of the general public attending executions during that time period, *id.* ¶¶ 87–90, 92–93, 95–97, and demonstrating that the press was always or virtually always among the public observers permitted to attend, *id.* ¶¶ 98–103, render this contention hard to refute.

Together, these allegations, taken as true, demonstrate that executions have "historically been open to the press and general public," *Press-Enterprise II*, 478 U.S. at 8–9, and cross the threshold of plausibility required under Rule 12.

In arguing otherwise, Defendants almost entirely rely on their own alleged facts outside Plaintiffs' pleadings, which are inappropriate for this Court to weigh against Plaintiffs' allegations at this stage. Fed. R. Civ. P. 12(d). For example, Defendants assert that "[a]lthough executions were initially held in 'public squares or commons' at our nation's inception, by the 1830s many states 'began to prohibit public executions.'" Defs.' Br. 9 (quoting *Associated Press*, 177 F.4th at 866). Not only does this fact appear nowhere in Plaintiffs' Amended Complaint, but it is also contradicted by Plaintiffs' allegations that in states including Florida, New York, Delaware, Alabama, Mississippi, North Carolina, Maryland, Georgia, Kentucky, South Carolina, and West Virginia executions continued to be attended by large crowds (i.e., more than fifty witnesses) well into the twentieth century, up to and including an execution attended by 20,000 people in 1936 in Kentucky. Am. Compl. ¶¶ 87–90, 96–97, 111, 115, 121, 128.[3]

[3] Defendants also assert that "in 1852, Indiana mandated that executions take place 'in some private enclosure as near to the jail as possible," Defs.' Br. 9 (quoting *Associated Press*, 177 F.4th at 866)). But as Plaintiffs allege, that statute "codified a requirement that the sheriff invite

Plaintiffs have also alleged that the tradition of general public observers at executions continued into the twentieth century, even as additional states passed laws governing where executions were to take place. *Id.* ¶¶ 105–107. When states passed laws requiring executions to take place in local or county jail yards, their statutes protected the general public's ability to observe executions, *id.* ¶¶ 106–107, and the press continued to be among the public observers permitted to attend, even where state law did not explicitly require it. *Id.* ¶¶ 110–118. And as states began to pass laws requiring executions to take place in their state prison or penitentiary, the majority adopted or kept provisions protecting the general public's ability to observe, *id.* ¶ 119, and the press, as surrogates for the general public, was always or virtually always permitted to continue attending, *id.* ¶¶ 122–135, even in states that did not explicitly permit press witnesses, *id.* ¶¶ 136–141.

Given the protections for public observers embedded in these statutes, the shift in fora from the town gallows to the jail yard is not evidence of a trend away from access. Just as "modern day trials are a "far cry from the 'town meeting trial' of ancient English practice," our "modern procedural protections have their origin in the ancient common-law principle which provided, not for closed proceedings, but rather for rules of conduct for those who attend trials," *Press-Enterprise II*, 478 U.S. at 8. Likewise, while executions today look different than they did in the past, their modern protections for observer access have roots in a longstanding tradition of openness. Moreover, citizens no longer "acquir[e] information about trials by firsthand

'twelve reputable citizens' to attend executions at the same time it mandated that executions take place in the jail yard, *see* 1852 Ind. Acts (Vol. II) 379," and that even with that statute in place, "executions continued to be attended by large crowds until the late nineteenth century" in the state. Am. Compl. ¶ 93. For example, 250 tickets were issued to an 1879 execution in Marion County, with 5,000 more who "throng[ed] the court yard and adjacent streets," *id.*, and that 50 to 75 persons attended a 1936 federal hanging in Marion County, *id.* ¶ 143.

observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media," *Richmond Newspapers*, 448 U.S. at 572–73 (plurality opinion), and the same is true of executions. And the historical record confirms that just as with criminal trials, members of the press have historically been "provided special seating and priority of entry so that they may report what people in attendance have seen and heard" at executions. *See id*. at 573; see also Am. Compl. ¶¶ 98–103, 110–119, 122–141, 144–147.

Defendants make too much of the Seventh Circuit's choice not to rely upon "nineteenth-century statutes prohibiting public executions [that] still allowed some observers to attend the private executions." *Associated Press*, 177 F.4th at 866. The Seventh Circuit predicted that Plaintiffs were unlikely to be able to show that these statutes amounted to anything more than "[a]llowing a dozen or so witnesses to view a largely private execution." *Id.* at 867. But the Amended Complaint and the posture of the Defendants' motion require a different conclusion. Plaintiffs allege—and corroborate their allegations with citations to contemporaneous news accounts—that far more than "a dozen or so witnesses" were permitted to attend executions in many states for a far greater portion of history than the Seventh Circuit had on the narrow record before it. *See* Am. Compl. ¶¶ 87–90, 96–97, 111, 115, 121, 128. Similarly, Plaintiffs allege that members of the press were always or virtually always among the public observers permitted to attend, whether the relevant statute specifically provided for their attendance or not. *See id.* ¶¶ 98-103, 110-118, 122-141, 146-47, 156-167, 170, 172-75. Furthermore, the Seventh Circuit, reviewing a preliminary injunction decision, was not required to accept Plaintiffs' allegations as true or give Plaintiffs "the benefit of all reasonable inferences in [their] favor." *Doe v. Univ. of S. Indiana*, 43 F.4th at 791.

Relatedly, Defendants are incorrect that the Court can determine as a matter of law on their Rule 12 motion that the tradition of public observers at executions ended in the twentieth century. *See* Defs.' Br. 10. The tradition of permitting the press to observe and "report what people in attendance have seen and heard," *Richmond Newspapers*, 448 U.S. at 573, to the wider public supports the inference that the purpose of statutes from this era was to permit those selected as witnesses to serve as "surrogates for the public," *id.*, rather than to render executions "private." *Contra* Defs.' Br. 9–10 (discussing *Associated Press*, 177 F.4th at 866); *see* Am. Compl. ¶¶ 119, 122–141, 143–147. And in states that reinstated the death penalty following *Gregg v. Georgia*, 428 U.S. 153 (1976), the historical tradition of general public observers, including their surrogates in the press, has continued into present day. This is pled in the Amended Complaint through allegations regarding the historical practices of states which continue to conduct executions today, *id.* ¶¶ 150– 167, and those that have abolished it. *Id.* ¶¶ 171–175. And the federal government has, since 1993, conducted its executions in Indiana, with regulations in place providing for the attendance of representatives of the press. *Id.* ¶¶ 168–170.

Defendants are also incorrect that Plaintiffs must allege a literally "unbroken uncontradicted history" of executions being "subject to categorically open invitations" Defs.' Br. 11. That language derives from the plurality decision in *Richmond Newspapers*, which described the history of access to criminal trials as "unbroken, uncontradicted," 448 U.S. at 573, but that decision does not say or suggest that a similar history must be shown for another proceeding to qualify for First Amendment protection. And the Courts of Appeals have rejected that kind of overly rigid approach.[4] Even public access to the criminal trial would not meet the literal

[4] *See, e.g.*, *Detroit Free Press*, 303 F.3d at 700 (rejecting premise that plaintiff must make "significantly long showing that the proceedings at issue were historically open, such as a common law tradition," and finding that right of access attached to deportation proceedings); *N. Jersey*

"unbroken uncontradicted" standard urged by Defendants. During the lead up to *Richmond Newspapers*, several states had passed statutes that restricted access to criminal proceedings in various ways, leading the Supreme Court to observe in 1979 that "[e]ven with respect to trials themselves, the tradition of publicity has not been universal." *See Gannett Co. v. DePasquale*, 443 U.S. 368, 388 n.19 (1979) (collecting statutes); *see also* Max Radin, *The Right to a Public Trial*, 6 Temp. L. Q. 381, 385 389–91 & n.18 (1932) (describing "sharply divided" courts on the issue of whether public observers were a "conditional privilege of the defendant" or a broader unqualified right, and collecting dozens of cases in which "exclusion of the public in whole or in part has been permitted"). In *Press-Enterprise II*, the Court addressed a California statute that permitted the closure of preliminary hearings in certain circumstances, and observed, in a footnote, that a previous iteration of the statute "gave the defendant the unqualified right to close the proceedings." 478 U.S. at 4 n.1. And in *Globe Newspaper*, the Court addressed a Massachusetts statute that *required* "the exclusion of the press and general public during the testimony of a minor victim in a sex-offense trial." *See Globe Newspaper*, 457 U.S. at 602. Despite this imperfect history of public access to the criminal trial, the tradition of public observers was nonetheless sufficient to support repeated decisions establishing the qualified First Amendment right of access.

---

*Media Grp*., 308 F.3d at 213 (agreeing that "a 1000–year history is unnecessary, and that in some cases, largely limited to the criminal context, relatively little history is required," but finding that right of access did not attach to deportation proceedings); *N.Y.C. Transit Auth*., 684 F.3d at 301 (finding right of access attached to certain state administrative proceedings and emphasizing that it "would come to the same conclusion" regardless of whether those proceedings were the "functional[] equivalent" of criminal proceedings because "the Supreme Court has instructed us to ask not whether the First Amendment was formulated with some particular forum in mind, but whether 'the place and process have historically been open'"); *Texas Trib. v. Caldwell Cnty., Texas*, 121 F.4th 520, 529 (5th Cir. 2024) (noting that although "modern day bail hearing does not have a historical twin . . . the trend towards open bail hearings has only grown in the modern era," and holding this was sufficient to satisfy the experience prong).

Next, Defendants' attempt to analogize the complex and layered tradition of public access to executions in this country to the single Black Code restriction on carrying firearms discussed in *Wolford v. Lopez*, 146 S. Ct. 2032 (2026) is woefully inapt. *See* Defs.' Br. 12–13. In *Wolford*, the Supreme Court considered whether a Hawaii statute that provided that "*no one* carrying a firearm may enter [private property] without express authorization" violated the Second Amendment. *Id.* at 2046 (emphasis in original). In the Second Amendment context, restrictions that fall within the plain text of the amendment are presumptively unconstitutional, and the burden lies with the government to demonstrate that "its challenged law did not infringe the historical understanding of the codified right." *Id.* Hawaii attempted to analogize its statute to a single 1865 Louisiana statute that "made it unlawful for 'any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order.'" *Id*. at 2053. The Court explained that this law was "part of Louisiana's Black Code, and it provided a tool for disarming blacks and thus leaving them defenseless against attacks" and therefore constituted a "tainted artifact" that "[could] not be taken seriously" as evidence of the "original understanding of the right to keep and bear arms." *See id*. at 2053. This is not similar in any way to the showing in Plaintiffs' amended complaint.

The Amended Complaint canvasses the history and traditions of public and press access to executions throughout the United States from the time of the founding to the ratification of the Fourteenth Amendment to the present day. Am. Compl. ¶¶ 78–175. It does not pin its support to a single law, much less one from the Reconstruction era, as was the case in *Wolford*. As Michael Trotti's article illuminates, the history of executions in this country and public access to them is not a simple or colorblind one. *See* Michael A. Trotti, *The Scaffold's Revival: Race and Public Execution in the South*, 45 J. Soc. Hist. 195, 196 (2011) ("[I]n the South, the 'public' at public

executions was a mixed-race crowd, often with more [B]lacks present than whites. The shift to private execution stripped [B]lack authority from gallows days, with culprits paying for their crimes now before small, white audiences."). Rather than meaningfully engage with this history, Defendants vaguely gesture at three paragraphs of Plaintiffs' Amended Complaint that refer to articles whose headlines include the word "Negro" to describe people who were executed—a term which was in widespread use in this country until the 1960's, including in news reporting about executions. The word is antiquated, but it is an inescapable reality of the historical record.[5] Moreover, the Amended Complaint is not narrowly confined to examples of executions limited to one race or ethnicity but instead contains dozens of examples of executions involving individuals of numerous different races and ethnicities to which the public had access. *Compare*, *e.g.*, Am. Compl. ¶¶ 99–101 (citing coverage of various executions in Pennsylvania, New York, and Kansas of white individuals) *with id.* ¶ 131 (citing coverage of 1924 Nevada execution of a Chinese individual), *and id.* ¶ 147 (citing coverage of executions of Nazi leaders at Nuremberg). In any case, this Court should reject Defendants' effort to make an end-run around the thorough historical record based on little more than three headlines they apparently find uncomfortable to confront.

Finally, while the court need not reach this issue to deny Defendants' motion, the strength of Plaintiffs' allegations with respect to the significant positive role that general public observers play at executions, *infra* Section I.D, also fortifies their demonstration as to the history of observers, since the experience and logic factors are "complementary considerations," *Press*

[5] *See* Hope Yen, *US Stopping Use of Term 'Negro' for Census Surveys*, Associated Press (Feb. 25, 2013), https://apnews.com/us-stopping-use-of-term-negro-for-census-surveys-45db7a55f5f540e4b1e121693c370ea7 (describing history of term); *see also AP Changes Writing Style to Capitalize 'B' in Black*, Associated Press (June 19, 2020), https://apnews.com/article/71386b46dbff8190e71493a763e8f45a (describing more recent guidance for usage of descriptors of race in news reporting stylebooks).

*Enterprise II*, 478 U.S. 1 at 8, that must be assessed together. The Supreme Court "has not specified how much weight courts should give each prong," *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 301 (2d Cir. 2012), and the Supreme Court has never held, either in *Press Enterprise II* or elsewhere, that one prong is a pre-test for the other. The corollary to the Seventh Circuit's caution that the logic prong alone would not support a finding in favor of Plaintiffs' likelihood of success, *see Associated Press*, 177 F.4th at 867–68, is not that this Court is free to dispense with logic as a matter of law. The aggregate of the two complimentary considerations, taken together, is the relevant inquiry under *Press-Enterprise II*. *See, e.g.*, *United States v. Suarez*, 880 F.2d 626, 627–28 (2d Cir. 1989) (finding that a strong public interest in openness fortified a more recent tradition of access); *United States v. Simone*, 14 F.3d 833, 838 (3d Cir. 1994) (focusing on logic, as "the 'experience prong' . . . provides little guidance"); *Seattle Times Co. v. U.S. Dist. Ct. for W.D. Wash.*, 845 F.2d 1513, 1516 (9th Cir. 1988) (finding presumption of access where logic factor "weigh[ed] heavily in favor of a right of access," despite finding that "[p]retrial detention proceedings do not share with criminal trials an unbroken history of public access"); *see also United States v. Chagra*, 701 F.2d 354, 355-57 (5th Cir. 1983) ("Access to bail reduction hearings, however, should not be foreclosed because those proceedings lack" an "unbroken, uncontradicted history" of openness because the First Amendment "must be interpreted in the context of current values and conditions.").

**D. Plaintiffs have plausibly alleged that general public observers, including their surrogates in the press, play a significant positive role in executions.**

The Amended Complaint also surveys the numerous ways in which general public observers at an execution play a significant positive role in the functioning of that event. Taken as true, the pleadings allege that the "logic" consideration of *Press-Enterprise II* has been met.

*First,* as noted above, Plaintiffs allege that public observers at executions foster "more accurate fact finding and provide[s] a check on the activities of judges and litigants in judicial proceedings that involve executions, including the underlying criminal and post-conviction proceedings for condemned persons." Am. Compl. ¶ 187. These allegations are supported by reference to historical instances in which condemned individuals had their sentences commuted based on statements made by their codefendant in the execution chamber in 1930 in Kentucky, *id.* ¶ 189, and by allegations regarding court filings and proceedings in Eighth Amendment challenges brought by condemned individuals that were premised and heavily reliant on facts developed in the execution chamber at executions in Arizona and Tennessee. *Id.* ¶¶ 190–192.

*Second*, Plaintiffs allege that public observers, including their surrogates in the press, promote "the public perception of fairness and transparency surrounding executions in a way that state officials, the condemned's attorneys, friends and family, or the family members of victims cannot," Am. Compl. ¶¶ 176, 183. This conclusion is well-supported by allegations in the Amended Complaint. For instance, Plaintiffs allege that following the 1994 execution of Gregory Resnover in Indiana, a spokesperson for the Indiana State Prison stated that the execution went well, with no problems, and that "[t]he equipment functioned properly." *Id.* ¶ 180. A reporter for the Indianapolis Star who had been invited to attend by the condemned, however, described how "a fiery orange halo of sparks and light gray smoke appeared atop Gregory Resnover's head for what seemed like several minutes, the smoke creating a surreal haze." *Id.* ¶ 181. Following the execution, the Indiana General Assembly passed a bill changing the method of capital punishment in the state from electric chair to lethal injection. *Id.* ¶ 185 (citing 1995 Ind. Acts 4145–46). "[T]he measure's author, Sen. Richard Thompson, R-North Salem . . . said he was moved to offer the proposal after seeing graphic media accounts detailing the electrocution last December of

convicted killer Gregory Resnover." *Id.* ¶ 185 (quoting Richard D. Walton, *Senate OKs Use of Lethal Injections*, Indianapolis Star, Feb. 17, 1995, at 1); *see also id.* ¶¶ 177–79 (comparing press accounts of the execution of Joseph Wood with statements by victim's family members).

*Third,* Plaintiffs allege that public observers at executions contribute to both of the "two principal social purposes" of the death penalty: "retribution and deterrence of capital crimes by prospective offenders." *Id.* ¶ 195 (quoting *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (plurality opinion)), both by increasing their salience, *id.* ¶ 196, and by "foster[ing] the same sense of catharsis that public observation of criminal trials fosters." *Id.* ¶ 197.

Notably, it is apparent from Defendants' preliminary injunction papers that they intend to enter testimony or other evidence that they believe undermines Plaintiffs' showing as to the significant positive role of public observers. *See, e.g.*, *Associated Press*, 177 F.4th at 867–68 ("[A]s Indiana underscores, allowing uninvited strangers with no immediate connection to the underlying crime to watch a prisoner die risks offending the dignity of their final moments."). The Seventh Circuit panel observed that "[a]ny inquiry into whether a role is positive must perforce consider whether it is potentially harmful." *Id.* at 867 (quoting *N. Jersey Media Grp.*, 308 F.3d at 200–01). The parties' factual dispute underlines why the Court must assess the merits of Plaintiffs' claim with the benefit of facts developed through the discovery process.

Plaintiffs' Amended Complaint not only plausibly pleads an affirmative case for access, but it also contains sufficient factual allegations to plausibly show that public observers at executions will not threaten or undermine the dignity of the person being executed, Am. Compl. ¶ 216, including because public oversight of executions ensures that they are conducted "humanely, efficiently, and consistently, and with due dignity and solemnity." *Id.* ¶ 183.

**E. Even setting aside the *Press-Enterprise II* considerations, Plaintiffs have stated a claim for relief requiring a fact-based determination as to whether Defendants' continued enforcement of Section 6(a) and ISP 06-26 passes constitutional muster.**

Even if this Court were to conclude that the *Press-Enterprise II* experience and logic framework does not govern Claim I of Plaintiffs' amended complaint, the result is not that the State of Indiana enjoys carte blanche to conduct its executions in secret. The opinions in *Richmond Newspapers*—which precede the majority decisions adopting the experience and logic framework—present two alternative pathways to evaluate whether there is any constitutional restriction on the government's authority to close a proceeding to all general public observers. The allegations in the Amended Complaint comfortably state a claim under both.

*First*, as Chief Justice Burger explained in his plurality opinion in *Richmond Newspapers*, certain "important but unarticulated rights have nonetheless been found to share constitutional protection in common with explicit guarantees" elsewhere in the constitution. 448 U.S. at 580. For instance, the "explicit, guaranteed rights to speak and to publish concerning what takes place at a trial would lose much meaning if access to observe the trial could . . . be foreclosed arbitrarily." *Id.* at 576–77. Here, public observers at executions are likewise necessary to "give meaning to those explicit guarantees" in the First Amendment, for freedom of speech and of the press; in the Fifth Amendment, for due process, *see, e.g.*, Am. Compl. at ¶¶ 188–89; and in the Eighth Amendment, against cruel and unusual punishment, *see, e.g.*, *id.* ¶ 190–93 because those rights would "lose much meaning if access to observe" execution proceedings could be withheld arbitrarily. Am. Compl. ¶ 200 (quoting *Richmond Newspapers*, 448 U.S. at 575–77 (plurality opinion)). Indeed, the explicit guarantees of the Eighth Amendment, which must be understood "in light of contemporary human knowledge," *see Robinson v. California*, 370 U.S. 660, 666 (1962); Am. Compl. ¶ 14, 184, may lose their meaning for future executions if there is no

constitutional protection for the public to gather such knowledge while executions are being carried out.

*Second*, as Justice Brennan explained in his concurring opinion in *Richmond Newspapers*, "the First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a structural role to play in securing and fostering our republican system of self-government." 448 U.S. at 587. Against that backdrop, Justice Brennan described a straightforward balancing test, under which an "assertion of the prerogative to gather information must accordingly be assayed by considering the information sought and the opposing interests invaded." *Id.* at 588. While "the case for a right of access has special force when drawn from an enduring and vital tradition of public entree to particular proceedings or information," that was a "helpful principle" guiding the analysis, not a necessary pre-requisite. *Id.* at 589. Here, Plaintiffs have alleged that public access to executions would serve the First Amendment's structural role "in securing and fostering our republican system of self-government" *id.* at 587, by fostering more accurate fact finding and providing the public with information necessary to exercise meaningful democratic oversight over executions and ensure that they are carried out in accordance with the constitution, Indiana law, and Indiana regulations. *See* Am. Compl. ¶¶ 14–27, 176–186. As alleged, Defendants are required to demonstrate opposing interests sufficient to overcome the qualified right of access.

In sum, while *Press-Enterprise II* supplies the appropriate framework for resolution of Count I, Defendants' restrictions on the right to observe and report on execution proceedings are nonetheless subject to constitutional scrutiny under either of the other two frameworks that could potentially apply. Because any one of these three analyses is sufficient to satisfy the plausibility standard applicable here, *see Bilek*, 8 F.4th at 586, Defendants' motion should be denied.

## II. Count II of Plaintiffs' Amended Complaint states a claim upon which relief can be granted.

Count II of Plaintiffs' Amended Complaint is an as-applied claim alleging that Defendants' enforcement of Section 6(a) and ISP 06-26 infringes Plaintiffs' First Amendment rights to gather and disseminate news and information about executions. *See generally* Am. Compl. ¶¶ 212–228, *see also id.*¶¶ 64–77.

Plaintiffs' primary theory for relief under Count II was not reached at the preliminary injunction stage of the case. As set forth below, the facts alleged in the Amended Complaint, taken as true, plausibly allege Indiana's enforcement of Section 6(a) and ISP 06-26 disadvantages or otherwise burdens the press from gathering news and reporting on executions in a more than incidental manner.

Separately, Plaintiffs also maintain (for the purposes of preserving the argument for any appeal) that Section 6(a) and ISP 06-26 are not generally applicable laws under closely analogous Supreme Court decisions in religious exercise cases.

### A. Plaintiffs have plausibly alleged that Section 6(a) and ISP 06-26 burden the press' ability to gather and disseminate news and information about executions in a manner that requires balancing against the purported government interest in causing that burden.

The Amended Complaint states a claim for relief under the controlling law set forth in cases such as *American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ("*ACLU v.* Alvarez") and *Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622 (1994). The plain text of ISP 06-26, the legislative history of Section 6(a), Indiana's actual practice in enforcing the statute and policy, and Defendants' statements at oral argument all support Plaintiffs' allegations that Section 6(a) and ISP 06-26 burden the ability of Defendants to gather news at and report on executions in a more than incidental manner.

The plain text of ISP 06-26 is probative, though not determinative, of whether Plaintiffs' right to gather and disseminate news and information are unconstitutionally burdened by the statute and regulation. Although Indiana protests that ISP 06-26 "in no way singles out press representatives," *see* Defs.' Br. 15–16, it does not deny that the press is the only group explicitly banned from the execution chamber in that policy, *see* Am. Compl. Ex. A at 3; *id.* ¶ 34. And while Indiana's argument that the press is treated like any other member of the general public was sufficient for the Seventh Circuit to determine that Section 6(a) was a generally applicable law, *see Associated Press v. Neal*, 177 F. 4th at 869, that does not necessarily end the constitutional inquiry. General applicability aside, Plaintiffs' Amended Complaint contains allegations sufficient to demonstrate that an intended effect of Indiana's enforcement of Section 6(a) and ISP 06-26 is to hamper news reporting about executions.

The legislative history of Section 6(a) is sparse but clear. In 1889, Indiana's General Assembly passed the forerunner to Section 6(a), which contained much of the framework still in place today:

> The following persons may be present at the execution, and none other: The Warden and such persons as may be necessary to assist him in conducting the execution, the Directors of the Prison, two physicians including the Prison Physician, the spiritual advisers of the condemned, the Chaplain of the Prison, and any of the relatives or friends of the condemned person, not to exceeding [sic] ten in number, whom he may request shall be admitted.

1889 Ind. Acts 193; *see* Am. Compl. ¶ 32. Plaintiffs allege, with contemporaneous support, that a purpose of this statute was "'to prevent the newspapers from sending representatives to describe the executions, and therefore no press representatives will be admitted.'" Am. Compl. ¶ 65 (quoting *A Day With Lawmakers*, Indianapolis J., Feb. 7, 1889, at 5)).

The manner in which Indiana has enforced Section 6(a) and ISP 06-26 during recent executions demonstrates its continued commitment to that goal. *See* generally *id.* ¶¶ 64–77.

Rather than provide space for the press within the Support Service building, or elsewhere indoors, during its midnight executions, *see* ISP 06-26 (providing that "identified representatives of the news media shall be permitted access to a designated area" during executions), Indiana chooses to confine the press to the parking lot of Indiana State Prison, *see* Am. Compl, ECF ¶ 78 ¶ 72. Rather than have Defendants or their designees answer questions about a completed execution—or make an in-person statement at all, *see* ISP 06-26 ("[a]fter the body has been removed from the facility, a representative of the facility or the Department of Correction shall make a statement to the news media")—Indiana chooses to provide only a written document providing the barest of information about what took place. *See* Am. Compl. ¶¶ 71. Neither challenged provision includes a counterbalancing requirement for Defendants to release any information gathered by anyone actually present in the execution chamber. *Id.* ¶ 70. There is every reason to believe that discovery will lead to evidence that that Defendants discourage such statements from being made. *See, e.g.*, *id.* ¶¶ 71–72. And to Plaintiffs' knowledge, Indiana's decisions to enforce Section 6(a) and ISP 06-26 in this manner have no concomitant basis in the administration of the prison or execution itself. *Id.* ¶ 73, 214–218.[6]

There are two separate but related reasons why this set of allegations requires Indiana to make a showing that it can meet enhanced constitutional scrutiny. *First*, the facts alleged by Plaintiffs support their claim that Indiana's enforcement of Section 6(a) and ISP 06-26 are intended to disadvantage Plaintiffs and their reporters from exercising their speech rights about executions precisely ***because*** they are members of the press. This is the "particular danger" the Supreme

---

[6] Beyond these allegations, Defendants' own statements at argument before the Seventh Circuit corroborate that their goal is to increase the burden on newsgathering and reporting on executions through its enforcement of ISP 06-26 and Section 6(a). *See, e.g.*, Am. Compl. ¶ 68 (quoting argument from opposing counsel that Plaintiffs are not permitted to "be their own primary source of the information" about executions in the state under Section 6(a) and ISP 06-26).

Court warned of in *Turner Broadcasting System*. 512 U.S. at 640 (discussing laws designed to single out the press); *see also Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue,* 460 U.S. 575, 585 (1983) ("[D]ifferential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional."). Laws that "seek[] not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate . . . rais[e] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Turner Broad. Sys.*, 512 U.S. at 641–42. This is true even of laws of general application. *Id.* at 640–41. In other words, Indiana is not correct that "constitutional muster" is met simply because Section 6(a) also applies to members of the public who are not members of the press. *See* Defs.' Br. 15. Because Plaintiffs have plausibly alleged that the purpose of Section 6(a) and ISP 06-26 is to disadvantage and specifically burden the ability of the press to report on executions, *see* Am. Compl. ¶¶ 32–34, 64–77, Count II states a claim upon which relief can be granted.

And *second*, the facts alleged by Plaintiffs support their claim that the restriction on newsgathering imposed by Indiana's enforcement of Section 6(a) and ISP 06-26 is so restrictive as to require constitutional analysis under *ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012). In that case, the Seventh Circuit held that restrictions on newsgathering are subject to constitutional scrutiny when they are so broadly drawn as to "sever[] the link between the . . . statute's means and its end." *Id.* at 606. Section 6(a) and ISP 06-26 fit comfortably within the category of law addressed by that decision, as they operate "at the front end of the speech process," by interfering with the right to gather information. *Id.* at 596–599. When a restriction implicates "expression commonly used for the preservation and dissemination of information and ideas," in a totalizing

manner, that statute "burdens speech and press rights and is subject to First Amendment scrutiny." *Id.* at 595, 600.

*Pell v. Procunier* does not override these later-decided cases. In *Pell*, the Supreme Court began its analysis by noting that the regulation in question "[was] not part of an attempt by the State to conceal the conditions in its prisons or to frustrate the press' investigation and reporting of these conditions." 417 U.S. 817, 830 (1974). That assessment alone distinguishes *Pell* from the Amended Complaint. The *Pell* Court also noted that, among other means of reporting, the press could correspond by mail with prisoners, *id.* at 824 — an option not open to reporters seeking to report on the experience of a recently-executed individual. Indeed, enforcement of Section 6(a) and ISP 06-26 results in a far greater restriction on reporting than the law at issue in *Pell*, given the discrete and infrequent nature of executions. Moreover, *Pell* was decided on a summary judgment record, which included facts about the penological interest in the contested regulations. *See id.* at 831–32 ("In practice, it was found that the [prior] policy . . . had resulted in press attention being concentrated on a relatively small number of inmates . . . [who then] often became the source of severe disciplinary problems."). Plaintiffs should be permitted to test Defendants' arguments on that fact question through discovery in this case. *See* Am. Compl. ¶ 73.

In short, Defendants are incorrect that *Pell* condones ***any*** limitation on the press so long as it is ***also*** a limitation on the general public. *See* Defs.' Br. 14. If that were true, Indiana could execute its prisoners in complete secrecy; there is no limiting principal between the theory of "constitutional muster" Indiana relies upon in its filing and a total blackout on public information about its executions. *See* Defs.' Br. 15. Today, Indiana has enacted a scheme wherein the only sources of information about an execution either (i) just watched their friend or family member die, (ii) just watched the execution of a person convicted of killing someone in their immediate

family, or (iii) performed the execution. *See* Defs.' Br. 13–14. Tomorrow, under the theory set forth in its motion, Indiana could just as easily decide that Defendants alone will be the sole source of information. Or it could decide that the public will receive no information at all. Any of these schemes would "limit[] any press access to that of the general public." *See id.* 14. But the First Amendment does not tolerate this level of abridgement of the freedom of speech, or of the press, without a fact-based demonstration by the government that such drastic measures are necessary in the first place.

### B. Plaintiffs have also alleged that Section 6(a) and ISP 06-26 are not generally applicable laws.

In the alternative, and for the purposes of preserving this issue for appeal, if necessary, the Seventh Circuit erred by failing to extend the definition of "general applicability" issued by the Supreme Court in *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021) and *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) to the Press Clause. Section 6(a) and ISP 06-26 are not generally applicable laws because they involve exceptions for groups that are not specially protected by the First Amendment, and because no asserted government interest justifies the regulation at issue. *See* Am Compl. ¶ 214–217. The Amended Complaint alleges that the potential interest identified by the Seventh Circuit cannot be substantiated by Defendants. Am. Compl. ¶¶ 183, 216–17. As such, Count II should not be dismissed because it alleges that Plaintiffs rights under the Press Clause have been infringed.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss the amended complaint.

Dated: September 21, 2026

Respectfully submitted,

*/s/ Kristopher L. Cundiff*
Kristopher L. Cundiff
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
PO Box 150
Fishers, IN 46038
Tel: (463) 271-4676
Fax: (202) 795-9310
kcundiff@rcfp.org

Lin Weeks, *admitted pro hac vice*
Elizabeth J. Soja, *admitted pro hac vice*
Allyson Veile, *admitted pro hac vice*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Tel: (202) 795-9300
Fax: (202) 795-9310
lweeks@rcfp.org
esoja@rcfp.org
aveile@rcfp.org

*Counsel for Plaintiffs*